# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**WINTU TRIBE OF NORTHERN CALIFORNIA**
PO Box 995
Shasta Lake, CA 96019

**PASKENTA BAND OF NOMLAKI INDIANS**
2655 Everett Freeeman Way
Corning, CA 96021

and

**SPEAK UP SHASTA ASSOCIATION**
PO Box 494760
Redding, CA 96049-4760,

                **Plaintiffs**,

       v.

**DEPARTMENT OF THE INTERIOR; BUREAU OF INDIAN AFFAIRS; SECRETARY OF THE DEPARTMENT OF THE INTERIOR; ASSISTANT SECRETARY OF THE INTERIOR FOR INDIAN AFFAIRS; REGIONAL DIRECTOR FOR THE BUREAU OF INDIAN AFFAIRS – PACIFIC REGION; NATIONAL MARINE FISHERIES SERVICE; DEPARTMENT OF COMMERCE; SECRETARY OF THE DEPARTMENT OF COMMERCE; and ACTING ASSISTANT ADMINISTRATOR OF FISHERIES OF THE DEPARTMENT OF COMMERCE,**

            Defendants.*

Case No.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

---

\* All officer Defendants are named in their official capacities only.  Due to the timing of filing, the names of the individuals holding these offices have not been included in these initial captions.  The appropriate individuals will be substituted by operation of law under Rule 25(d).

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

GLOSSARY OF ABBREVIATIONS AND DEFINED TERMS ...................................... v

INTRODUCTION .............................................................................................................. 1

PARTIES ............................................................................................................................ 7

   I.    Plaintiffs ................................................................................................................. 7

         A.  The Wintu Tribe of Northern California .................................................. 7

         B.  The Paskenta Band of Nomlaki Indians .................................................. 7

         C.  Speak Up Shasta Association .................................................................... 8

   II.   Defendants ............................................................................................................. 8

         A.  The BIA Defendants .................................................................................. 8

         B.  The NMFS Defendants .............................................................................. 9

JURISDICTION .............................................................................................................. 10

VENUE ............................................................................................................................ 10

GENERAL BACKGROUND .......................................................................................... 10

   I.    The Project and Project Area ............................................................................... 12

   II.   The Historical, Cultural, and Religious Significance of Strawberry Fields to the Wintu and Nomlaki Peoples ..................................................................................... 17

   III.  The Ecological Significance of Strawberry Fields and Abutting Areas of the Sacramento River ....................................................................................................... 20

   IV.  The Local Community Context of Strawberry Fields ......................................... 22

   V.   The Rancheria Engaged in Extensive Grading of the Site in Early July 2024 Without Attaining or Conducting the Permits and Surveys Required in the Record of Decision ... 24

   VI.  The Rancheria's Cavalier Disregard for Wintu Cultural Resources in July 2024 Is Not an Isolated Incident ..................................................................................... 30

   VII.  Plaintiffs Complied with All Procedural Requirements .................................... 31

         A.  Irreparable Harm and Arbitrary and Capricious Action ........................ 31

         B.  Exhaustion of Administrative Remedies ................................................ 32

CLAIMS FOR RELIEF .................................................................................................. 33

   I.    Violations of the IGRA, IRA, and APA (First and Second Claims for Relief) ................ 33

         A.  Statutory and Regulatory Framework of IGRA and IRA ...................... 33

              1.  IGRA, 25 U.S.C. §§ 2701 *et seq.* ......................................... 33

              2.  Part 292 Regulations—Gaming on Trust Lands Acquired After October 17, 1988 ........................................................................ 34

              3.  IRA, 25 U.S.C. §§ 5101 *et seq.* ........................................... 35

              4.  Part 151 Regulations—Trust Acquisitions by the Secretary ................. 35

         B.  Procedural History of the Rancheria's Application to Have the DOI Take Strawberry Fields into Trust ................................................................ 36

         C.  The DOI's Decision to Take Strawberry Fields into Trust .................... 38

1.  The AS-IA's Restored Lands Determination.........................................39

2.  The AS-IA's Trust Acquisition Determination......................................43

3.  The AS-IA's Fee-to-Trust Determination..............................................45

FIRST CLAIM FOR RELIEF ......................................................................................46

SECOND CLAIM FOR RELIEF .................................................................................46

II.  Violations of NHPA and APA (Third through Seventh Claims for Relief) ....................47

A. Statutory and Regulatory Framework of the National Historic Preservation Act .48

1.  Introduction: The Section 106 Process, "Historic Properties," and the "Area of Potential Effects" .......................................................48

2.  Initiation of the Section 106 Process and Required Consultation with Federally Recognized Indian Tribes ......................................................50

3.  Identification and Evaluation of Historic Properties ............................51

4.  Results of Identification and Evaluation ................................................53

B. Factual Background of Plaintiffs' NHPA Claims...................................................54

1.  Wintu Elder Norel-putis, Smithsonian Linguist Jeremiah Curtin, and the Location of the Six Wintu Villages Transecting Strawberry Fields .......54

2.  The Strawberry Fields Site Is Subject to Special Protections Under NHPA ......................................................................................................61

a.  The Eligibility of the Six Wintu Villages for Listing in the National Register of Historic Places ...............................................61

b.  The Eligibility of the Six Wintu Villages for Listing in the National Register as a District, Traditional Cultural Property, and/or Cultural Landscape ...........................................................61

c.  The Wintu and Nomlaki Listing of Strawberry Fields as a Sacred Site .............................................................................................62

d.  The Wintu and Nomlaki Nomination of Strawberry Fields for Listing on the National Register ....................................................63

3.  The Project's Harm to Wintu/Nomlaki Historic Properties and Examples of the BIA Defendants' NHPA Violations ..............................................63

C. The BIA Defendants Violated the National Historic Preservation Act in Numerous Ways...................................................................................................66

1.  The BIA Defendants' Identification and Evaluation Efforts of Historic Properties Without SHPO, Wintu, or PBNI Involvement .....................66

a.  The Rancheria's Consultant's (AES) Studies and Reports for the BIA Defendants ...........................................................................66

b.  AES's and the BIA Defendants' Knowledge of Dotta 1980 and Kardell & Dotta 1980.................................................................67

c.  AES's and the BIA Defendants' Early Knowledge, and Dismissal, of Wintu Concerns ........................................................................68

d.  The BIA Defendants' Identification and Evaluation Efforts Without the SHPO or the Tribes ...................................................70

i.  Limited Efforts Within the Strawberry Fields Site ............70

ii.  Limited Efforts Within Offsite Improvement Areas..........71

a) Erroneous Assertion of Prior Identification Efforts in the South Access Improvement Area..............72

b) Identification and Evaluation Efforts in the North Access Improvement Area................................74

2. The BIA Defendants' Purported Compliance with Section 106 Through the NEPA Documents ...................................................................76

   a. Scoping Report...........................................................................76

   b. The DEIS ................................................................................77

      i. The Strawberry Fields Site.................................................78

      ii. The North and South Access Improvement Areas.............79

      iii. Indirect Effects from Utility/Infrastructure Connections...80

   c. The Tribes' DEIS Comments...........................................................81

   d. Communications on Tribal Consultation .......................................84

      i. PBNI .................................................................................84

      ii. Wintu..................................................................................85

   e. The FEIS .................................................................................85

      i. The Strawberry Fields Site.................................................86

      ii. "Affected Environment" for the North and South Access Improvement Areas..........................................................87

      iii. Indirect Effects from Utility/Infrastructure Connections...89

      iv. The BIA Defendants' Limited Disclosure of SHPO Consultation Through the FEIS's Exhibit P .....................89

      v. The BIA Defendants' Contradictory APEs and Finding of "No Historic Properties Affected".....................................91

   f. The ROD .................................................................................91

THIRD CLAIM FOR RELIEF .........................................................................94

FOURTH CLAIM FOR RELIEF ....................................................................96

  A. Failure to Consult with the SHPO, Wintu, and PBNI to Determine the Scope of Identification Efforts ...............................................................96

  B. Failure to Consult with the SHPO or PBNI in Taking Steps to Identify Historic Properties ...................................................................................97

  C. Failure to Make Reasonable and Good Faith Efforts to Identify Historic Properties..97

  D. Failure to Evaluate the Historic Significance of Identified Historic Properties as Required by Law ...................................................................100

FIFTH CLAIM FOR RELIEF ......................................................................101

SIXTH CLAIM FOR RELIEF......................................................................102

SEVENTH CLAIM FOR RELIEF ................................................................102

III. Violations of the ESA, the MSA, and NEPA (Eighth Through Fourteenth Claims for Relief) ...................................................................................105

  A. Statutory and Regulatory Framework of the ESA, MSA, and NEPA .................105

   1. The ESA...................................................................................105

   2. The MSA...................................................................................108

      3.  NEPA ........................................................................................................110

EIGHTH CLAIM FOR RELIEF ......................................................................................112

    A.  The Listed Species and Critical Habitat...........................................................112

    B.  The Project and Potential Effects on Listed Species and Critical Habitat................114

    C.  The BIA Defendants Failed Their Section 7 Obligations in Assessing the Project's
        Effects on the Listed Species ....................................................................118

NINTH CLAIM FOR RELIEF.........................................................................................125

TENTH CLAIM FOR RELIEF ........................................................................................126

ELEVENTH CLAIM FOR RELIEF .................................................................................128

TWELFTH CLAIM FOR RELIEF...................................................................................132

THIRTEENTH CLAIM FOR RELIEF .............................................................................135

    A.  The FEIS Fails to Take a Hard Look at Project Effects on the Local Community ...135

        1.  The FEIS's Conclusion that Project Effects on Public Law Enforcement and
            Emergency Services Will Be Less than Significant Is Arbitrary and Capricious
            ....................................................................................................135

        2.  The BIA Defendants Failed to Take a Hard Look at Traffic Effects.............149

            a.  The BIA Defendants Failed to Address Factors Pertinent to Informed
               Decision-Making Regarding the Project's Traffic Impacts ............151

            b.  The BIA Defendants Failed to Take a Hard Look at Traffic
               Mitigation....................................................................................153

            c.  The BIA Defendants Failed to Take a Hard Look at Aesthetic and
               Noise Impacts of the Project ........................................................156

    B.  The BIA Defendants Failed to Adequately Disclose or Analyze Offsite Work Called
        for by the Project to Provide Patrons and Others Access to Planned Casino, Hotel,
        Retail, and Event Center and to Connect the Development to Public Utilities .........160

        1.  The BIA Defendants Failed to Take a Hard Look at Access to the Casino,
            Hotel, Retail, and Event Center Development by Patrons, Staff, and Others......
            ....................................................................................................162

        2.  The BIA Defendants Failed to Take a Hard Look at Providing Water and
            Wastewater Service to the Strawberry Fields Site .........................................170

        3.  The BIA Defendants Failed to Take a Hard Look at Providing Natural Gas
            Service to the Strawberry Fields Site .........................................................173

    C.  The FEIS Fails to Take a Hard Look at Project Effects on Cultural Resources ........174

    D.  The FEIS Fails to Take a Hard Look at Project Effects on Biological Resources ....175

FOURTEENTH CLAIM FOR RELIEF ............................................................................181

PRAYER FOR RELIEF ..................................................................................................182

## <u>GLOSSARY OF ABBREVIATIONS AND DEFINED TERMS</u>

ACHP – Advisory Council on Historic Preservation

AES – Analytical Environmental Services

ALAN – Artificial Light at Night

APE – Area of Potential Effects

BA/EFHA – Biological Assessment / Essential Fish Habitat Assessment

DEIS – Draft Environmental Impact Statement

FEIS – Final Environmental Impact Statement

I-5 – U.S. Interstate Highway 5

IGRA – Indian Gaming Regulatory Act

IRA – Indian Reorganization Act

MSA – Magnuson-Stevens Fisheries Management Act

NAIA – North Access Improvement Area

NEPA – National Environmental Policy Act

NHPA – National Historic Preservation Act

NRHP – National Register of Historic Places

PBNI – Paskenta Band of Nomlaki Indians

ROD – Record of Decision

SAIA – South Access Improvement Area

SHPO – State Historic Preservation Office

Plaintiffs the Wintu Tribe of Northern California ("Wintu" or the "Tribe"); the Paskenta Band of Nomlaki Indians ("PBNI" or "Nomlaki" or the "Band," and together with the Wintu, the "Tribes"); and Speak Up Shasta Association ("SUS" or the "Association") allege on information and belief based on investigation by counsel, except where based on personal knowledge and/or the administrative record, against Defendants the Bureau of Indian Affairs (the "BIA"); the Assistant Secretary, Indian Affairs, of the Department of the Interior ("AS-IA"); the Regional Director for the Bureau of Indian Affairs – Pacific Region ("Pacific Regional Director"); the Department of the Interior (the "DOI"); the Secretary of the DOI ("Secretary," and collectively with the BIA, AS-IA, Pacific Regional Director, and the DOI, the "BIA Defendants"); the National Marine Fisheries Service ("NMFS"); the Assistant Administrator for Fisheries of the Department of Commerce ("Assistant Administrator for Fisheries"); the Department of Commerce (the "DOC"); and the Secretary of the Department of Commerce ("Commerce Secretary," and collectively with the NMFS, the Assistant Administrator for Fisheries, and the Department of Commerce, the "NMFS Defendants," and collectively with the BIA Defendants, "Defendants") allege as follows:

## **INTRODUCTION**

1.     This case challenges an extraordinary collection of failures, errors, and omissions committed by the Defendants in their approval of an application by the Redding Rancheria (the "Rancheria") for the BIA Defendants to take 221.41 acres of land known as "Strawberry Fields" in Redding, California ("Strawberry Fields," the "Strawberry Fields Site," or the "Site) into federal trust status so the Rancheria can build and operate a massive casino, hotel, event center, and retail complex with related large-scale off-site construction for traffic and utility access to the Site (the "Project").[1]

---

[1] As used herein the "Project" refers to the construction and operation of the Rancheria's proposed casino resort complex within the 221.41-acre Strawberry Fields Site together with the off-site construction for traffic and utilities on adjacent lands to the north and south of the Site. These off-site traffic and utility construction areas, described further in paragraphs 54-58 below, are not being taken

2.      The Defendants' approval of the Project triggered a host of legal obligations and restrictions that Defendants repeatedly violated.

3.      First, as detailed in Plaintiffs' **First and Second Claims for Relief**, pursuant to the **Indian Gaming Regulatory Act ("IGRA") and the Indian Restoration Act ("IRA")** the Rancheria's operation of a highly lucrative casino since 1993 prohibits the BIA Defendants from approving the Rancheria's application for the Secretary's trust acquisition of Strawberry Fields for a more lucrative casino venture.

4.      Most glaringly, because the Rancheria had, for over 30 years, already realized the economic benefits from casino gaming under IGRA, the BIA Defendants were required by IGRA to invoke a "two-part determination" in deciding whether to grant the Rancheria's application to take Strawberry Fields into trust to build and operate a new casino there. This process would have required the BIA Defendants to, amongst other things, consult with local governments and nearby Indian tribes (including PBNI); in so doing, make a determination that establishment of a casino at the Strawberry Fields Site would not be "detrimental to the surrounding community"; and obtain the California Governor's concurrence in that determination.

5.      Instead, the BIA Defendants simply waived a requirement that necessitated this two-part determination (with its required consultations, concurrence, and accountability), and proceeded to approve the application based on factors that were demonstrably false. This includes the arbitrary and capricious conclusion that the Rancheria needed to build the massive new casino complex on a different parcel of property than its existing casino in order to generate economic revenues for the benefit of its roughly 300 members, when its current casino was already producing so much profit that, in 2017, each of its members was receiving annual per capita payments that were *in excess of the average household*

into trust by the Secretary for the Rancheria. Strawberry Fields and these off-site construction areas are collectively referred to herein as the "Project Area."

COMPLAINT

2

*income* in Shasta County along with tens of millions of dollars of other benefits and services provided by the Rancheria.

6.      Second, as detailed in Plaintiffs' **Third through Seventh Claims for Relief**, the decision to approve the Project triggered numerous obligations under the **National Historic Preservation Act and related regulations (the "NHPA")**, which the BIA Defendants again simply ignored.

7.      The Project Area is of significant historical, cultural, and religious significance to the Wintu and the Nomlaki.

8.       Bordered to the west by a large bend in the Sacramento River historically rich in salmon runs, the Project Area is the location of six "pre-contact" Wintu villages (the "Six Wintu Villages"), with which the Nomlaki had important economic and social relationships. It is also the location of the first massacre of Indigenous people in California by the U.S. government and one of the largest in American history, in which approximately 1,000 unarmed Wintu, and likely visiting Nomlaki, men, women, and children were, in the words of its participants, butchered and slaughtered by the forces of John Fremont.

9.      With two exceptions, the Project Area is currently undeveloped;[2] and the Project, if allowed to go forward, will place facilities, roads, and utilities directly on and abutting the Six Wintu Villages and the massacre site, while requiring extensive and deep excavation, grading, and ground moving work directly where the Wintu's (and likely the Nomlaki's) ancestors lived and were gunned down.

---

[2] Those two exceptions being (1) an area to the north of Strawberry Fields through which the Project calls for extensive road access and utility access work and on which the Rancheria previously built a hotel and (2) an approximately 2.5 acre area of Strawberry Fields that the Rancheria, just days after the trust decision, illegally graded and converted into a parking lot without first getting any of the required permits or conducting any of the required surveys.

10.     Accordingly, NHPA imposed on the BIA Defendants numerous obligations to identify and evaluate the Project's likely effects upon historic properties, with special consideration for tribes that attach cultural and religious significance to the affected area, namely, the Wintu and Nomlaki.

11.     As catalogued herein, the BIA Defendants have violated their NHPA obligations in multiple respects, including:

- failing to consult with PBNI and the Wintu as required by NHPA;

- ignoring NHPA's requirement that they consult with the California State Historic Preservation Officer ("SHPO"), PBNI and Wintu in efforts to identify and evaluate historic properties that could be affected by the Project;

- failing to abide by NHPA's requirement that they make reasonable, good faith efforts to identify and evaluate historic properties affected by the Project, including by:

    o   making no efforts to identify and evaluate the Six Wintu Villages and Strawberry Fields as part of a unique Wintu/Nomlaki district, traditional cultural property, and/or cultural landscape;

    o   claiming to make efforts to identify historic properties in areas that will be affected by the Project, such as access and infrastructural improvements that are necessary to accommodate such a massive casino complex, when in fact they made no such efforts; and

    o   conceding that they made no such efforts in the southern half of the "North Access Improvement Area" (the offsite area to the north of Strawberry Fields where the Project calls for extensive road work to be conducted in order to provide vehicle access to the Site);

- ignoring NHPA's requirement that they establish an "area of potential effects" ("APE") to evaluate the Project's potential effects upon historic properties in consultation with the SHPO and with transparency for the public to understand that process;

- establishing, inconsistent APEs for identifying historic properties affected by the Project without explaining the reasons for such inconsistencies;

- using a limited APE to secure the SHPO's concurrence with the BIA Defendants' finding of "no historic properties affected" for the Project by omitting from that APE areas immediately offsite of Strawberry Fields where the Project calls for significant infrastructure work necessary to provide vehicle access and utility connections to the Site, while, at the same time, announcing in the FEIS that the APE for the Project includes those offsite areas;

- ignoring NHPA's requirement that they apprise the Advisory Council on Historic Preservation ("ACHP") of the Project's adverse effects upon a known archaeological site associated with one of the Six Wintu Villages; and

- failing to consult with the SHPO, PBNI, or Wintu to develop and evaluate ways to avoid, minimize, or mitigate those adverse effects.

12.     Third, as detailed in Plaintiffs' **Eighth through Fourteenth Claims for Relief**, the Defendants committed numerous violations of the **Endangered Species Act ("ESA"), the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), and the National Environmental Policy Act ("NEPA")** in their environmental review of the Project.

13.     The Project calls for the construction of a casino with 1,300 electronic gaming devices and 36 gaming tables, a 120-foot tall hotel with 250 rooms (making it the tallest structure north of Sacramento in California), 130,000 square feet of retail space, a 10,080 square-foot conference center, and 2,250 parking spaces, including 600 surface spaces and 1,650 in a 580,000-square-foot parking structure, along with other various supporting facilities built on approximately 37 acres of impervious surfaces. The BIA Defendants have estimated that, when the Project is operational, the casino alone will generate between 4,000 and 5,000 daily vehicle-round trips on Fridays and Saturdays, with thousands more generated by the Project's retail and event center components each day.

14.     Strawberry Fields, where this massive development is slated to occur, is, as mentioned, bordered to the west by the Sacramento River, specifically a portion of the river that is very important critical and essential habitat for two evolutionarily significant units ("ESUs") of Chinook salmon—one listed as endangered and the other listed as threatened under the ESA—a distinct population segment ("DPS") of steelhead—which is listed as threatened under the ESA, and a DPS of green sturgeon—which is also listed as threatened under the ESA.

15.     The Project calls for extensive 24/7 lighting of the developments' facilities and grounds, much of which are within 150 feet of the river; and artificial light at night ("ALAN") is recognized in

the best available science as a potentially significant risk factor for salmonids, generally, and listed salmonids in this portion of the Sacramento River, specifically. Nonetheless, in neither the Biological Assessment and Essential Fish Habitat Assessment (the "BA/EFHA"), the NMFS Defendants' concurrence therein, the Final Environmental Impact Statement (the "FEIS"), nor any other environmental document prepared and circulated by Defendants is there *any* acknowledgement (let alone analysis) of potential impacts of Project produced ALAN on these endangered and listed salmonids. Indeed, these documents barely provide any information regarding even how much ALAN the Project will produce.

16.    This is but one among many failings in the environmental review of the Project under NEPA, the ESA, and the MSA. Further examples include, but are not limited to:

- Failing to provide any disclosure or analysis of basic obstacles that will need to be overcome in order to provide vehicle access and utility connections to Strawberry Fields, including that the Rancheria's plan for providing such vehicle access involves expansion of a narrow country road into a private property that neither it nor the BIA owns, controls, or has any other rights concerning and that its plan for providing utility connections will requiring extensive trenching and installation underground utility connections across the same private property;

- Failing to provide any acknowledgement or analysis of the fact that all of the traffic mitigation measures (based on which the FEIS claims such impacts will be reduced from significant to less than significant) will involve expansion of roads and intersections that neither the Rancheria nor the BIA Defendants have any ownership, control, or other rights, will require significant financial outlays by other governmental entities, will trigger other environmental review, and so may well never be achieved;

- Failing to provide any acknowledgement or analysis of the fact that the Intergovernmental Agreement that the Rancheria entered into with Shasta County to provide police, fire, and emergency services on Strawberry Fields is subject to legal challenge that could result in its invalidation or that, according to the County Fire Chief and Sherriff, the agreement does not provide adequate funding and so, if not invalidated, will likely result in unanalyzed public safety impacts on and off Strawberry Fields;

- Failing to adequately disclose or analyze how the Rancheria, itself, will provide police, fire, and emergency services on Strawberry Fields, if it chose that "option";

- Including several such "options" in the "approved alternative" described in the FEIS that was ultimately approved as the Project, but which should have been analyzed as distinct alternatives; and

- Failing to properly establish the Project's purpose and need, positing that the Rancheria needed this massive new casino resort to provide its members "economic development," without any analysis whether the Rancheria's members' economic needs were already well taken care of by the highly profitable casino that it has been operating for approximately three decades.

17.   As detailed herein, these are but some of the fatal flaws in the environmental review of the Project.

18.   Accordingly, Defendants, in their review and approval the Project, acted in a manner that was arbitrary and capricious in numerous ways.

19.   Based on each of these failures, Plaintiffs respectfully request that the Court vacate the BIA Defendants' decision to approve the Project, declare unlawful Defendants' challenged actions, enjoin Defendants from approving or authorizing any aspect of the Project, and remand the matter to the BIA Defendants for further review and compliance with procedures required by law.

## PARTIES

### I.   Plaintiffs

#### A.   The Wintu Tribe of Northern California

20.   Plaintiff the Wintu Tribe of Northern California is a state-recognized Indian tribe that is in the process of petitioning the United States for federal recognition. As set forth below, Strawberry Fields is the Indigenous territory of the Wintu and, to a lesser extent, the Nomlaki, and members of the Tribes have regularly visited Strawberry Fields, given the historical, cultural, and religious significance of Strawberry Fields to the Tribes as described below.

#### B.   The Paskenta Band of Nomlaki Indians

21.   Plaintiff the Paskenta Band of Nomlaki Indians is a federally recognized Indian tribe. The Band's territorial government and its gaming facility, Rolling Hills Casino, which operates pursuant to IGRA and provides the principal source of the Band's governmental revenue, are located in present day Corning, California. PBNI also owns trust land located in Cottonwood, California, which DOI took into trust for the benefit of the Band on March, 2024 ("PBNI's Trust Land").

C.     **Speak Up Shasta Association**

22.     Plaintiff Speak Up Shasta Association is a California unincorporated nonprofit association established in Redding, California. The association was formed and exists to advocate for responsible local land use decision-making that respects and protects the natural environments and communities of Shasta County. As part of its organizational mission, the association and its members are committed to protecting and preserving Strawberry Fields and the adjacent Sacramento River, and its individual members' continued enjoyment of the area's aesthetic, recreational, and spiritual value, from the harmful effects of the Project.

23.     Speak Up Shasta members include persons who live in the communities immediately adjacent to Strawberry Fields, relying on Bechelli Lane and Bonnyview Road to the north, and Smith Road to the south, for their daily commute to work, to get to and from their children's schools, to shop in Redding, to get to and from the doctor, to access Interstate 5 ("I-5") for longer journeys, among other things. The association's members use the Sacramento River, including the stretch that borders Strawberry fields to the west, for aquatic recreation such as fishing and boating, and intend to use it in the future. The Speak Up Shasta members who live outside the City of Redding's city limits rely on the Shasta County Sherriff's office for law enforcement needs, and the Shasta County Fire Department and City of Redding Fire Department for fire and emergency services; and its members who live in the City rely on the Shasta County Fire Department and City of Redding Fire Department for fire and emergency services.

II.     **Defendants**

A.     **The BIA Defendants**

24.     Defendant the Bureau of Indian Affairs (the "BIA") is a bureau of the Department of the Interior (the "DOI").

25.     Defendant Assistant Secretary of Indian Affairs ("AS-IA") is an officer in the DOI.

26.     Defendant Pacific Regional Director is an officer in the BIA and the DOI.

27.     Defendant the DOI is a department of the U.S. government.

28.     Defendant Secretary of the Department of the Interior ("Secretary") is the head of the DOI.

29.     As used herein, the "BIA Defendants" refers to the actions of any individual Defendant identified in the foregoing paragraphs 24-28 because, at all material times, (a) the BIA Defendants acted in concert or (b) the Pacific Regional Director acted as agent for Defendants AS-IA and Secretary, while AS-IA acted as agent for Defendant Secretary, and all of the foregoing individually-named officials have been and/or continue to be agents of the DOI and/or the BIA.

## B.    The NMFS Defendants

30.     Defendant the National Marine Fisheries Service ("NMFS") is an agency within the National Oceanic and Atmospheric Administration of the Department of Commerce ("DOC").

31.     Defendant Assistant Administrator for Fisheries of the Department of Commerce ("Assistant Administrator for Fisheries") is an officer in the DOC.

32.     Defendant the DOC is a department of the U.S. government.

33.     Defendant Secretary of the Department of Commerce ("Commerce Secretary") is the head of the DOC. As used herein, the "NMFS Defendants" refers to the actions of any individual Defendant identified in the foregoing paragraphs 30-32 and this paragraph because, at all material times, (a) the NMFS Defendants acted in concert or (b) Assistant Administrator for Fisheries acted as agent for Defendant Secretary of DOC while both of those officials have been and/or continue to be agents of the DOC and/or NMFS.

## JURISDICTION

34.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362. The matter in controversy arises under the laws of the United States and is brought by a federally recognized Indian tribe and others against federal agencies and federal agency officials in their official capacities.

## VENUE

35.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) because the U.S. Department of the Interior and other Defendants are located within the District and a substantial part of the events and omissions which gave rise to this action occurred in this District.

## GENERAL BACKGROUND

36.     On April 30, 2019, the Rancheria submitted an updated application to DOI for the United States Secretary of Interior to acquire over 200 acres of land located just south of Redding, California, in trust for gaming and other purposes pursuant to 25 C.F.R. Part 151 (the "Application").

37.     The Rancheria is a federally recognized tribe, having gained restored federal recognition in 1984 following settlement of a class action lawsuit.

38.     The Rancheria has, since 1993, operated a casino resort, the Win-River Resort and Casino, located in Redding, California, pursuant to IGRA on lands that the DOI previously took into trust for the benefit of the Rancheria.

39.     By its updated Application, the Rancheria sought to have Strawberry Fields taken into trust in order to build a new casino resort there, approximately 1.6 miles on a straight line or 3.7 miles by road from its Win-River Resort and Casino, with a proposal to close the latter before commencing gaming at Strawberry Fields.

40.     On July 1, 2024, then-AS-IA Bryan Newland ("Newland") issued a decision granting the Application (the "Decision") and taking Strawberry Fields, determined to comprise 221.41 acres of land, into trust for gaming and specifically for the Rancheria to proceed with the Project.

41.     The AS-IA issued the Decision pursuant to Section 5 of the IRA, 25 U.S.C. § 5108, and Section 20 of the IGRA, 25 U.S.C. § 2719(b)(1)(B)(iii).

42.     As stated in the Decision, it "constitutes a final agency action pursuant to 5 U.S.C. § 704."

43.     The Decision is endorsed by Defendant Secretary and the Secretary is responsible for executing it.

44.     The BIA Defendants' action of taking the Site into trust for the Rancheria to construct and operate the Project is a "major federal action" under NEPA, requiring Defendants to prepare and publish, amongst other things, a Scoping Report, a Draft Environmental Impact Statement ("DEIS" or "Draft EIS"), a Final Environment Impact Statement ("FEIS" or "Final EIS"), and a Record of Decision ("ROD," not to be confused with the "Decision" identified in Paragraph 40 above) (collectively the "NEPA Documents").

45.     The BIA Defendants' action of taking Strawberry Fields into trust for the Rancheria to construct and operate the Project is also an "undertaking," subject to the requirements of NHPA, 54 U.S.C. §§ 300101 *et. seq.* and related regulations, 36 C.F.R. Part 800 (collectively referred to herein as "NHPA").

46.     The BIA Defendants' action taking Strawberry Fields into trust for the Rancheria to construct and operate the Project also triggered their obligation under Section 7 of ESA and Section 305 of the MSA to assess, in consultation with NMFS, the Project's impacts on threatened and endangered fishes, Pacific salmon (whether or not threatened or endangered), and on those fishes' critical habitat designated under the ESA and essential fish habitat designated on the MSA.

47.    The BIA Defendants, through the Pacific Regional Office of the Bureau of Indian Affairs (the "BIA Pacific Regional Office"), published the Scoping Report in December, 2016; the DEIS in April, 2019; the FEIS in March, 2024; and the ROD in July, 2024.

**I.    The Project and Project Area**

48.    Strawberry Fields is located just outside the borders of the present-day City of Redding, California (the "City"), about two miles southeast of the City's center and between Interstate–5 to the east and the Sacramento River to the west. With the exception of approximately 2.5 acres of unpermitted and illegal grading that the Rancheria conducted immediately after the Decision, described in more detail below, Strawberry Fields is currently undeveloped.

49.    Illustration 1 shows the Strawberry Fields Site along with what the FEIS defines as "Potential Off-Site Access Improvement Areas." The "potential" modifier is misleading with regards to the portion of the latter that is to the north of Strawberry Fields, which is referred to as the "North Access Improvement Area" in the NEPA Documents. As discussed herein, the Project calls for extensive work to be conducted in that area in all cases.



Illustration 1

COMPLAINT

13

50.     Strawberry Fields is located approximately 46 miles from the PBNI's territorial government and gaming facility in present-day Corning, California.

51.     As set forth in detail below, due to the proximity of PBNI's territorial government and gaming facility to Strawberry Fields, PBNI provided detailed comments and information to the DOI related to the Application, both prior to and following Redding's submission of the Application.

52.     PBNI's Trust Land, located in Cottonwood, California, is 12 miles from Strawberry Fields.

53.     The Project includes: a 1,123,200 square-foot casino, with 1,300 electronic gaming devices and 36 gaming tables; a 250-room, 120-feet tall, hotel; 10,080 square-foot conference and event center; several restaurants and bars; 130,000 square feet of retail facilities; acres of 24 hour-lit parking; and other supporting facilities, including water, wastewater, storm water, and access road facilities; "Offsite Access Improvement Areas"; and offsite "Utility/Infrastructure Connections," which include underground pipelines or conduits for providing water, wastewater, natural gas, and electrical services.

54.     Strawberry Fields—which is hemmed in by the Sacramento River to the west and I-5 to the east—has no road access from the south, and road access from the north consists of a narrow two-lane road, Bechelli Lane, the right-of-way for which abuts a residential private property to the west and I-5's right of way to the east. The Offsite Access Improvement Areas involve major road and intersection changes and construction to allow traffic access to the Site from the North ("North Access Improvement Area" or "NAIA") and the South ("South Access Improvement Area" or "SAIA") on land that was not taken into trust as part of the Decision and which is neither owned and/or controlled by the BIA or the Rancheria, both described in more detail below.

55.     The offsite Utility/Infrastructure Connections, also described in more detail below, require grading, excavation, trenching, laying of pipe, and the placement of backfill material to construct

connections to the City's existing water, wastewater, electricity, and natural gas utilities, including on land that was not taken into trust as part of the Decision and which is neither owned and/or controlled by the BIA or the Rancheria.

56.    Illustration 2 shows the Strawberry Fields Site Plan with Off-site Access Improvement Areas.



Illustration 2

57.    Illustration 3 shows the offsite Utility/Infrastructure Connections for water and sewer

line construction, but not the natural gas pipeline described in paragraphs 784-89 below.



Illustration 3

58.     The Defendants' NEPA Documents do not depict on any map or figure the location of the natural gas pipeline or underground electricity transmission upgrades associated with the offsite Utility/Infrastructure Connections. Nor does any other publicly available document.

## II.     The Historical, Cultural, and Religious Significance of Strawberry Fields to the Wintu and Nomlaki Peoples

59.     Unequivocal historical and archeological evidence demonstrates that Strawberry Fields is the Indigenous territory of the Wintu and, to a lesser extent, the Nomlaki.

60.     The Wintu and Nomlaki Peoples are closely related by language, culture, and ancestral ties.

61.     The Project Area and lands immediately adjacent to it are the location of the above-referenced Six Wintu Villages, bordered by the Sacramento River to the west and Churn Creek to the east.

62.     Between 760 and 950 Wintu citizens resided within about 190 Wintu homes in these villages, relying upon the salmon runs in the Sacramento River for their subsistence.

63.     The Nomlaki, indigenous to lands south of Strawberry Fields, regularly migrated to the Site to take part in the salmon harvests and to engage in economic and related ceremonial activities with the Wintu.

64.     The Six Wintu Villages were in existence and occupied for thousands of years well until the middle of the nineteenth century when a genocidal campaign, coupled with intrusions from White settlers during the California Gold Rush, caused the Wintu People to disperse.

65.     Strawberry Fields is also the location of one of largest massacres of Indigenous people in American history and the first of its kind in California.

66.     This massacre, carried out by John Fremont and his forces on April 8, 1846, involved the outright slaughter of Native people, mostly women and children, who were there processing the fish catch.

67.     Fremont's contemporaneous diary entries between April 5 and April 8, 1846, recount the march of his troops along the Sacramento River from the south, and directly place the massacre within the boundaries of Strawberry Fields.

68.     Illustration 4 depicts Fremont's march and stopping points along the Sacramento River to Strawberry Fields between April 5 and April 8, 1846 in accordance with his diary entries:



Illustration 4

69.   According to one member of Fremont's party:

The Indians killed was [sic] somewhere between six and seven hundred. [B]y actual count I am speaking of those killed on land, as we could not count those killed in the river[,] but I have no doubt there was fully two or three hundred more. We camped there all night and ate up all their salmon.

70.   Kit Carson, who participated, wrote in his diary, "The number killed I cannot say. It was

a perfect butchery."

COMPLAINT

19

71.    Another eyewitness witness wrote, "I don't think that I could have assisted in the slaughter. It takes two to fight or quarrel but in that case there was but one side fighting and the other side trying to escape."

72.    It is likely that every family in the Six Wintu Villages transecting the Project Area and lands adjacent to it would have had some direct involvement with this historic massacre.

73.    Given the frequency of Nomlaki visits to the Site, particularly during the salmon runs, it is also likely that ancestors of the present-day PBNI perished in this massacre as well.

74.    The Strawberry Fields massacre was the first large-scale massacre of Indigenous Peoples in California, and viewed by perpetrators of the ensuing genocidal campaign against California's Indigenous inhabitants as a "model" for the endeavor.

75.    Because of their important historic, cultural and ceremonial relationship to the Site and the deaths suffered by their ancestors there, Strawberry Fields is of unique cultural and religious significance to the Wintu and Nomlaki.

### III.    The Ecological Significance of Strawberry Fields and Abutting Areas of the Sacramento River

76.    Strawberry Fields consists of over 220 acres of undeveloped land that abuts the largest river in California, the Sacramento River. The site is a mix of grassland, oak woodland and riparian habitat and is important to resident and migratory species of wildlife, and to area residents and passersby who enjoy the site's scenic beauty.

77.    As shown on Illustration 5 below, the Site is adjacent to approximately one linear mile of the Sacramento River, which makes up the entire western boundary of Strawberry Fields.



Illustration 5

78.     The Sacramento River is designated as critical habitat for four species of fish listed as either endangered or threatened under the ESA: winter-run Chinook, spring-run Chinook, steelhead, and green sturgeon ("green sturgeon," collectively with the winter-run Chinook, spring-run Chinook and steelhead, the "listed species").

79.     The reach of the Sacramento River in the immediate vicinity of Strawberry Fields supports a diverse aquatic community. Adult Chinook salmon and steelhead migrate upstream past the site, spawn and incubate eggs in the reach and upstream, fry and parr rear in the area, and juveniles migrate downstream past the site on their way to the ocean.

80.     In addition to the critical habitat in the mainstem of the Sacramento River that is adjacent to Strawberry Fields, approximately 2.15 acres of riverine habitat *in* Strawberry Fields, consisting of a backwater of the river and floodplain habitat, is also designated as critical habitat for the listed fish species.

81.     The habitat on and adjacent to Strawberry Fields is critically important to the survival and recovery of the listed species.

**IV.     <u>The Local Community Context of Strawberry Fields</u>**

82.     Strawberry Fields is bordered by rural residential communities to the south and immediate north of the site.

83.     To the immediate north of Strawberry Fields is the southern border of the City of Redding. Redding has a population of approximately 95,500 and is the seat of Shasta County. It is the largest urban area in Shasta County and surrounding counties and is the city in which residents from a broad geographic area shop, get medical services, bank, etc.

84.     As shown on Illustration 6 below, the Redding neighborhood to immediately north of Strawberry Fields is a small rural neighborhood of large lots abutting the river, while areas further north and to the east and west are a mix of single family residential neighborhoods and commercial development.



Illustration 6

85.    To the northeast across I-5, an already existing large retail development was recently expanded. A large complex containing a Costco Wholesale warehouse and other service and retail facilities was recently completed just northeast of the intersection of South Bonnyview Road and Bechelli Lane (shown on Illustration 6 above as under development). This intersection will be the entrance point for the Project's North Access, and is already burdened with heavy traffic.

86.    As shown on Illustration 7 below, to the south of Strawberry Fields—which is unincorporated Shasta County—is a rural residential neighborhood, with a significant single family residential neighborhood to the southeast.

Illustration 7

87.    Residents of nearby communities and areas more far afield rely on the road segments and

intersections in the vicinity of Strawberry Fields to get to and from work, to get their children's school,

to get to the doctor, and to do all the various things that require transportation by car in the greater

Redding area, which lacks any type of light rail or other similar public transportation

**V.    The Rancheria Engaged in Extensive Grading of the Site in Early July 2024 Without Attaining or Conducting the Permits and Surveys Required in the Record of Decision**

88.    Pursuant to the FEIS and ROD, and specifically the Mitigation Monitoring and

Enforcement Plan included in the ROD, the Rancheria was required to fulfill the following obligations

COMPLAINT

24

before it could begin earth-moving work in the Project Area:

a) Development by a qualified professional archaeologist of an Unanticipated Discoveries plan, in consultation with the Rancheria and BIA, that includes measures for the identification and assessment of finds made during construction and procedures to follow if human remains are discovered, and at a minimum, addresses documentation methods, analysis methods, sampling and testing parameters, and pre-identify storage location and repatriation procedures for discovered artifacts;

b) Compliance with the National Pollution Discharge Elimination System ("NPDES") General Construction Permit via application for coverage thereunder and preparation of a Stormwater Pollution Prevention Plan ("SWPPP") and implementation and maintenance of Best Management Practices ("BMPs") that are to be provided in the Stormwater Pollution Prevention Plan (listed below);

c) Training of construction contractors on potential damage of construction-related soil erosion during pre-construction meeting and distribution of copies of the Stormwater Pollution Prevention Plan at the pre-construction meeting;

d) Preconstruction surveys by a qualified biologist for bald eagle nests (must be done if ground disturbance occurs between Jan. 1 and Aug. 15);

e) Preconstruction surveys by a qualified biologist for western spadefoot toads;

f) Preconstruction surveys by a qualified biologist for foothill yellow-legged frog;

g) Preconstruction surveys by a qualified biologist for migratory bird nests (must be done if ground disturbance occurs between Feb. 15 and Sept. 15); and

h) Fencing of wetlands and jurisdictional water features.

89.    The FEIS and ROD require that the Project Stormwater Pollution Prevention Plan

include, without limitation, the following BMPs:

a) Existing vegetation shall be retained where practicable. To the extent feasible, grading activities shall be limited to the immediate area required for construction and remediation;

b) Temporary erosion control measures (such as silt fences, fiber rolls, vegetated swales, a velocity dissipation structure, staked straw bales, temporary re-vegetation, rock bag dams, erosion control blankets, and sediment traps) shall be employed for disturbed areas;

c) To the maximum extent feasible, no disturbed surfaces shall be left without erosion control measures in place;

d) Construction activities shall be scheduled to minimize land disturbance during peak runoff periods. Soil conservation practices shall be completed during the fall or late winter to reduce

erosion during spring runoff;

e) Creating construction zones and grading only one area or part of a construction zone at a time shall minimize exposed areas. If practicable during the wet season, grading on a particular zone shall be delayed until protective cover is restored on the previously graded zone;

f) Disturbed areas shall be re-vegetated following construction activities;

g) Construction area entrances and exits shall be stabilized with large-diameter rock;

h) Sediment shall be retained on site by a system of sediment basins, traps, or other appropriate measures;

i) A spill prevention and countermeasure plan shall be developed which identifies proper storage, collection, and disposal measures for potential pollutants (such as fuel, fertilizers, pesticides, etc.) used on site;

j) Petroleum products shall be stored, handled, used, and disposed of properly in accordance with provisions of the Clean Water Act;

k) Construction materials, including topsoil and chemicals, shall be stored, covered, and isolated to prevent runoff losses and contamination of surface and groundwater;

l) Fuel and vehicle maintenance areas shall be established away from all drainage courses and designed to control runoff;

m) Sanitary facilities shall be provided for construction workers;

n) Disposal facilities shall be provided for soil wastes, including excess asphalt during construction and demolition; and

o) Other potential BMPs include use of wheel wash or rumble strips and sweeping of paved surfaces to remove any and all tracked soil.

90.     In or around July of 2024, shortly after the BIA Defendants issued the ROD, the Rancheria brought heavy equipment to Strawberry Fields and conducted groundbreaking and grading work on an area of grassland approximately 2.5 acres in size, on 1.5 acres of which it installed a gravel parking lot, gravel driveway, and flagpole.

91.     Illustration 8, below, is an aerial image taken of the area of the Site on which the July 2024 earthmoving work prior to its occurrence. It shows undeveloped grass lands crossed by a few dirt tracks.

COMPLAINT



Illustration 8

92.     Illustration 9, below, is an aerial image taken in or around October 2024, after the July

2024 earthmoving work. It shows the significant ground disturbance that occurred in the area.



Illustration 9

93.    Illustration 10, below, is a photograph taken at or around the start of the July 2024

earthmoving work and shows some of the heavy equipment used for the work.

COMPLAINT



Illustration 10

94.    Neither the Rancheria nor the BIA Defendants fulfilled any of the planning, permitting, or surveying requirements outlined in the FEIS, the ROD, or the ROD's Mitigation Monitoring and Enforcement Plan before the July 2024 earthmoving work was conducted.

95.    The 2.5-acre area involved in the July 2024 earthmoving work is likely associated with the pre-contact Wintu village known an *Nosono,* described further below.

96.    Before the July 2024 earthmoving work, neither the Rancheria nor the BIA Defendants made any efforts to protect the integrity of *Nosono* or any associated cultural resources or graves of Wintu ancestors, including preparation of an Unanticipated Discoveries plan.

97.    Before the July 2024 earthmoving work, neither the Rancheria nor the BIA Defendants

applied for coverage under the NPDES General Construction Permit, prepared a Stormwater Pollution Prevention Plan, trained the construction workers involved in the work on potential damage of construction-related soil erosion during pre-construction meeting or distributed to them copies of the Stormwater Pollution Prevention Plan, and neither the Rancheria nor the BIA Defendants implemented or maintained, before or during the work, any BMPs that might have been contained in such a Stormwater Pollution Prevention Plan.

98.    Before the July 2024 earthmoving work, neither the Rancheria nor the BIA Defendants conducted any surveys for bald eagle nests, western spadefoot toads, yellow-legged frogs, or migratory bird nests.

99.    Before the July 2024 earthmoving work, neither the Rancheria nor the BIA Defendants fenced wetlands or jurisdictional water features.

100.    Rather, as soon as the ROD was issued, the Rancheria simply fired up heavy equipment and started clearing the ground.

101.    By conducting the July 2024 earthmoving work without first fulfilling the mitigation and monitoring obligations outlined in the ROD and FEIS, the Rancheria demonstrated its lack of intent to fulfill such obligations going forward.

## VI.    The Rancheria's Cavalier Disregard for Wintu Cultural Resources in July 2024 Is Not an Isolated Incident

102.    In 2000, the Rancheria knowingly disturbed the integrity of one of the Six Wintu Villages, with archaeological designation "CA-SHA-266," described in more detail below, by constructing a Hilton Garden Hotel and an adjacent parking lot with knowledge that CA-SHA-266 was eligible for listing the National Register of Historic Places and covered an area of approximately 126,800 square feet (or 2.9 acres) with multiple associated artifacts and burials. *See* Vaughan, *Archaeological Reconnaissance and Limited Test Excavation for the Proposed Hotel Site of the Redding Rancheria Economic Development Corporation* (APN-070-180-24) (March 2000) at 1-2; Analytical

Environmental Services, *Cultural Resources Report Offsite Access Improvements* (July, 2017) at 13.

103.    At that time, the Rancheria knew the importance of CA-SHA-266 to the Wintu and its association with others of the Six Wintu Villages.

104.    Notwithstanding that knowledge, the Rancheria proceeded to construct the Hilton Garden Hotel and related parking lot, and in that process, undermined the integrity of CA-SHA-266 and its relationship with others of the Six Wintu Villages.

105.    In April 2002, during excavation for the parking lot, the Rancheria "scooped out" human remains, consisting of four individuals:  the partial remains of an adult male, an older woman, an adolescent child, and a very young child.

106.    In July 2002, the Rancheria dug up small human bone fragments about 50 feet to the east of the burials referenced in the preceding paragraph, and found intact human remains in a dirt wall adjacent to a trench for a water pipeline.

107.    The Project requires the relocation of 28 parking spaces from the western end of the Hilton Garden Inn parking lot to a location further south.

108.    With respect to digging up and building over the 28 parking spaces, Analytical Environmental Services, the BIA Defendants' consultant (paid for by the Rancheria) tasked with evaluating the Project's impacts upon historic properties, observed that "disturbance has already impacted much of the site [CA-SHA-266] thereby greatly-reducing the potential for intact deposits."

## VII.   Plaintiffs Complied with All Procedural Requirements

### A.   Irreparable Harm and Arbitrary and Capricious Action

109.    At all times mentioned herein, the BIA Defendants have been able to deny the approvals and reject certification of the FEIS, the ROD, and the BA/EFHA for the Project. Notwithstanding such ability, the BIA Defendants have failed and continue to fail to perform their duty to deny and reject the Project. If the BIA Defendants are not ordered to withdraw their approval of the Project and the FEIS,

the Plaintiffs, as well as the land, cultural, historic, watershed, wildlife, community welfare, and environmental values subject to and affected by the Project, will suffer immediate, irreparable, and permanent damage.

110.    Plaintiffs bring this action on the ground that each Plaintiff and their members will suffer irreparable injuries if Defendants' actions herein are not set aside immediately. Such injuries include, but are not limited to, injuries to Plaintiffs' aesthetic, spiritual, cultural, scientific, recreational, social and educational interests caused by deterioration of cultural, historic, community and environmental resources, the Sacramento River, the Strawberry Fields landscape and the wildlife and listed species found therein, as well as impacts associated with construction, traffic and public safety impacts.

## B.     **Exhaustion of Administrative Remedies**

111.    Plaintiffs through their representatives and members have performed all conditions precedent to the filing of this Complaint by raising each and every issue known to them before the BIA in compliance with the IRA, IGRA, NHPA, NEPA, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), including by participating in the public meetings and hearings hosted by the BIA and submitting written comments.

112.    To the extent Plaintiffs have failed to do so, they were not required to exhaust their administrative remedies, as any attempt to do so would have been futile, because, amongst other things, Plaintiffs did not have adequate administrative remedies and/or because Plaintiffs lacked a full and fair opportunity to exhaust them.

## CLAIMS FOR RELIEF

I.    VIOLATIONS OF THE IGRA, IRA, AND APA (FIRST AND SECOND CLAIMS FOR RELIEF)

    A.    **Statutory and Regulatory Framework of IGRA and IRA**

        1.    **IGRA, 25 U.S.C. §§ 2701 *et seq.***

113.    Congress enacted IGRA in 1988 "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702.

114.    Pursuant to IGRA, a tribe may only conduct gaming activities on eligible "Indian lands," *id.* § 2710(b)(1), (d)(1), which includes "all lands within the limits of any Indian reservation" and "any lands title to which is ... held in trust by the United States for the benefit of any Indian tribe." *Id.* § 2703(4)(A–B).

115.    IGRA prohibits gaming "on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988," unless a statutory exception applies. *Id.* § 2719(a).

116.    The statutory exceptions relevant to this case are the "restored lands" exception, *id.* § 2719(b)(1)(B)(iii), and the "two-part determination" exception, *id.* § 2719(b)(1).

117.    The "restored lands" exception permits gaming on "lands ... taken into trust as part of ... the restoration of lands for an Indian tribe that is restored to Federal recognition." *Id.* § 2719(b)(1)(B)(iii); *see* 25 C.F.R. § 292.7.

118.    The "two-part determination" exception provides that "the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would (a) be in the best interests of the tribe and (b) not detrimental to the surrounding community, and the Governor concurs in that two-part determination." 25 U.S.C. § 2719(b)(1).

### 2.    Part 292 Regulations—Gaming on Trust Lands Acquired After October 17, 1988

119.    In 2008, the DOI, which administers IGRA, promulgated regulations at 25 C.F.R. § 292 to implement IGRA's exceptions to gaming on trust lands acquired after October 17, 1988.

120.    Part 292 sets out four criteria required for the restored lands exception to apply:

   a.    The tribe must have previously been federally recognized. 25 C.F.R. § 292.7(a).

   b.    The tribe must have "lost its government-to-government relationship," by "[l]egislative termination," "[c]onsistent historical written documentation from the Federal Government effectively stating it no longer recognized a government-to-government relationship with the tribe," or "[c]ongressional restoration legislation that recognize[d] the existence of the previous government-to-government relationship."  *Id.* §§ 292.7(b), 292.9.

   c.    The tribe must have been "restored to Federal recognition."  *Id.* § 292.7(c).

   d.    "The newly acquired lands [must] meet the criteria of 'restored lands' in § 292.11."  *Id.* § 292.7(d). The applicable criteria vary depending on the applicable method of restoration.

121.    If, as is the case of Rancheria, "the tribe was restored by a court-approved settlement agreement entered into by the United States, it must meet the requirements of § 292.12."  *See id.* § 292.11(a)(2).

122.    Part 292.12 requires that the tribe demonstrate:

   a.    That the land is "located within the State ... where the tribe is now located" and that it has a "modern connection[ ]" to the land. *Id.* § 292.12(c).

   b.    A significant historical connection to the land," *id.* § 292.12(b), meaning "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the existence

of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land," *id.* § 292.2.

c.  And finally, "a temporal connection between the date of the acquisition of the land" and the date when the tribe was federally restored. *Id.* § 292.12(c). This requires a showing that either (1) the land is part of the tribe's first request for newly acquired lands after its restoration, or (2) the tribe "submitted an application to take the land into trust within 25 years after the tribe was restored to Federal recognition and the tribe is not gaming on other lands." *Id.*

### 3.    IRA, 25 U.S.C. § 5101 *et seq.*

123.    Congress enacted the IRA in 1934 in a shift away from a policy of assimilation and toward one of tribal self-determination and self-governance.

124.    The IRA authorizes the Secretary of the Interior to "acquire ... any interest in lands ... including trust or otherwise restricted allotments ... for the purpose of providing land for Indians." 25 U.S.C. § 5108. Lands taken into trust under that provision may be designated as part of the tribe's reservation. *Id.* § 5110.

### 4.    Part 151 Regulations—Trust Acquisitions by the Secretary

125.    The Secretary has promulgated regulations governing land acquisitions under the IRA at 25 C.F.R. § 151.

126.    The AS-IA determined that the version of 15 C.F.R. Part 151 in effect prior to January 11, 2024 would apply to the Application.

127.    The Secretary's land acquisition policy is set forth at 25 C.F.R. § 151.3. Title 25 C.F.R. § 151.3(a) provides that the Secretary may acquire land for a Tribe in trust status when: (1) "the property is located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within the tribal consolidation area"; (2) "the tribe already owns an interest in the land"; or (3) "the Secretary determines

that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, Indian housing."

128.    Part 151 also provides how the Secretary will consider off-reservation acquisitions.

**B.    Procedural History of the Rancheria's Application to Have the DOI Take Strawberry Fields into Trust**

129.    In 2003, the Rancheria first submitted a trust application requesting the DOI to take a portion of Strawberry Fields, consisting of five parcels and 152 acres, into trust.

130.    In the following years, the Rancheria submitted multiple amendments to its 2003 application.

131.    In 2008, the Rancheria requested an opinion, known as an Indian Lands Opinion, from the DOI that the identified portion of Strawberry Fields would qualify as restored lands under the restored lands exception pursuant to the then newly promulgated regulations at 25 CFR Part 292, which implement the DOI's requirements for determining whether gaming may occur on trust lands pursuant to IGRA, 25 U.S.C. § 2719.

132.    In July 2010, the Rancheria amended its application to include an additional 3 parcels, totaling 80 acres, directly to the south of lands subject to the initial application, and that additional 80 acres was thereafter included as part of the Strawberry Fields Site.

133.    In December 2010, as part of its request for an Indian Lands Opinion, the Rancheria submitted a letter to the DOI stating that the Rancheria was willing to close its current Win-River Casino before opening a new casino at Strawberry Fields, and offered to memorialize that commitment in a memorandum of understanding.

134.    On December 22, 2010, the DOI issued the requested Indian Lands Opinion. It found the Rancheria is a restored tribe, but that Strawberry Fields would not qualify as restored lands if acquired in trust under 25 C.F.R. Part 292 (the "2010 Indian Lands Opinion").

135.    In the 2010 Indian Lands Opinion, the DOI determined that the Rancheria satisfied two of the three restored lands exception requirements of Section 291.12, namely, the in-state and modern connections test and significant historical connections to the Site, but failed to demonstrate the temporal connection requirement of Section 292.12(c) because the Rancheria was already conducting gaming on other lands (i.e., the Win-River Casino, which it had been operating since 1993).

136.    The Rancheria initiated litigation challenging the 2010 Indian Lands Opinion.

137.    Ultimately, on January 20, 2015, the United States Court of Appeals for the Ninth Circuit issued a decision remanding the matter to the DOI for consideration of the temporal connection issue, in light of the Rancheria's December 2010 offer to close its existing Win River gaming facility. *Redding Rancheria v. Jewell*, 776 F.3d 706 (9th Cir. 2015).

138.    Specifically, the Ninth Circuit instructed the DOI to evaluate whether the governing regulations require the Rancheria to not be gaming on other lands at the time of application or at the time of acquisition in trust.

139.    Thereafter, in 2016, the Rancheria persuaded the DOI to enter into a private memorandum of understanding (the "MOU") agreeing to process its trust application under the restored lands exception.

140.    In the MOU, the DOI represented that it would invoke the restored lands exception to take the subject land into trust if the Rancheria closed its existing Win River Casino before commencing gaming at Strawberry Fields.

141.    In or around 2016, PBNI obtained a copy of the MOU through a Freedom of Information Act request.

142.    Thereafter, from 2016 through 2019, in formal letter submissions and in meetings with Department staff, PBNI repeatedly objected to the MOU, and requested that the DOI reconsider the position it took in the MOU with respect to the restored lands exception.

143.    On April 30, 2019, the Rancheria submitted its updated trust Application pursuant to the restored lands exception.

144.    In May 2020, at the request of the Rancheria, the DOI stayed further consideration of the Application pending a decision by the California Supreme Court regarding the Governor's authority to concur with the Secretary of the Interior with respect to the two-part determination exception.

145.    In February 2020, counsel for the Rancheria submitted a letter to the DOI stating that "we have determined to await the decision of the California Supreme Court before we decide" whether to "consider amending [the] . . . [A]pplication to request a two-part determination".

146.    In August 2020, the California Supreme Court issued its decision, holding that the Governor has authority, under the California Constitution, to concur in two-part determinations. *United Auburn Indian Cmty. of Auburn Rancheria v. Newsom*, 10 Cal. 5th 538, 472 P.3d 1064 (2020).

147.    By letter to the Rancheria dated November 16, 2020, the DOI withdrew from the MOU on grounds that the MOU was legally erroneous.

148.    In its November 16, 2020, letter, the DOI reaffirmed its 2010 Indian Lands Opinion position that because the Rancheria had already taken lands into trust for gaming as part of its restoration (i.e., the location of the Win-River Casino), it cannot invoke the restored lands exception.

149.    The November 16, 2020, letter further states that the California Supreme Court's decision in *United Auburn Indian Cmty* cleared the way for the Rancheria to pursue an application under the two-part determination exception.

150.    Despite that, the Rancheria did not pursue an application pursuant to the two-part determination exception, but pursued its updated Application based on the restored lands exception.

**C.    The DOI's Decision to Take Strawberry Fields into Trust**

151.    Despite the DOI's prior position that the Rancheria could not invoke the restored lands exception, on July 1, 2024, the AS-IA issued the Decision granting the Application and stating: "I have

determined that the Strawberry Fields Site will be acquired in trust for the benefit of the [Rancheria] pursuant to Section 5 of the Indian Reorganization Act (IRA), 25 U.S.C. § 5108. Once acquired in trust the [Rancheria] may conduct gaming on the Site as restored lands for a restored tribe pursuant to Section 20 of the Indian Gaming Regulatory Act (IGRA), 25. U.S.C. § 2719(b)(1)(B)(iii)."

### 1.    The AS-IA's Restored Lands Determination

152.    In reaching that Decision, the AS-IA reaffirmed the DOI's prior determination, set forth in its 2010 Indian Lands Opinion, that the Rancheria qualifies as a restored tribe under 25 C.F.R. § 292.7.

153.    Pursuant to 25 C.F.R. § 292.11(c), the AS-IA went on to apply the factors of 25 C.F.R. § 292.12(a), (b) and (c) to determine whether Strawberry Fields meets the restored land requirements.

154.    Pursuant to the "In-State and Modern Connections" factor, 25 C.F.R. § 292.12(a), the Rancheria was required to demonstrate that Strawberry Fields is "located within the State or States where the tribe is now located, as evidenced by the tribe's government presence and tribal population" based on one or more of the "modern connections to the land" set forth in 25 C.F.R. § 292.12(a).

155.    The AS-IA found that the Rancheria's Application met two of the "modern connections" factors based on Strawberry Fields being within 1.6 straight-line miles, or 3.8 driving miles, from the Rancheria's existing trust lands.

156.    Specifically, the AS-IA found that the Application met 25 C.F.R. § 292.12(a)(1), because "[t]he land is within reasonable commuting distance of the tribe's existing reservation," and 25 C.F.R. § 292.12(a)(3), because "[t]he land is within a 25-mile radius of the tribe's headquarters or other tribal government facilities that have existed at that location for at least 2 years at the time of the application of land-into-trust."

157.    Next, pursuant to the "Significant Historical Connection" factor, 25 C.F.R. § 292.12(b), and 25 C.F.R. § 292.2, which defines the term "significant historical connection," the Rancheria was

required to demonstrate that Strawberry Fields is either "located within the boundaries of the tribe's last reservation under a ratified or unratified treaty" or "by historical documentation the existence of the tribe's villages, burial grounds, occupancy, or subsistence use in the vicinity of the land."

158.    The AS-IA found that the Rancheria's Application

> demonstrated significant connection to the lands by providing historical documentation of the existence of [the Rancheria's] villages, burial grounds, occupancy or subsistence use in the vicinity of the land. The record also indicates that the Redding Rancheria, which is the site of tribal residences and burial grounds from at least as early as 1922, is less than two miles from the subject parcels.

159.    The AS-IA made this determination despite the fact that the Administrative Record establishes that the Rancheria cannot meet the "Significant Historical Connection" factor. Namely, the Rancheria has shown no historic use of the Strawberry Fields site or the vicinity, and another tribe, the Wintu, is the actual Indigenous occupant of that land.

160.    Finally, pursuant to the "Temporal Connection" factor, 25 C.F.R. § 292.12(c), which requires a tribe to demonstrate "a temporal connection between the date of the acquisition of land and the date of the tribe's restoration," the Rancheria needed to demonstrate that either "(1) [t]he land is included in the tribe's first request for newly acquired lands since the tribe was restored to Federal recognition" or "(2) [t]he tribe submitted an application to take the land into trust within 25 years after the tribe was restored to Federal recognition and the tribe is not gaming on other lands."

161.    25 C.F.R. § 292.12(c)(1) is inapplicable as Strawberry Fields is not part of the Rancheria's first request for newly acquired lands after restoration.

162.    The AS-IA, therefore, focused on subpart (2) of the Temporal Connection factor, requiring that the tribe "is not gaming on other lands." 25 C.F.R. § 292.12(c)(2).

163.    In addressing whether the "is not gaming on other lands" requirement operates at the time of a tribe's trust application or some unknown future time, the AS-IA concluded it was the former and, as a result, the Rancheria could not meet the Temporal Connection requirement.

164.    The AS-IA did not address the requirement that the Rancheria was required to submit its trust application "within 25 years after the tribe was restored to Federal recognition," 25 C.F.R. § 292.12(c), despite the fact that, with respect to the additional 80 acres added to the Strawberry Fields Site, the Rancheria could not meet that requirement. (That deadline expired on June 11, 2009, and the Rancheria did not submit a request to take that parcel into trust until July 27, 2010.)

165.    Rather than denying the Application, as he should have, for failure to meet the Temporal Connection factor, the AS-IA, at the Rancheria's request, took the unprecedented step of purporting to waive the requirements of 25 C.F.R. § 292.12(c)(2), pursuant to 25 C.F.R. § 1.2.

166.    Title 25 C.F.R. § 1.2 provides that "the Secretary retains the power to waive or make exceptions to his regulations as found in chapter I of title 25 CFR in all cases where permitted by law and the Secretary finds that such waiver or exception is in the best interest of the Indians."

167.    The AS-IA purported to exercise this power of waiver, stating that it was delegated to him as Assistant Secretary impliedly under the DOI Manual, Part 209, Chapter 8.1A.

168.    In waiving 25 C.F.R. § 292.12(c)(2), the AS-IA stated, in part, "I believe it is in the best interest of Indians to have flexibility in the DOI's regulations, when allowed. Based on the fact that the new proposed parcel for gaming is simply replacing the existing casino, also located within [the Rancheria's] historic area, and waiving 292.12(c)(2) is in the best interest of Indians, I invoke my authority in 25 C.F.R. § 1.2 and waive 25 C.F.R. § 292.12(c)(2)."

169.    He then concluded that, with that waiver, the Rancheria met the restored lands exception requirements making Strawberry Fields eligible for gaming under IGRA.

170.    The AS-IA's Decision correctly determined that, absent a waiver, the Rancheria could not meet the Temporal Connection requirement because it was gaming on other lands (i.e., the Win-River Casino) at the time of its Application.

COMPLAINT

171.    The AS-IA improperly and without statutory or regulatory authority created a workaround to the Temporal Connection requirement.

172.    In fact, it is clear from the Administrative Record that the Rancheria has for decades benefited, and continues to benefit, from IGRA gaming and, therefore, does not need the benefit of the restored lands exception.

173.    As such, the AS-IA's unprecedented use of 25 C.F.R. § 1.2 to waive the Temporal Connection requirement of the restored lands exception is not "permitted by law" as 25 C.F.R. § 1.2 requires.

174.    For the Temporal Connection requirement goes to the heart of Congress's restored lands exception: that gaming benefits are "part of" a tribe's restoration (i.e., temporally connected to restoration), and this is echoed by the regulations' plain requirement that there be "a temporal connection between the date of the acquisition of land [here 2024] and the date of the tribe's restoration [in this case, 1984]"—the temporal gap is now forty years. Waiving that essential requirement is contrary to IGRA and, therefore, not "permitted by law."

175.    The AS-IA should have applied the only other available exception, the two-part determination exception, which would have required consultation with "appropriate State and local officials, including officials of other nearby Indian tribes" to determine whether the acquisition would "(a) be in the best interests of the tribe and (b) not detrimental to the surrounding community," and the Governor's concurrence in that two-part determination.  25 U.S.C. § 2719(b)(1).

176.    In other words, the loophole the AS-IA created and went through in order to make the Decision was not necessary in order for the Rancheria to potentially develop Strawberry Fields in its planned massive casino, hotel, event center, and retail complex. It was only necessary in order to foreclose input by local, State, and tribal governmental stakeholders in the decision, including State Governor review and approval.

177.    Further, by invoking 25 C.F.R. § 1.2 to waive the Temporal Connection requirement, for the benefit of the Rancheria, the AS-IA violated 25 U.S.C. § 5123(f) by enhancing the Rancheria's privileges relative to other Indian tribes.

178.    Section 5123(f), a provision of the IRA, provides, in pertinent part:

> Departments or agencies of the United States shall not . . . make any decision or determination pursuant to the [IRA] or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

179.    The AS-IA's waiver of the Temporal Connection requirement plainly violates Section 5123(f) by allowing the Rancheria, alone, to benefit from IGRA *twice*.

## 2.    The AS-IA's Trust Acquisition Determination

180.    Applying Section 5 of the IRA, and the regulations of 25 C.F.R. Part 151, the AS-IA determined that the Rancheria's Application "meets all of the regulatory requirements as well as the spirit and purpose of the underlying statutes and therefore the Strawberry Fields Site will be acquired into trust as restored lands for a restored Tribe."

181.    Specifically, the AS-IA determined that the Application met two of the requirements of the DOI's land acquisition policy, 25 C.F.R. §151.3, namely, that the Rancheria already owned an interest in Strawberry Fields, 25 C.F.R. §151.3(a)(2), and that "acquisition of [Strawberry Fields] is also necessary to facilitate Tribal self-determination and economic development," 25 C.F.R. §151.3(a)(3).

182.    In determining acquisition was "necessary to facilitate Tribal self-determination and economic development," the AS-IA reasoned:

> Today, [the Rancheria] owns 11 current Rancheria parcels comprising approximately 14.8 acres, 48 percent of the original Rancheria (8.51 acres of which are held in trust and 6.29 of which are held in fee by [the Rancheria]). Of these, 6.9 acres are fully developed with the Win-River Casino; 6.3 acres are fully developed with [the Rancheria's] administrative offices; 1.06 acres are developed with the [Rancheria's] Head Start facility; and 0.5 acres consist of a historic burial ground. [The Rancheria] is unable to purchase more of the original Rancheria, or lands contiguous to the existing reservation,

and seeks to use its limited Rancheria lands for governmental purposes and to meet growing needs of its citizens.

183.    The AS-IA ignored entirely that the Rancheria has been engaged in and benefitting from IGRA gaming for more than thirty years and, therefore, acquisition of Strawberry Fields in trust to allow a *new* sprawling casino complex is not "necessary" to facilitate the Rancheria's self-determination and economic development.

184.    The AS-IA then analyzed the off-reservation acquisition criteria, 25 C.F.R. § 151.11, which require consideration of 25 C.F.R. § 151.10(a) through (c), and (e) through (h).

185.    25 C.F.R. § 151.10(b) requires the Secretary consider "[t]he need of . . . the tribe for additional land." In applying that requirement, the AS-IA said that the Rancheria:

> needs additional trust land in order to help the Tribe restore adequate land base capable of supporting the governmental, economic, and housing needs of the Tribe and its growing population. In addition, allowing the Win-River Casino to move to a more prominent and accessible location will allow [the Rancheria] to diversify its gaming and non-gaming economic activities while also allowing conversation of the existing facility into Tribal governmental offices.

186.    Again, he ignored entirely the fact that the Rancheria has been engaged in and benefitting from IGRA gaming for more than thirty years and, therefore, does not "need" additional land.

187.    The AS-IA failed to address that the Rancheria has no economic need to engage in gaming at Strawberry Fields because it realizes generous governmental revenues and distributes lucrative per capita payments to its members by means of its existing Win River Casino.

188.     The AS-IA ignored an independent expert study, which was submitted to the DOI for its consideration of the Application, establishing that the Rancheria was estimated to have generated at least $15 million in tribal government revenues and at least $22 million in per capita distributions for tribal members, demonstrating the economic strength of the Rancheria as a result of its existing casino operations.

189.    He also ignored the lack of any evidence by the Rancheria regarding what tribal services are missing, how many housing units are needed, or how much land any of those uses would occupy.

190.    Nor did the AS-IA consider that, as of March 2019, the United States held just over 63 acres of land in trust for the Rancheria on lands that are just over 1,000 feet from its pre-existing trust lands. These pre-existing holdings, separate from Strawberry Fields, are a more than adequate land base for locating tribal governmental offices and housing.

191.    In short, the AS-IA failed to properly analyze the question of "need" and, instead, engaged in a conclusory analysis that ignored the Rancheria's actual financial status and land holdings. Title 25 C.F.R. § 151.10(h) requires the Secretary to consider "[t]he extent to which the applicant has provided information that allows the Secretary to comply with [the requirements of the NEPA]."  Based on an FEIS with respect to the Project, the AS-IA determined that the Project will have "less-than-significant impacts."  The AS-IA further determined that the DOI had complied with "both the letter and spirit of NEPA."  As discussed *infra* in the Thirteenth, Fourteenth, and Fifteenth Claims for Relief, the AS-IA substantially erred in this determination as the Decision was issued in violation of NEPA.

### 3.    The AS-IA's Fee-to-Trust Determination

192.    Despite the Application's shortcomings and the failure of the Rancheria to meet the requirements of the restored land exception, the AS-IA ultimately and erroneously concluded that the Application "meets all of the regulatory requirements as well as the spirit and purpose of the underlying statutes" and that, pursuant to Section 5 of the IRA, 25 U.S.C. § 5108, the DOI would immediately acquire Strawberry Fields in trust for the Rancheria.

193.    The AS-IA went on to state that, pursuant to Section 20 of IGRA, 25 U.S.C. § 2719(a)(1), and the Rancheria's approved gaming compact with the State of California, the Rancheria may conduct gaming at Strawberry Fields, despite IGRA's clear prohibition on gaming on lands acquired after October 17, 1988 and the lack of an applicable exception.

## FIRST CLAIM FOR RELIEF

**(Violations of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701, *et seq.* and the
Administrative Procedure Act, 5 U.S.C. §§ 701-706)
(Against the BIA Defendants)**

194.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

195.    The BIA Defendants' Decision is a final agency action which has harmed Plaintiffs, and which is reviewable by this Court pursuant to the APA, and for which Plaintiffs have no other adequate remedy in court other than review under the APA.

196.    The BIA Defendants' Decision is, among other things within the meaning of 5 U.S.C. § 706(2), arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law (including, without limitation, IGRA and corresponding regulations); in excess of the DOI's jurisdiction and authority; without observance of required procedure under the same authorities; unsupported by substantial evidence; and unwarranted by the facts.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

**(Violations of the Indian Reorganization Act, 25 U.S.C. § 5101 *et seq.* and the Administrative
Procedure Act, 5 U.S.C. §§ 701-706)
(Against the BIA Defendants)**

197.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

198.    The BIA Defendants' Decision is a final agency action which has harmed Plaintiff, and which is reviewable by this Court pursuant to the APA, 5 U.S.C. §§ 701-706, and for which Plaintiffs have no other adequate remedy in court other than review under the APA.

199.    The BIA Defendants' Decision is, among other things within the meaning of 5 U.S.C. § 706(2), arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law (including, without limitation, IRA and corresponding regulations); in excess of the DOI's jurisdiction

and authority; without observance of required procedure under the same authorities; unsupported by substantial evidence; and unwarranted by the facts.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## II. VIOLATIONS OF NHPA AND APA (THIRD THROUGH SEVENTH CLAIMS FOR RELIEF)

200.    If there were ever a model case for agency action taken without observance of procedure required by law under NHPA, this would be the one.

201.    As touched upon in the Introduction, the BIA Defendants here have unabashedly violated virtually every procedural requirement of Section 106 of NHPA. Thus, the BIA Defendants flagrantly issued the Decision without observance of procedure required by law.

202.    It is a long story to tell, but the details, spanning eight years, reveal cavalier neglect of the most fundamental requirements of NHPA, intractable contradictions in the Defendants' narrative, and, in some instances, flat out misrepresentations—all flaunting the BIA Defendants' legal responsibilities to the Tribes, to the SHPO, and to the public.

203.    The BIA Defendants' illegal conduct places in harm's way the integrity of one of the last remaining intact Indigenous cultural landscapes in northern California, one that holds the unique, millennia-old story of the Wintu and Nomlaki Peoples: their historic connection to the Sacramento River and surrounding natural environment from which they derived their physical, spiritual, and cultural sustenance and their near annihilation from the first "Indian massacre" (of many) in California: that carried out by John Fremont and his forces in 1846.

204.    If the BIA Defendants proceed with their Decision without complying with the requirements of NHPA, the Project will irreparably harm the integrity of Strawberry Fields and the Six Wintu Villages as part of a Wintu/Nomlaki district, traditional cultural property, and/or cultural landscape, including the integrity of location, setting, feeling, or association.

205.    If the BIA Defendants proceed with their Decision without complying with the requirements of NHPA, the Project will irreparably harm the status of Strawberry Fields as a Sacred Site and the ability of the Tribes to list Strawberry Fields in the National Register of Historic Places.

A.    **Statutory and Regulatory Framework of the National Historic Preservation Act**

1.    **Introduction: The Section 106 Process, "Historic Properties," and the "Area of Potential Effects"**

206.    Pursuant to section 106 of NHPA, "prior to" to the Decision to take Strawberry Fields into trust for the Rancheria to develop its casino resort Project, the BIA Defendants were required "take into account the effect" of the Project "on any historic property," 54 U.S.C. § 306108. This is known as the "Section 106 Process," referencing Section 106 of the Act, codified at 54 U.S.C. § 306108.

207.    NHPA established the ACHP which is responsible for promulgating regulations for implementing the act and for participating in certain processes to protect historic properties.

208.    The Section 106 Process is designed to be a cooperative effort between federal agencies, states, local governments, Indian tribes, and interested organizations, 54 U.S.C. § 300101, and requires federal agencies to affirmatively "seek and consider" the views of the public, 36 C.F.R. § 800.3(d)(1).

209.    The BIA Defendants were required to complete the Section 106 Process and related documentation separate and apart from the NEPA process and documentation unless, in advance of commencing the Section 106 Process, they notified the SHPO and the ACHP that they would comply with the Section 106 Process and documentation requirements by means of the NEPA Documents and process. 36 C.F.R. § 800.8(c).

210.    Pursuant to the Section 106 Process, the BIA Defendants were required to make reasonable and good faith efforts to identify and evaluate the Project's likely effects upon "historic properties" within an APE in consultation with the SHPO, federally recognized Indian tribes that might attach cultural and religious significance to such historic properties, and to involve organizations likely to have knowledge or concerns with historic properties in the APE.

211.    The APE is the area in which historic properties must be identified, evaluated, and protected from adverse effects.

212.    NHPA defines the APE as the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist."  36 C.F.R. § 800.16(d).

213.    Pursuant to NHPA, "historic property" means, in pertinent part, "any prehistoric or historic district [or] site . . . included in, or eligible for inclusion in, the National Register of Historic Places," and "includes artifacts, records, and remains that are related to and located within such properties."  *Id.* § 800.16(l)(2).

214.    A "district" is "a geographically definable area . . . possessing a significant concentration, linkage, or continuity of sites, buildings, structures, or objects united by past events or aesthetically by plan or physical development. A district may also comprise individual elements separated geographically but linked by association or history."  *Id.* § 60.3(d).

215.    A "site" is "the location of a significant event, a prehistoric or historic occupation or activity, or a building or structure, whether standing, ruined, or vanished, where the location itself maintains historical or archeological value regardless of the value of any existing structure."  *Id.* § 60.3(l).

216.    Pursuant to NHPA, the criteria for inclusion in the National Register of Historic Places (the "National Register" or "NRHP") are, in pertinent part, as follows:

> The quality of significance in American history, architecture, archaeology, and culture is present in districts, sites, buildings, structures, and objects of state and local importance that poses integrity of location, design, setting, materials, workmanship, feeling, association, and A. That are associated with events that have made a significant contribution to the broad patterns of our history ("Criterion A"); B. That are associated with the lives of persons significant in our past ("Criterion B"); . . . or D. That have yielded, or may be likely to yield, information important to prehistory or history ("Criterion D").

*Id.* § 60.4.

217.    Pursuant to NHPA, an undertaking will have an "effect" upon a historic property if it "alter[s] . . . the characteristics of a historic property qualifying it for inclusion in or eligibility for the National Register."  *Id.* § 800.16(i).

218.    NHPA specifically provides that "[p]roperty of traditional religious and cultural importance to an Indian tribe . . . may be determined to be eligible for inclusion on the National Register."  54 U.S.C. § 302706(a).

219.    A "traditional cultural property" ("TCP") is a historic property "that is eligible for inclusion in the National Register because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." U.S. DEP'T OF THE INTERIOR, NATIONAL PARK SERVICE, NATIONAL REGISTER BULLETIN 38: GUIDELINES FOR EVALUATING AND DOCUMENTING TRADITIONAL CULTURAL PROPERTIES at 1 (1998). TCPs may include cultural landscapes.

### 2.    Initiation of the Section 106 Process and Required Consultation with Federally Recognized Indian Tribes

220.    NHPA gives Indian tribes—defined as tribes that are federally recognized, *see* 36 C.F.R. § 800.16(m)—a special role in the Section 106 Process.

221.    The BIA Defendants were required to "consult with any Indian tribe . . . that attaches religious and cultural significance" to a property. 54 U.S.C. § 302706(b).

222.    An Indian tribe "that might attach religious and cultural significance to historic properties in the area of potential effects" and "requests in writing to be a consulting party shall be one."  36 C.F.R. § 800.3(f)(2).

223.    "Consultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." *Id.* § 800.16(f).

224.    The BIA Defendants' obligations to include Indian tribes in the Section 106 Process is marked by the special trust relationship that the federal government owes to Indian tribes and the unique government-to-government relationship between the United States and Indian tribes.

225.    The BIA Defendants' respect for these special relationships is expressly mandated by the regulations. *See id.* §§ 800.2(c)(2)(ii)(B) (recognizing that the trust relationship must inform this consultation mandate and that consultation must, therefore, be "conducted in a sensitive manner"), 800.2(c)(2)(ii)(C) (restating the attendant "government-to-government relationship between the Federal Government and Indian tribes," which must be observed "in a manner sensitive to the concerns and needs of the Indian tribe").

### 3.    Identification and Evaluation of Historic Properties

226.    As part of the Section 106 Process, the BIA Defendants were further required, amongst other things, to:

- "[d]etermine and document the area of potential effects," as defined in paragraph 212 , above, "in consultation with the SHPO,"

- "[s]eek information, as appropriate, from consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties," and

- make a good faith effort to identify Indian tribes "that might attach religious and cultural significance to historic properties in the area of potential effects" and "[g]ather information" from such tribes "to assist in identifying properties, . . . which may be of religious and cultural significance to them and may be eligible for the National Register."

36 C.F.R. § 800.4(a).[3]

_____

[3] The regulations provide that the BIA Defendants must "recogniz[e] that an Indian tribe . . . may be reluctant to divulge specific information regarding the location, nature, and activities associated with

227.    Next, "[b]ased on the information gathered under [36 C.F.R. § 800.4(a)], and in consultation with the SHPO . . . and any Indian tribe . . . that might attach religious and cultural significance to properties within the area of potential effects," the BIA Defendants were required to "take the steps necessary to identify historic properties within the area of potential effects." *Id.* § 800.4(b).

228.    The "level of effort" imposed on the BIA Defendants to identify historic properties in the APE requires "a reasonable and good faith effort to carry out appropriate identification efforts," taking account of "the magnitude and nature of the undertaking . . . , the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the [APE]." *Id.* § 800.4(b)(1).

229.    The BIA Defendants were then required, "[i]n consultation with the SHPO . . . and any Indian tribe . . . that attaches religious and cultural significance to identified properties" to apply the National Register criteria (36 CFR part 63) [quoted above] to properties identified within the [APE] that have not been previously evaluated for National Register eligibility." *Id.* § 800.4(c)(1).

230.    In this process, the BIA Defendants were required to "acknowledge that Indian tribes . . . possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them." *Id.* § 800.4(c)(1).

231.    Further, if, after applying the National Register eligibility criteria, the BIA Defendants decided that a property does not meet those criteria, "an Indian tribe . . . that attaches religious and cultural significance to a property [and] . . . does not agree . . . may ask the Council to request the agency official to obtain a determination of eligibility" from the Secretary of Interior. *Id.* § 800.4(c)(2).

---

such sites [and] should [therefore] address concerns raised about confidentiality pursuant [other sections of the regulations]." 36 C.F.R. § 800.4(a)(4).

232.    The BIA Defendants may not defer efforts to identify and evaluate historic properties unless such deferral "is specifically provided for in a memorandum of agreement" or a "programmatic agreement" entered into with the SHPO and, if appropriate, consulting Indian tribes. 36 C.F.R. § 800.4(b)(2).

### 4.    Results of Identification and Evaluation

233.    If the BIA Defendants make a finding of "*no historic properties affected*," either because "there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them," the BIA Defendants "shall provide documentation of this finding, as set forth in § 800.11(d), to the SHPO."   36 C.F.R. § 800.4(d)(1). The BIA Defendants must then "notify all consulting parties, including Indian tribes . . . and make the documentation available for public inspection prior to approving the undertaking." *Id.*

234.    That documentation must include: "(1) A description of the undertaking, specifying the Federal involvement, and its area of potential effects, including photographs, maps, drawings, as necessary; (2) A description of the steps taken to identify historic properties, including, as appropriate, efforts to seek information pursuant to § 800.4(b) [quoted in paragraph 96, above]; and (3) The basis for determining that no historic properties are present or affected." *Id.* § 800.11(d).

235.    If the BIA Defendants find that "there are *historic properties which may be affected* by the undertaking, the[y] shall notify all consulting parties, including Indian tribes . . . , invite their views on the effects and assess adverse effects." *Id.* § 800.4(d)(2) (emphasis added).

236.    In that instance, section 800.5 requires the BIA Defendants to assess and resolve any adverse effect to historic properties within the APE "in consultation with the SHPO . . . and any Indian tribe . . . that attaches religious and cultural significance to identified historic properties," and "consider any views concerning such effects which have been provided by consulting parties and the public." *Id.* §800.5(a).

237.    Whether finding "*no historic properties affected*" or finding "*adverse effect*" on historic properties, the BIA Defendants' documentation for such finding must be sufficient "to enable any reviewing parties to understand the basis for it."  *Id.* § 800.11(a) (emphasis added).

238.    If the undertaking involves an adverse effect to a historic property, the BIA Defendants must "consult further" with the SHPO and required consulting Indian tribes "to resolve the adverse effect."  *Id.* §§ 800.5(d)(2), 800.6.

**B.    Factual Background of Plaintiffs' NHPA Claims**

239.    As summarized above, unequivocal historical and archeological evidence demonstrates that Strawberry Fields is the Indigenous territory of the Wintu and, to a lesser extent, the Nomlaki. The Site and its immediate environs are the location of the Six Wintu Villages and the Fremont massacre, and it is of unique cultural and religious significance to the Wintu and Nomlaki.

240.    This historical and archaeological evidence was, moreover, known to the BIA Defendants in connection with the Section 106 process, and was simply ignored or, in some cases, affirmatively withheld from the SHPO.

**1.    Wintu Elder Norel-putis, Smithsonian Linguist Jeremiah Curtin, and the Location of the Six Wintu Villages Transecting Strawberry Fields**

241.    Between 1884 and 1889, Jeremiah Curtin, the most well-respected American linguist and ethnographer of his time, worked closely with renowned Wintu elder, Norel-putis, who had lived through the Fremont massacre, to visit, study, and document the location of Wintu villages along the Sacramento River and its tributaries.

242.    Curtin was fluent in 70 languages, exceptionally well-traveled for his time, and a prolific author of books and articles on the creation stories and folklore of Indigenous Peoples, from the Wintu of northern California to the Buryats of Siberia, and absent Curtin's work with Norel-putis, there would be no historical record of the Wintu Peoples' occupation of vast areas of the Sacramento River watershed, including Strawberry Fields.

243.    Curtin wrote that Norel-putis was "the most remarkable person" he had ever met.

244.    A village chief, singer, dancer, and keeper of Wintu oral history, Norel-putis was widely known and respected as one of the most influential Wintu leaders of his time.

245.    Working under the auspices of the Smithsonian Institute, Curtin documented Norel-putis's identification of the locations and names of 239 Wintu Villages, together with the names of Wintu leaders associated with each village and the number of houses in each.

246.    In so doing, Curtin described each of the Six Wintu Villages running from the north, just above Strawberry Fields, through Strawberry Fields, and to south of Strawberry Fields as follows:

#9 *Yonotŭmnomsono* "[B]uckeye west nose place," "30 houses," "East bank of Sacramento R.," "Chief Qämamtopi = wing of Komaskulit (an extinct bird)";

#8 *Kĕ'nkodi* "foot of the hill," "35 houses," "East bank of Sacramento R. above *Nosono*," "Chief Päthiwi = drives out";

#7 *Nosono* "South nose," "40 houses," "East bank of Sacramento R. a short distance above  Kentiqĕ'ril,"  "Chief Kälalwita";

#6 *Kentiqĕ'ril* "down under village," "25 houses,"  "East bank of Sacramento R. above the mouth of Clear Cr., chief or headman Teänaldoli = light colored roll of hair";

#5 *Tcakkópûs* "young live oak to cut," "10 houses," "East bank of the Sacramento R. above the mouth of Clear Cr," Chief Ni'hluï'lis = shouting to someone";

#4 *Nomdaltopi* "point to the west," "50 houses," "Opposite the mouth of Clear Cr. (Nomwakûtolwenem = up the creek west) Chief: Sáka = bad man who killed Indians by night and day, both Wintu and Nosa. This chief had a son the tallest man on the Sacramento R., his name was Puiwani = going east."

247.    Working from Curtin's contemporaneous notes and drawings, anthropologist, James Dotta, mapped the locations of these 239 Wintu Villages along the Sacramento River and its tributaries, including the Six Wintu Villages.

248.    Dotta published his maps of the 239 Wintu Villages in two separate volumes: (a) Dotta, James, "Some Elements of Wintu Social Organization as Suggested By Curtin's 1884-1889 Notes," in *Papers on Wintu Ethnography: 239 Wintu Villages in Shasta County, Circa 1850*, OCCASIONAL PAPERS

OF THE REDDING MUSEUM, NUMBER 1, December, 1980, Redding, CA. ("Dotta 1980") and (b) with

anthropologist, Margaret Guilford-Kardell, in Kardell, Margaret Guilford, with Dotta, James, "Some

Pre-Contact Shasta County Wintu Site Locations: A Correlation of Previously Unpublished Notes of

Jeremiah Curtin and J.P. Harrington with Later Published, Recorded, and Unrecorded Data on the

Dawpom, Weneman, Puidalpom, and Waimuk Areas of Wintu Population," in *Papers on Wintu*

*Ethnography: 239 Wintu Villages in Shasta County, Circa 1850*, OCCASIONAL PAPERS OF THE REDDING

MUSEUM, NUMBER 1, December, 1980, Redding, CA. ("Kardell & Dotta 1980").

 249. Kardell & Dotta 1980 describe Curtin and Norel-putis, their relationship, and their

significant association with Wintu aboriginal lands, including the Six Wintu Villages, as set forth above.

 250. Illustration 11 is the map from Dotta 1980, showing the 239 Wintu villages documented

by Curtin and Norel-putis, with circles depicting the relative populations of each village, and an insert of

the Six Wintu Villages in larger scale.



**Dotta 1980**

Illustration 11

251.    Illustration 12 is the map from Kardell & Dotta 1980 showing the 239 Wintu villages documented by Curtin and Norel-putis, with circles representing villages identified on the ground by means of archaeological surveys and triangles representing villages not yet identified on the ground by means of archaeological surveys, and an insert of the Six Wintu Villages in larger scale.



**Kardell & Dotta 1980**

Illustration 12

252.    In each map, the Six Wintu Villages, running from north to south through Strawberry Fields are labelled #9, #8, #7, #6, #5, and #4.

253.    Illustration 11 shows the location of the Six Wintu Villages in the Dotta 1980 map in relation to the Strawberry Fields Site.



Illustration 11

254.    Illustration 12 shows the location of the Six Wintu Villages in the Kardell & Dotta 1980

map in relation to the Strawberry Fields Site.



Illustration 12

255.     *Nosono* (Curtin's Village #7), located between the sharp easterly bend in the Sacramento

River and the sharp westerly bend in Churn Creek, places it directly within the Strawberry Fields Site.

256.     The BIA Defendants concede that *Nosono* may be in the Project footprint.

257.    The BIA Defendants also concede that a known historic property, with archaeological designation CA-SHA-266 associated with *Yonotŭmnomsono* (Curtin's Village #9), will be adversely affected by construction in the North Access Improvement Area.[4]

258.    Between 1940 and 2002, developments in and near the North Access Improvement Area have unearthed over 15 Wintu burials associated with CA-SHA-266, most of them intact, and Wintu representatives have been involved in caring for a number of them.

      **2.**      **The Strawberry Fields Site Is Subject to Special Protections Under NHPA**

          **a.**      **The Eligibility of the Six Wintu Villages for Listing in the National Register of Historic Places**

259.    The Wintu village that the BIA Defendants identify as *Yonotŭmnomsono*, CA-SHA-266, is eligible for listing on the National Register, which, as explained above, renders it subject to special protections under NHPA.

260.    The other five villages of the Six Wintu Villages transecting Strawberry Fields have the same historical characteristics as CA-SHA-266; each is, therefore, likely eligible for listing on the NRHP.

          **b.**      **The Eligibility of Strawberry Fields for Listing in the National Register as a District, Traditional Cultural Property, and/or Cultural Landscape**

261.    Wintu residents of the Six Wintu Villages, with their seasonal Nomlaki visitors, interacted with strong, interdependent economic and community ties.

---

[4] The village that the BIA Defendants identify as *Yonotŭmnomsono* is actually likely to be *Kĕ'nkodi* (Curtin Village #8), but that is immaterial, because whether CA-SHA-266 is *Yonotŭmnomsono* or *Kĕ'nkodi,* it is undisputed that (a) it is part of a string of Six Wintu Villages transecting the Site from north to south, (b) it is eligible for listing on the National Register of Historic Places, and (c) it will be adversely affected by the Project. For the purposes of this Complaint, the village that the BIA Defendants identify as *Yonotŭmnomsono* will be referred to by its archaeological designation, CA-SHA-266.

262.    The estimated length of occupancy, the seasonal, inter-tribal activities carried out in a unique river configuration exceptionally suited to the salmon harvest, and the shared history of assault and attempted annihilation of the entire community all contribute to the exceptional historical significance of the Six Wintu Villages and the Strawberry Fields Site.

263.    Strawberry Fields, therefore embodies a shared Wintu/Nomlaki Indigenous history with shared cultural and religious values.

264.    Strawberry Fields is one of the last intact parcels of Wintu village locations in northern California and features distant views of Mt. Lassen and Mt. Shasta, as well as views of the Sacramento River – key landscape features within the larger Wintu Cultural Landscape.

265.    When taken collectively, the material culture, landscape components, and documentary research demonstrate that Strawberry Fields contains a significant concentration, linkage, and continuity of sites for the Wintu and Nomlaki, united historically and aesthetically by physical development.

266.    As such, Strawberry Fields is eligible for listing on the NRHP as part of a "district," a "traditional cultural property," and/or "cultural landscape," which, as explained above, would render it subject to special protections under NHPA.

c.    **The Wintu and Nomlaki Listing of Strawberry Fields as a Sacred Site**

267.    The California Native American Heritage Commission ("NAHC") identifies, catalogs, and protects Native American cultural resources—ancient places of special religious or social significance to Native Americans.

268.    Given the cultural and religious significance of Strawberry Fields to the Wintu and Nomlaki, the Tribes successfully registered Strawberry Fields as a Sacred Site in the NAHC's Sacred Lands Files under the name, "The Sacramento River Massacre Site."

       **d.**     **The Wintu and Nomlaki Nomination of Strawberry Fields for Listing on the National Register**

269.    Given the cultural and religious significance of Strawberry Fields to the Wintu and Nomlaki, the Tribes are working to nominate the Site for listing as a historic property on the NRHP.

270.    That nomination is being developed by consultants under contract, it follows the requirements and process outlined in 36 C.F.R. Part 60, and it draws upon the unique historic and cultural significance of Strawberry Fields to the Wintu and Nomlaki Peoples described above.

       **3.**     **The Project's Harm to Wintu/Nomlaki Historic Properties and Examples of the BIA Defendants' NHPA Violations**

271.    Construction of the Project will destroy the integrity of Strawberry Fields as part of a Wintu/Nomlaki district, traditional cultural property, and/or cultural landscape made up of the Six Wintu Villages transecting the Site.

272.    Construction of the Project will thereby harm Strawberry Fields as a Sacred Site for the Wintu and Nomlaki and undermine the Tribes' ability to list the Site on the NRHP.

273.    One aspect of such harm is that to undisturbed views of the Site.

274.    For example, Illustration 13 is the view of Strawberry Fields at present from below the south border, looking north, and Illustration 14 depicts the same view after construction of the Project.



Illustration 13



Illustration 14

275.    As another example, Illustration 15 is the view of Strawberry Fields at present from above its north border, looking south, and Illustration 16 depicts the same view after construction of the Project.



Illustration 15



Illustration 16

C. **The BIA Defendants Violated the National Historic Preservation Act in Numerous Ways**

    1. **The BIA Defendants' Identification and Evaluation Efforts of Historic Properties Without SHPO, Wintu, or PBNI Involvement**

        a. **The Rancheria's Consultant's (AES) Studies and Reports for the BIA Defendants**

276.   The BIA Defendants used Analytical Environmental Services ("AES"), retained by the Rancheria as the Project developer, to study the Project's impacts to "cultural resources"; and AES's resulting reports, described below, served as the sole basis for Defendants' purported compliance with the Section 106 Process.

277.   Between 2016 and 2019, AES engaged in this process on behalf of the BIA Defendants without involving the SHPO, Wintu, or PBNI.

278.   As the BIA Defendants' agent, AES's work, actions, and knowledge are imputed to the BIA Defendants. *See* 36 C.F.R. § 800.2(a)(3) ("The agency official remains responsible for all required findings and determinations of [such consultants].").

279.   AES produced at least five reports for the BIA Defendants, which the BIA Defendants cite throughout the DEIS and the FEIS and list as references.

280.   The Tribes have been able to obtain the following, which are referenced in the FEIS but not provided in the NEPA Documents: AES 2016a, *Cultural Resources Study* (February, 2016) ("AES 2016a");  AES 2016b, *Cultural Resources Study: Phase II Testing and Evaluation Report, Redding, CA.* (June, 2016) ("AES 2016b"); AES, 2017, Cultural Resources Report *Offsite Access Improvements,* (July, 2017) ("AES 2017"); AES 2019a, *Extended Phase I Survey* (July, 2019) ("AES 2019a"); and AES 2019b, *CA-SHA-4413Phase II Testing and Evaluation Report, Redding, CA* (July 2019) ("AES 2019b") (collectively the "2016-2019 AES Reports").

281.   AES prepared at least one additional report for the BIA Defendants reference to which the BIA Defendants do not disclose in any of the NEPA Documents.

282.    Those additional report(s) are described in AES 2019a as reporting on "[w]ork to identify resources which might be affected by construction of an access route either from the north or south," AES 2019a at ii, and identified in a "References" list as "AES (updated in 2019)," and/or "2018, *Offsite Access Improvements for the Redding Rancheria Fee-to-Trust Project*," AES 2019a at 23.

283.    The Tribes have only been able to obtain AES, *Cultural Resources Report Offsite Improvements* (Oct. 2019) (hereinafter referred to as "AES 2019c"), the title of which does not match those of the report (or reports) in said "References" list in AES 2019a, and AES 2019c is not disclosed by the BIA Defendants in any NEPA Document.

284.    The 2016-2019 AES Reports are not appended to the DEIS, the FEIS, or the ROD or otherwise made available to the public (unlike most other references to which the FEIS provides "hyperlinks" for access); they must be obtained by a credentialed archaeologist or public official charged with historic preservation responsibilities from the Northeast Center of California Historical Resources Information System ("NEIC").

### b.    AES's and the BIA Defendants' Knowledge of Dotta 1980 and Kardell & Dotta 1980

285.    AES 2016b relies upon and references Dotta 1980 (described above) to explain the "Ethnographic Setting," and states that "the Proposed Project region" was "occupied" by "the Wintu in the immediate vicinity" and "the Nomlaki to the south," that "their overall lifeways were similar," and that "[t]he availability of resources allowed the Wintu to live in dense settlements, politically organized into independent tribelets, with the largest villages containing about 250 people." AES 2016b at 9-10.

286.    "Fig. 1" on page 120 of Dotta 1980 is the map set forth as Illustration 11 and relatedly described above.

287.    AES relies upon and references Kardell & Dotta 1980 to identify "*Yonotumnosona*," with archaeological site designation "CA-SHA-266," as a Wintu "ethnographic village" that will be impacted

by construction in the North Access Improvement Area, and reports that CA-SHA-266 is eligible for listing with the NRHP.

288.    "Figure 2" on page 38 of Kardell & Dotta 1980 is the map set forth as Illustration 12 and relatedly described above.

289.    "Table 1" on page 42 of Kardell & Dotta 1980, "Norel-Putis' 1884-89 Report on Wintu Population and Dwelling Places in the Stillwater Area and Along the McCloud, Pit and Sacramento Rivers with Comparisons to Later Data" is the list of Six Wintu Villages with descriptions set forth in pertinent part, in paragraph 246, above.

### c.    AES's and the BIA Defendants' Early Knowledge, and Dismissal, of Wintu Concerns

290.    In AES 2016a, AES attached as "Appendix A" Crawford, Kristina, "Strawberry Fields Study Area, Archaeological Resources Reconnaissance Investigation, of 225.86 +/- acre, Shasta County, California" (October 19, 2007), prepared for the Rancheria ("Crawford 2007").

291.    Crawford 2007 reports that in the context of Crawford's "pedestrian survey" of the Site for archaeological elements (ground observations while walking) in the spring of 2007, "Lori Light of the Wintu Tribe of Northern California . . . stated that . . . the proximity of the Sacramento River to and known sensitive resources near the study area warranted thorough investigation [and] that the Wintu Tribe of Northern California would like to be informed of the results of the investigation."

292.    AES 2016b notes that during Crawford's 2007 pedestrian survey, a Wintu representative, Robert Burns, stated that "the northwestern corner of the APE contained an unrecorded site."

293.    Notwithstanding its awareness of and reference to Dotta 1980 and Kardell & Dotta 1980, which documented and mapped the Six Wintu Villages, AES dismissed Mr. Burns's concern, writing, "[the unrecorded site referenced by Burns] was never mapped or formally recorded."

294.    In AES 2016a, AES also reported that when backhoe trenching began at the Site in 2016, "Greg Burgin, Cultural Resources Manager for the Wintu Tribe of Northern California both called and emailed to express concerns that he had about the project after having spoken with Robert Burns" and that "Robert Burns also visited the site during [survey work in 2016], and indicated that a prehistoric site was present and that artifacts had been periodically recovered."

295.    Again, notwithstanding its awareness of and reference to Dotta 1980 and Kardell & Dotta 1980, which documented and mapped the Six Wintu Villages, AES dismissed Mr. Burgin's and Mr. Burns' concerns, stating "Mr. Burns could not confirm that the site had ever been formally mapped or recorded and did not specify a location for the finds."

* * *

296.    Notwithstanding its knowledge of and citation to (a) Kardell & Dotta 1980, which documented and mapped the Six Wintu Villages and described Curtin and Norel-putis as extraordinary historic figures in the same manner as above, and (b) Dotta 1980, which documented and mapped the Six Wintu Villages, in its efforts to identify or evaluate historic properties in the 2016-2019 AES Reports, AES did not consider the inter-relationships between the Six Wintu Villages and the Site as part of a district, traditional cultural property, and/or cultural landscape, or the relationship of Norel-putis and Curtin to the Site and/or the Six Wintu Villages, under Criterion A, B, and/or D.

297.    Notwithstanding its knowledge of and citation to Dotta 1980 in AES 2016b and Kardell & Dotta 1980 in AES 2017, in its efforts to identify or evaluate historic properties in the 2016-2019 AES Reports, AES did not consider the likelihood that the five other villages, shown by Dotta 1980 and Kardell & Dotta 1980 to transect the Site, were likely eligible for NHPA listing in the same manner as CA-SHA-266.

298.    By letter dated March 1, 2016 the NEIC wrote to AES stating that "the [P]roject is located in a region utilized by the *Stillwater* group of Wintu populations"; that "[u]recorded prehistoric

cultural resources may be located in the project area"; and that "Native American representatives [should be contacted] for information regarding traditional cultural properties that may be located within the project boundaries for which we have no records."  AES 2016a, Appendix C at 1, 3.

### d. The BIA Defendants' Identification and Evaluation Efforts Without the SHPO or the Tribes

### i. Limited Efforts Within the Strawberry Fields Site

299.    The 2016-2019 AES Reports establish inconsistent APEs for the Project without consulting with the SHPO, the Wintu, or PBNI, and instead proceed to identify and evaluate historic properties within those APEs—as described below, it identifies only two—without any involvement of the SHPO, the Wintu, or PBNI, and only under Criterion D of NHPA (36 C.F.R. § 60.4).

300.    With respect to the 221-acre Strawberry Fields Site, AES limited its survey efforts to the construction footprint of the proposed casino, hotel, and ancillary facilities at the north end of the Site, which it described in AES 2016a and AES 2016b as 45 acres, but later described as 37 acres in AES 2019a and AES 2019b.

301.    Without any input from the SHPO, Wintu, or PBNI, AES 2016b reports that findings from AES 2016a, coupled with the observations in Crawford 2007, warrant designating a new prehistoric site with NEIC as CA-SHA-4413, thus stating, "the 45-acre development area includes a prehistoric archeological site, CA-SHA-4413."

302.    Without any involvement of the SHPO, Wintu, or PBNI, AES evaluated CA-SHA-4413 only under Criterion D, finding that it "lacks significant data potential," ignoring its potential eligibility for listing on the National Register under the other criteria.

303.    The only person AES consulted with in this evaluation was the Rancheria's "Cultural Resources Manager James Hayward" who "stated that he did not feel that CA-SHA-4413 possessed cultural significance."

304.    According to AES, "[t]he statement by Mr. Hayward, coupled with the apparent lack of data potential at CA-SHA-4413 [under Criterion D], lead to the recommendation that the site, as currently understood, is not eligible for listing on the National Register of Historic Places."  AES 2016b at 39.

305.    In AES 2019a and AES 2019b, AES prepared two reports on identification efforts in a purported expanded APE within the 221-acre Strawberry Fields Site to include an option for on-site stormwater, water supply, and wastewater treatment facilities, "on 49 acres in the southeastern portion of the larger project site."

306.    AES did not involve the SHPO, Wintu, or PBNI in establishing this expanded APE or in any efforts to identify historic properties within the additional described 49 acres.

307.    In any event, AES did not report any efforts to identify historic properties within those 49 acres, and stated, contrary to the addition of 49-acre in the southeast portion of the site that should have been included in the APE, that "[w]ith a project such as development of a casino-resort and ancillary facilities, there will be a wide range of construction impacts *across the 37-acre APE*."  APE 2019b at 10 (emphasis added).

### ii.    Limited Efforts Within Offsite Improvement Areas

308.    In AES 2017, AES sets out to identify and evaluate "cultural resources" that will be impacted by the North Access Improvement Area and the South Access Improvement Area without any involvement by the SHPO, Wintu, or PBNI in those efforts.

309.    The APE for AES 2017 is set forth in Illustration 17.



Illustration 17

a)    *Erroneous Assertion of Prior Identification Efforts in the South Access Improvement Area*

310.    With respect to the South Access Improvement Area, AES rests its finding that "[n]o archaeological sites have been identified that would be affected by the southern access route" on an incorrect statement: that "[t]he southern access route was included in comprehensive surveys completed for the Proposed Project (Crawford, 2007; AES, 2016a)." AES 2017 at 2.

COMPLAINT

311. As described above, AES 2016a and AES 2016b only examined the then-proposed 45-acre (or 37-acre) construction footprint for the Project's casino and hotel and immediately adjacent ancillary facilities in the northern portion of the Site, not the South Access Improvement Area.

312. The reference to "Crawford, 2007" is to the report of Kristina Crawford described above, i.e., Crawford 2007.

313. Crawford 2007 was limited to a "pedestrian survey," observations of the ground while walking, by Crawford and a colleague.

314. Illustration 18 shows the "study area" covered by their pedestrian survey, and its limitation to the Strawberry Fields Site; it does not include the South Access Improvement Area.



Illustration 18

315.   Based on the erroneous assertion that Crawford 2007, AES 2016a, and/or AES 2016b

involved "comprehensive surveys" of the Southern Access Route, AES 2017 states, "this report will not

further discuss that particular access option," and later concludes "[t]he proposed southern access route

would not affect any identified archaeological resources (AES, 2016 a; b)."

> b)    *Identification and Evaluation Efforts in the North Access*
> *Improvement Area*

316.   In addressing the North Access Improvement Area, AES 2017 relies upon and refers to

Kardell & Dotta 1980, stating:

> The northern access route, if selected, would likely intersect elements of archaeological site CA-SHA-266. This is the ethnographic village of Yonotumnosona or Paspuisono (Guilford-Kardell and Dotta, 1980), occupied for several hundred years up to the early 20th century. The northern access route would require expansion of the Bechelli Lane/South Bonnyview Road intersection, expansion of Bechelli Lane south of the intersection, removal of a Burger King building, and the relocation of 28 parking spaces from the western end of the Hilton Garden Inn parking lot to a location further south along Bechelli Lane. These expansion areas are considered to be part of the project's Area of Potential Effects (APE) . . . . Studies in the last 30 years have uncovered artifacts, features, and burials from CA-SHA-266 within and adjacent to the APE, indicating the likelihood that similar finds would be made during any project-related construction activities.
>
> In 1976, it was determined that CA-SHA-266 was eligible for listing on the National Register of Historic Places (NRHP).

AES 2017 at 2.

317.    AES 2017 concludes that "[t]he proposed northern access route would affect deposits associated with CA-SHA-266"; "it is clear that intact portions of CA-SHA-266 are within the APE, as burials were encountered during hotel parking lot construction in 2002"; and "[c]onstruction of the northern access route to the Strawberry Fields Site will affect CA-SHA-266."

318.    AES only applies Criterion D in its discussion of CA-SHA-266's eligibility for listing on the NRHP, *see* AES 2017 at 7, 19-20 *and compare* 2019b at 37; 2016b at 39, and it does so without any involvement by the SHPO, Wintu, or PBNI.

319.    Nevertheless, AES 2017 states that because the Project will have adverse effects upon CA-SHA-266, "Section 106 of the NHPA requires that the BIA consult with the SHPO and other parties to negotiate and execute a Section 106 agreement document that sets out the measures the federal agency will implement to resolve those adverse effects through avoidance, minimization, or mitigation." As set forth below, the BIA Defendants unlawfully ignored this requirement.

**2.**    **The BIA Defendants' Purported Compliance with Section 106 through the NEPA Documents**

       **a.**    **Scoping Report**

320.    In May, 2017, the BIA Defendants, through the BIA Pacific Regional Office published, pursuant to NEPA, a "Scoping Report: Redding Rancheria Fee-To-Trust and Casino Project," prepared by AES.

321.    The Scoping Report makes no mention of the requirements of NHPA, whether the EIS and related NEPA Documents and process will operate in lieu of the Section 106 Process and documentation, or whether AES has commenced work to establish an APE or identify and evaluate historic properties that may be affected by the Project.

322.    The Scoping Report lists "cooperating agencies" involved in the NEPA process "which may develop information to be included in the EIS," but neither the SHPO, the ACHP, nor any Indian tribe is listed in the Scoping Report as a cooperating or consulting agency.

323.    Section 3.2.6 of the Scoping Report, entitled "Cultural and Paleontological Resources," refers to comments the BIA Defendants received regarding the significance of the Site to the Wintu, including that "the project site and surrounding area was the most densely populated area of indigenous people in the United States," that the BIA Defendants should "[c]onsult and engage with the Wintu Tribe of Northern California prior to decisions of development," and that they should "provide monitoring authority to the Wintu Tribe of Northern California."

324.    Fourteen (14) comment letters, included in "Appendix B" to the Scoping Report, variously state that the Strawberry Fields Site "is Wintu Territory," that "[t]he Wintu Tribe has tribal members who are directly related to ancestors who lived in villages all along the proposed site," and that "the Wintu . . . should be the lead tribe in charge of any and all cultural monitoring of the [Strawberry Fields] property."

325.    At the "Public Scoping Hearing For the Redding Rancheria Proposed Fee To Trust and Casino Project" held by the BIA Defendants through their BIA Pacific Regional Office on December 21, 2016, in Redding, California, Gene Malone, council member for the Wintu, testified that the Strawberry Fields Site is "Wintu aboriginal territory," that "large amounts of aboriginal people were there," and that there are "burial grounds there."

### b.    The DEIS

326.    In April 2019, the BIA Pacific Regional Office published the DEIS.

327.    The DEIS states that the BIA Defendants must comply with the requirements of NHPA, but does not indicate that the NEPA Documents and process will operate in lieu of the Section 106 Process and documentation.

328.    The DEIS states that, in accordance with NHPA, that "the BIA. . . , through consultation with the SHPO . . ., Indian tribes, and other consulting parties (including applicants, local governments, and possibly the Advisory Council on Historic Properties [sic]) . . . complete[s] . . . steps to establish an Area of Potential Effects (APE), identify historic properties, assess the potential effects of its undertaking on them, and determine [whether] its undertaking may adversely affect a historic property." DEIS at 3.6-2.

329.    The DEIS, however, makes no mention of any consultation with, or involvement of, the SHPO, any local government, any Indian tribe, or the ACHP in efforts to establish an APE, identify historic properties, to assess the potential effects of the Project on them, or to determine whether the Project may adversely affect a historic property.

330.    Notwithstanding their knowledge of (a) Dotta 1980; (b) Kardell & Dotta 1980; (c) the location Wintu village, CA-SHA-266, within the North Access Improvement Area; (d) extensive discussions in AES 2016-2019 of Strawberry Fields as the Indigenous territory of the Wintu, but also "occupied" by the Nomlaki, (e) the NEIC statements that the Site is Wintu aboriginal territory and that

Defendants should consult with Native American representatives "regarding traditional cultural properties that may be located within project boundaries"; (f) a plethora of Wintu statements that Strawberry Fields is Wintu aboriginal territory with village sites, articulated for nine years, between 2007 and 2016 (as documented in Crawford, 2007, AES 2016a, AES 2016b, and the Scoping Report); and other material information, the BIA Defendants made no mention of any Wintu or Nomlaki historical connection to Strawberry Fields in the DEIS.

331.    Section 6.0 of the DEIS lists consulting federal, state, and local governments, but does not list the SHPO, the ACHP, or any Indian tribe.

332.    There is no map or figure in the DEIS that shows the boundaries of any APE.

###### i.      The Strawberry Fields Site

333.    The DEIS references Crawford 2007, AES 2016a, and AES 2016b as the sources for identifying and evaluating historic properties within the "Strawberry Fields Site."

334.    There is no map or figure in the DEIS describing the APE; the DEIS states only that the backhoe testing program reported in AES 2016a was "within the APE (defined as the footprint of the proposed development, including water, wastewater, storm water, and access road facilities)."

335.    The DEIS then tracks AES 2016b to state that historic site CA-SHA-4413 "does not possess values that would make it eligible for listing on the NRHP" because (a) Rancheria members "did not feel that CA-SHA-4413 had cultural significance" and (b) there was an "apparent lack of significant data potential under Criterion D of the NRHP."

336.    Thus, the DEIS concludes, "development of [the Project] within the Strawberry Fields Site would not result in direct adverse effects to known historic properties."

337.    The DEIS does not explain where testing was performed to identify CA-SHA-4413 or how the location of such testing was decided.

### ii.      The North and South Access Improvement Areas

338.    The DEIS references AES 2017 as the source for identifying and evaluating historic properties in the "offsite improvement areas."

339.    Again, there is no map or figure describing this part of the APE.

340.    The DEIS addresses the "South Access Area" in two sentences without defining an APE and without referencing any AES report or Crawford, 2007:

> The South Access Area extends along a rural driveway located to the south of the Strawberry Fields Site; at the time of the survey, visibility was poor due to weeds and grasses obscuring the graveled ground surface. No archaeological or historical sites were observed or identified during the NEIC record search, which would be affected by development of the proposed South Access route.

DEIS Vol. I at 3.6-6.

341.    Turning to the "North Access Area," the DEIS states:

> The North Access Area extends along either side of the existing paved Bechelli Lane north of the Strawberry Fields Site. The northern portion of the North Access APE (defined as the footprint of the improvements required for the North Improvement Area) is entirely paved with road surfaces, sidewalks, and parking areas for various commercial uses near the intersection with Bonnyview Road. The southern portion of the North Access APE includes disturbed road shoulders, parking areas associated with the Sunnyhill Pump Station, landscaping, and a canal bridge crossing. The results of the record search and pedestrian survey of the North Access APE indicate that one previously recorded cultural resource is located within the APE, CA-SHA-266. This resource has been found beneath paved surfaces within the northern portion of the North Access APE.

*Id.* at 3.6-6 – 3.6-7.

342.    The DEIS then tracks and cites AES 2017, stating that "it is clear that intact portions of CA-SHA-266 are located within the APE for the northern access route to the Proposed Project"; that "the 'major' portion of the site was found to be eligible for listing on the NRHP"; that the site measures "240 meters east-west by 40 meters north-south (7,540 square meters)" and contains "copious numbers of artifacts and cooking features"; and that "elements" of CA-SHA-266, including "intact burials," were

discovered "during construction of the Hilton Garden Inn parking lot in 2002." DEIS Vol. I at 3.6-7 to

3.6-8.

343.    Relying on AES 2017, the DEIS states:

When it can be reasonably anticipated that a project will adversely affect an NRHP-eligible or listed resource, Section 106 of the National Historic Preservation Act (NHPA) requires that the federal lead agency (Bureau of Indian Affairs; BIA) consult with the State Historic Preservation Office (SHPO) and other parties to negotiate and execute a Section 106 agreement document that sets out the measures the federal agency will implement to resolve those adverse effects.

DEIS Vol. I at 4.6-2.

344.    Turning to the South Access Improvement Area, the DEIS simply states: "No cultural

resources were observed during field surveys or observed on or in the vicinity of the Strawberry Fields

Site."

### iii.    Indirect Effects from Utility/Infrastructure Connections

345.    The DEIS addresses the "Environmental Consequences" of the Project from "Indirect

Effects From Utility/Infrastructure Connections," including those to "Cultural Resources," but does not

define an APE for the latter.

346.    It describes the location of these "Utility/Infrastructure Connections" as follows:

Connection to the City's water system would require construction of approximately 777 linear feet of water pipelines from the site to an existing 24-inch water main at the intersection of Bechelli Lane and the driveway leading west to 5170 Bechelli Lane. Wastewater treatment would be provided by the City via connection to the City's conveyance system and wastewater treatment plant (WWTP). Connection to the existing treatment system would require the installation of a lift station on the Strawberry Fields Site, and 702 linear feet of sewer force main pipelines between the new lift station located northwest of the casino and the existing Sunnyhill Lift Station, located at 5100 Bechelli Lane, currently operated by the City.

Additionally, [the Project] would require utility service connections with Redding Electric Utility (REU) for electricity and Pacific Gas and Electric Company (PG&E) for natural gas service. . . . Offsite electrical improvements are conceptual at this time . . . PG&E would extend natural gas service to the Strawberry Fields Site. A PG&E main natural gas line exists approximately 1,100 feet north of the Strawberry Fields Site at the southern edge of the Hilton Garden Inn parking lot . . . PG&E would likely connect [the

Project] to the main line via open trenching with four inch plastic piping . . . .

DEIS Vol. I at 4:14-11, 4:14-13.

347.    Although not disclosed in the DEIS, AES 2019a states that potential excavations "could

extend to 10 feet in order to accommodate utility trenching."

348.    Illustration 3, above, is identical to DEIS Figure 4.14-2, which purportedly depicts these

Utility/Infrastructure Connections, but omits any information about the location of proposed natural gas

line or underground electricity transmission upgrades.

349.    In addressing impacts to "cultural resources" from these Utility/Infrastructure

Connections, the DEIS conclusively states, without referencing any study or report (by AES, Crawford,

or any other person or entity):

> No prehistoric or historic period cultural or paleontological resources are known to occur
> within the vicinity of the utility infrastructure improvements based upon a field survey
> and a record search conducted at the NEIC (refer to Section 3.6). Therefore, no
> significant impacts to known cultural resources would occur as a result of offsite
> water/wastewater improvements and utility connections.

DEIS Vol. I at 4.14-15.

### c.    The Tribes' DEIS Comments

350.    On June 19, 2019, the Tribes timely submitted comments on the DEIS.

351.    The Tribes' general comments on the DEIS included the following:

- the APEs for the Strawberry Fields Site and offsite improvements are vague and not clearly
  identified on any map or figure;

- there is no indication that the BIA Defendants consulted with the SHPO with respect to
  establishing any APE or in any aspect of the Section 106 Process;

- AES 2016a, AES 2016b, and AES 2017 are not available to the public or even through the
  NEIC; and

- notwithstanding "readily available information," the DEIS makes no mention of the fact that
  Strawberry Fields and adjacent lands constitute the Indigenous territory of the Wintu,
  regularly frequented by the Nomlaki.

FEIS Vol. I, Comment Letter T4 at 1-2; Comment Letter T6 at 49-51.

352.    The Tribes submitted, as "Exhibit B" to their comments, the report of Dorothea Theodoratus and Kathleen McBride (collectively "Theodoratus and McBride"), *Report on Tribal Historical Connections to the "Strawberry Fields" Site Near Redding California* (May 29, 2019) ("Theodoratus & McBride 2019").

353.    Dr. Theodoratus is one of the most acclaimed anthropologists specializing on the Indigenous Peoples of Northern California, including the Wintu and Nomlaki.

354.    Kathleen McBride is a highly accomplished anthropologist with extensive experience in managing and consulting on Indigenous historic and cultural resources.

355.    At page 9 of their Report, Theodoratus and McBride set forth the same list of Curtin's notes on the Six Wintu Villages as that is set forth in paragraph 246 above, with additional details from subsequent anthropological studies.

356.    At page 11 of their report, Theodoratus and McBride include as "Map 3" the map from Kardell & Dotta 1980 set forth in Illustration 12 and described relatedly above, with a large scale insert of a portion of the map from Dotta 1980 set forth in Illustration 11 and described relatedly hereto, showing the Six Wintu Villages within and adjacent to the Strawberry Fields Site.

357.    Illustration 19 is "Map 3" from Theodoratus & McBride 2019.



**Map 3. Showing Dawnow area (Kardell 1980, Figure 2 Wintu Territory)**

Illustration 19

358.    Paragraphs 8, 59-66, and 72-75 above track the findings of Theodoratus & McBride

2019.

359.    In light of Theodoratus & McBride 2019, the Tribes made additional comments regarding

the Six Wintu Villages and the Strawberry Fields Site as a whole, including:

- the Six Wintu Villages transect the Site;

- the Nomlaki regularly visited their Wintu relatives at Strawberry Fields;

- residents of the Six Wintu Villages and Nomlaki visitors likely perished together in the 1846 Fremont massacre;

- "Every Wintu village in this six village string should be eligible for listing in the [NRHP] . . . , each has essentially the same history";

- the shared indigenous history of the Wintu and Nomlaki in relation to the Six Wintu Villages, including the Fremont massacre, render the entire Strawberry Fields Site likely eligible for listing on the NRHP as part of a district and/or cultural landscape;

- the Project adversely affects the integrity of the entire Site as a district and/or cultural landscape as a whole and through its integrated relationship of the Six Wintu Villages;

- the Project adversely affects CA-SHA-266, *Nosono* is likely harmed because of its location in the middle of the Site, and others of the Six Wintu Villages are likely impacted directly or indirectly; and

- consultation should include the Wintu and PBNI, and both should be part of a MOU or programmatic agreement as required by NHPA.

### d.    Communications on Tribal Consultation

### i.    PBNI

360.    By letters dated June 11, 2019 and June 12, 2019 to the SHPO and ACHP, PBNI requested to participate in the Section 106 Process as a consulting party.

361.    PBNI received no responses to these requests.

362.    By letter dated January 15, 2020, the BIA Pacific Regional Office wrote to Andrew Alejandre, Chairman of PBNI, extending "an invitation to the Paskenta Rancheria [sic] to participate as a consulting party" for the Section 106 Process.

363.    The letter stated only that the PBNI was welcome to submit additional information for the BIA Defendants to consider as they "initiate the Section 106 process with the . . . SHPO."

364.    It makes no mention of any opportunity to discuss, advise, or participate in the identification or evaluation of historic properties, or to resolve adverse effects to historic properties, with Defendants on a government-to-government basis.

365.    There was no further follow up to this letter.

366.    PBNI separately requested consulting party status by email to the BIA Pacific Regional Office in August, 2023.

### ii.     Wintu

367.     By letters dated June 4, 2019 to the Pacific Regional Director, the ACHP, and the SHPO, the Wintu requested to participate in the Section 106 Process as a consulting party.

368.     The Wintu received no responses to these requests.

### e.     The FEIS

369.     On March 29, 2024, the BIA Defendants published the FEIS.

370.     The FEIS, like the DEIS, states that the BIA Defendants must comply with the requirements of NHPA, but (again) does not indicate that the NEPA Documents and process would operate in lieu of the Section 106 Process and documentation.

371.     The FEIS, like the DEIS, states that, in accordance with NHPA, "the BIA. . . , through consultation with the SHPO . . ., Indian tribes, and other consulting parties (including applicants, local governments, and possibly the Advisory Council on Historic Properties [sic]) . . . completed . . . steps to establish an Area of Potential Effects (APE), identify historic properties, assess the potential effects of its undertaking on them, and determine [whether] its undertaking may adversely affect a historic property." FEIS Vol. II at 3.6-2.

372.     The FEIS, however, makes no mention of any consultation with, or involvement of, the SHPO, any local government, any Indian tribe, or the ACHP in efforts to establish an APE, identify historic properties, assess the potential effects of the Project on them, or determine whether the Project may adversely affect a historic property other than in one sentence, described below, stating that by letter dated May 23, 2023, the SHPO concurred in the BIA Defendants' finding of "no historic property affected."

373.     Despite knowing for at least five years about (a) Theodoratus & McBride, 2019; (b) the Tribes' DEIS comments summarizing Theodoratus & McBride; (c) Dotta 1980; (d) Kardell & Dotta 1980; (e) the location Wintu village, CA-SHA-266, within the North Access Improvement Area; (f) the

possibility that another Wintu village, *Nosono* (Curtin village #7) "may be in the project footprint," (g) the NEIC statements that the Site is Wintu aboriginal territory and that Defendants should consult with Native American representatives "regarding traditional cultural properties that may be located within project boundaries; (h) extensive discussions in AES 2016-2019 of Strawberry Fields as the Indigenous territory of the Wintu, but also "occupied" by the Nomlaki; and (i) a plethora of Wintu statements that Strawberry Fields is Wintu aboriginal territory with village sites, articulated for nine years, between 2007 and 2016 (as documented in Crawford, 2007, AES 2016a, AES 2016b, and the Scoping Report), and other material information, the BIA Defendants make no mention of any Wintu or Nomlaki historical connection to Strawberry Fields or Fremont's unprecedented "Indian massacre" associated with the Site.

374. Section 6.0 of the FEIS lists consulting federal, state, and local governments. As in the DEIS, it does not list the ACHP or any Indian tribe, but it does list the SHPO.

375. In response to the Tribe's comments that AES 2016a, AES 2016b, and AES 2017 were not available at the NEIC, the BIA Defendants responded that AES 2016a and AES 2016b were submitted to the NEIC in March, 2017, and that AES 2017, 2019a, 2019b were submitted to NEIC in April, 2023.

### i.    The Strawberry Fields Site

376. Like the DEIS, the FEIS references Crawford 2007, AES 2016a, and AES 2016b as the sources for identifying and evaluating historic properties within the "Strawberry Fields Site."

377. It then describes the APE as follows:

The APE for the Strawberry Fields Site is defined as the footprint of the proposed development, including the casino, a 250-room hotel, conference and event centers, restaurants, retail facilities, parking, and other supporting facilities water, wastewater, storm water, and access road facilities and *depicted on DEIS Figure 2-8.1*. It is presumed that construction and staging may occur anywhere within the Strawberry Fields Site and that no construction will continue more than 8 feet below ground surface.

FEIS Vol. II at 3.6-5 (emphasis added).

378.    There is no DEIS Figure 2-8.1, so this reference presumably means FEIS Figure 2-8.1 (reproduced above as Illustration 2), which is virtually identical to DEIS Figure 2-8, except that FEIS Figure 2-8.1 includes an option for an on-site "Police, Fire, and EMS Building" in the southeast corner of the Site.

379.    The FEIS states that one of the Six Wintu Villages, "Nosono[,] may be in the project footprint," but describes no efforts to identify or evaluate it.

380.    The FEIS, like the DEIS, tracks AES 2016b to state that historic site CA-SHA-4413 "does not possess values that would make it eligible for listing on the NRHP" because Rancheria members "did not feel that CA-SHA-4413 had cultural significance" and there was an "apparent lack of significant data potential under Criterion D of the NRHP."

381.    As in the DEIS, the FEIS does not explain where testing was performed to identify CA-SHA-4413 or how the location of such testing was decided.

382.    In the first mention of SHPO involvement in any of the NEPA Documents, the FEIS states:

> In accordance with Section 106 of the NHPA, the BIA initiated consultation with the State Historic Preservation Office (SHPO) regarding the potential for effects to historic properties resulting from the Proposed Action. *In a letter dated May 9, 2023, the SHPO concurred with the BIA's finding that the Proposed Action will result in "no historic properties affected" (Appendix P.). Therefore, development of [the Project] within the Strawberry Fields Site would not result in direct adverse effects to known historic properties.*

FEIS Vol. II at 4.6-1 (emphasis added).

###### ii.    "Affected Environment" for the North and South Access Improvement Areas

383.    Unlike the DEIS, the FEIS specifically defines an APE for the "South Access Area," but like the DEIS, does not reference a specific AES report or Crawford 2007:

The South Access Improvement Area APE is defined as the footprint of the proposed road and a 50-foot corridor on either side, to allow for road construction and staging. The South Access Improvement Area includes an existing private access driveway and land located on either side of the driveway from its connection point with the Strawberry Fields Site and intersection with Smith Road to the south. The access driveway is referred to as Adra Way on certain County maps. It is assumed that construction impacts would not exceed 4 feet below ground surface.

The proposed South Access route lies almost entirely within the Strawberry Fields Site. Most of is [sic] a grassed-over cow pasture (Figure 2-8.1). At the time of the survey in 2016, visibility was poor due to weeds and grasses obscuring the ground surface. No archaeological or historical sites were identified in the NEIC background record search or the archaeological field survey.

FEIS Vol. II at 3.6-8.

384.    It concludes, without citation, that "[n]o cultural resources were observed during field surveys or uncovered by background research."

385.    Turning to the "North Access Improvement Area," the FEIS expands the APE beyond what is stated in the DEIS (compare above):

The North Access Improvement Area APE extends along either side of Bechelli Lane, north of the Strawberry Fields Site. The North Access Improvement Area APE includes Bechelli Lane and a 50-footwide corridor on either side of Bechelli Lane from its intersection with Bonnyview Road to the Strawberry Fields Site. Within the northern portion of the alignment, these areas are mostly paved and currently developed with sidewalks, and parking areas for the Hilton Garden Inn. Within the southern portion of the alignment, the proposed improvements areas include disturbed road shoulders, undeveloped land, and the Sunnyhill Lift Station driveway and parking areas (Figure 2-8.1). It is assumed that construction impacts would not exceed 4 feet below ground surface.

FEIS Vol. II at 3.6-8.

386.    The FEIS adds that "the southern half of the footprint has not been surveyed."

387.    Like the DEIS, the FEIS states that CA-SHA-266 "is located within the APE [of the North Access Improvement Area]," and tracking and citing AES 2017, states that "the 'major' portion of the site was found to be eligible for listing on the NRHP"; that the site measures "240 meters east-west by 40 meters north-south (7,540 square meters)" and contains "copious numbers of artifacts and cooking

COMPLAINT

features"; and that "elements" of CA-SHA-266, including "five burials," were discovered "during construction of the Hilton Garden Inn parking lot in 2002." FEIS Vol. II at 3.6-8 – 3.6-9. The FEIS also notes that, "[o]f the Traffic Improvement areas, two (Intersection #3 and widening Bechelli Lane) may impact archaeological site CA-SHA-266."

388.    As in the DEIS, the FEIS then relies upon AES 2017 to state:

> When it can be reasonably anticipated that a project will adversely affect an NRHP-eligible or listed resource, Section 106 . . . requires that the federal lead agency . . . consult with the . . . SHPO . . . and other parties to negotiate and execute a Section 106 agreement document that sets out the measures the federal agency will implement to resolve those adverse effects. . . .

FEIS Vol. II at 4.6-2.

389.    There is, however, no discussion of any involvement by the SHPO or any other party in the resolution of the Project's adverse effects upon CA-SHA-266.

390.    The reason for the SHPO's exclusion can be partially explained only through careful examination of the SHPO's May 23, 2023 letter in "Appendix P" to the FEIS, discussed in paragraphs 394-402 below.

### iii.    Indirect Effects from Utility/Infrastructure Connections

391.    The FEIS describes the location of these "Utility/Infrastructure Connections" in language that is identical to that in the DEIS and provides Figure 4.14-2, which is identical to DEIS Figure 4.14-2, to show these Utility/Infrastructure Connections.

392.    Illustration 3, DEIS Figure 4.12-2, is identical to FEIS Figure 4.14-2.

393.    In addressing impacts to "cultural resources" from these Utility/Infrastructure Connections, the FEIS uses the same language as the DEIS quoted above, also without citation.

### iv.    The BIA Defendants' Limited Disclosure of SHPO Consultation Through the FEIS' Exhibit P

394.    The BIA Defendants attached as Appendix P to the FEIS a letter from the SHPO to the BIA Pacific Regional Office, dated May 9, 2023 (the "SHPO Letter").

395.    The SHPO Letter states: "Per the 15 April 2020 letter written for the previous SHPO review, on behalf of the Redding Rancheria BIA proposed the transfer of a 232-acre parcel . . . from fee to trust status [and] . . . BIA determined the APE to be the 232-acre parcel."

396.    In other words, the APE that the BIA Defendants asked the SHPO to evaluate *did not include the Offsite Improvement Areas*, i.e. the North Access Improvement Area, where CA-SHA-266 was well known by the BIA Defendants to exist, or the South Access Improvement Area, where the BIA Defendants had not conducted an adequate survey, *or the Utility/Infrastructure Connections area*, where, again, CA-SHA-266 was well known by the BIA Defendants to exist.

397.    The BIA Defendants have not made any April 15, 2020 correspondence between the BIA and the SHPO available to the public, despite a Freedom of Information Act ("FOIA") request by the Tribes.

398.    The SHPO Letter separately states that the SHPO received a letter dated February 24, 2023 from the BIA for a proposed "no historic properties affected" determination with respect to the Project.

399.    Defendants have not made the February 24, 2023 letter available to the public despite a FOIA request by the Tribes.

400.    The SHPO Letter states that "[p]er additional communications with BIA, CA-SHA-1433 [sic] and the 'historic pump house' [a property that is not material to this Complaint] are the only potential historic properties in the 232-acre APE."

401.    The BIA Defendants did not provide the SHPO with AES 2017, sections from the DEIS addressing adverse effects to CA-SHA-266, Theodoratus & McBride 2019, or the Tribes' DEIS Comments.

402.    Based on a review of limited materials, and an APE *limited to Strawberry Fields and excluding the Offsite Improvement Areas*, the SHPO stated it concurred with the BIA's conclusion that

CA-SHA-4133 did not possess data to render it eligible for the listing on the National Register and that it concurred with a undisclosed BIA finding of "*no historic properties affected*" by the Project.

**v.    The BIA Defendants' Contradictory APEs and Finding of "No Historic Properties Affected"**

403.    In the FEIS, the BIA Defendants did not explain why they employed an APE limited only to the 232-acre Strawberry Fields Site in seeking the SHPO's concurrence of "no historic properties affected" by the Project, while simultaneously (a) defining the APE in the FEIS and the DEIS to include the North Access Improvement Area and the South Access Improvement Area, and (b) stating in both the FEIS and DEIS that because of the Project's adverse effect upon CA-SHA-266, they are required by Section 106 to resolve those effects in consultation with the SHPO and other parties.

404.    As described below, such explanation was only disclosed by the BIA Defendants in their response to the Tribes' comments on the FEIS in the ROD, published in July 2024.

405.    Apart from the *one sentence* at page 4.6-1 of the FEIS, quoted above, stating that "development of [the Project] within the Strawberry Fields Site would not result in direct adverse effects to known historic properties," there is no place, in any of the NEPA Documents, other than in the SHPO Letter found in FEIS Appendix P, where a reader can discern that the BIA Defendants made a "no historic properties affected" finding for the Project pursuant to Section 106.

406.    Such a finding is completely at odds with the BIA Defendants' statement, *on the very next page* of the FEIS, and in the DEIS, that because of the Project's adverse effect upon CA-SHA-266, they must "consult with the State Historic Preservation Office (SHPO) and other parties to negotiate and execute a Section 106 agreement document that sets out measures . . . to resolve *those adverse effects*." FEIS Vol. II at 4.6-2 (emphasis added).

**f.    The ROD**

407.    On July 1, 2024, the BIA Defendants issued the ROD.

COMPLAINT

408.    In Table 2 to Attachment 3 to the ROD (the BIA Defendants' responses to the Tribes' FEIS comments), the BIA Defendants revealed, for the first time—without any previous disclosure to the public in the NEPA Documents and contrary to their statements in the DEIS and the FEIS—that they purported to establish an APE, for their Section 106 Process consultation with the SHPO, that was limited to the Strawberry Fields Site only, excluding the North and South Access Improvements Areas and the Utility/Infrastructure Connections area.

409.    The BIA Defendants stated, in their response the Tribe's comments published as an attachment to the ROD, that in an undisclosed letter to the SHPO dated March 4, 2020, four years before they published the FEIS, the BIA Defendants decided that the "off-site improvement areas were *no longer* part of the Section 106 APE as 'BIA has neither jurisdictional authority nor a federal action connected with the funding or approval of off-site improvements.'" (Emphasis added.)

410.    However, the FEIS—which was, again, published more than four years after the date this letter and two months before this surprising announcement in the ROD—stated that the APE *includes* the Offsite Improvements Areas.

411.    The BIA Defendants did not explain, in their response to the Tribe's comments to the FEIS (or anywhere else), when they made the decision to exclude the Offsite Access Improvement Areas from the APE used in their consultation with the SHPO or why they described the APE, in the FEIS (and DEIS), as *including* the Offsite Access Improvement Areas.

412.    Instead, they asserted, without any explanation or citation to legal authority, that "the APE is defined within the EIS for NEPA purposes differs from the APE established for NHPA Section 106 purposes."

413.    As in the DEIS and the FEIS, the BIA Defendants did not indicate, in the ROD, that they have used the NEPA Documents and process in lieu of the Section 106 Process and documentation.

414.    Other than in Table 2 to Attachment 3 to the ROD (Defendants' responses to the Tribes' FEIS comments), the ROD makes no mention of NHPA or the Section 106 Process.

415.    In responding to many of the Tribes' FEIS comments, including that the BIA Defendants have (a) used inconsistent APEs throughout the NEPA Documents, (b) failed to account for visual effects to the integrity of Strawberry Fields as part of a Wintu/Nomlaki cultural landscape, (c) failed to resolve adverse effects to CA-SHA-266 through consultation with the SHPO and other parties, and (d) failed to enter into an agreement with the SHPO to defer efforts to identify historic properties in the offsite areas, Defendants simply stated, in contradictory fashion, that these offsite areas are not within the APE.

416.    Other than in Table 2 to Attachment 3 to the ROD (Defendants' responses to the Tribes' FEIS comments), the ROD does not identify *any* APE.

417.    As in the FEIS, despite knowing for at least five years about (a) Theodoratus & McBride, 2019; (b) the Tribes' DEIS comments summarizing Theodoratus & McBride; (c) Dotta 1980; (d) Kardell & Dotta 1980; (e) the location Wintu village, CA-SHA-266, within the North Access Improvement Area; (f) the possibility that another Wintu village, *Nosono* (Curtin village #7) "may be in the project footprint," (g) the NEIC statements that the Site is Wintu aboriginal territory and that Defendants should consult with Native American representatives "regarding traditional cultural properties that may be located within project boundaries; (h) extensive discussions in AES 2016-2019 of Strawberry Fields as the Indigenous territory of the Wintu, but also "occupied" by the Nomlaki; and (i) a plethora of Wintu statements that Strawberry Fields is Wintu aboriginal territory with village sites, articulated for nine years, between 2007 and 2016 (as documented in Crawford 2007, AES 2016a, AES 2016b, and the Scoping Report), and other material information, the BIA Defendants made no mention in the ROD of any Wintu or Nomlaki historical connection to Strawberry Fields or Fremont's unprecedented "Indian massacre" associated with the Site.

418.     Section 5.1.5 of the ROD addresses "Environmental Impacts" to "Cultural Resources," stating only that "[a] prehistoric archaeological site (CA-SHA-4413) is within the area proposed for development [of the Project] at the Strawberry Fields Site, although it is not eligible for listing on the National Register of Historic Places (NRHP)."

419.     The ROD further—in contradiction with the FEIS, the DEIS, and AES 2017—fails to acknowledge that CA-SHA-266 is eligible for listing on the NRHP or to state that compliance with Section 106 requires Defendants to enter into an agreement with the SHPO and other parties to resolve adverse effects to the site.

420.     The ROD—in contradiction with the DEIS and the FEIS—mentions no identification efforts for historic properties within the area for Utility/Infrastructure Connections depicted in Illustration 3 and described relatedly above.

## THIRD CLAIM FOR RELIEF

**(Violations of the National Historic Preservation Act, 54 U.S.C. §§ 306101 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 - Failure to Make the Wintu and the Nomlaki Consulting Parties)**
**(Against the BIA Defendants)**

421.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

422.     The Wintu and PBNI attach religious and cultural significance to historic properties affected by the Project, including historic properties within the APEs variously established by AES in AES 2016-2019, the APEs that the BIA Defendants described in the DEIS and the FEIS, and the circumscribed APE that the BIA Defendants improperly used in their consultation with the SHPO.

423.     At all material times herein, had Defendants made a good faith effort, they would have known that the Wintu and PBNI might attach religious and cultural significance to historic properties affected by the Project, within these APEs.

424.    At all material times herein, the BIA Defendants knew or should have known that the Wintu and PBNI had knowledge of and concerns about the Project's effects on such historic properties.

425.    PBNI made written requests to be a consulting party for the Section 106 Process.

426.    The Wintu also made written requests to be a consulting party for the Section 106 Process.

427.    The BIA Defendants violated NHPA by failing to make PBNI a consulting party for any part of the Section 106 Process. *See, e.g.,* 54 U.S.C. § 302706(b); 36 C.F.R. §§ 800.2(c)(2)(ii); 800.3(f)(2); 800.4(a)(4).

428.    The BIA Defendants never considered the Wintu's written requests to be a consulting party in consultation with the SHPO thereby violating 36 C.F.R. § 800.3(f)(3).

429.    The BIA Defendants abused their discretion by failing to make the Wintu a consulting party for any part of the Section 106 Process. *Id.* §§ 800.2(c)(5), 800.3(f)(3).

430.    By illegally failing to make the Wintu and PBNI consulting parties, the BIA Defendants illegally deprived the Tribes of NHPA's requirements that Defendant consult with the Tribes pursuant to 36 C.F.R. §§ 800.4(a)(3), 800.4(a)(4), 800.4(b) 800.4(c)(1), 800.4(c)(2), 800.4(d)(1), 800.4(d)(2), 800.6(a), 800.6(a)(i), 800.8(c)(1)(iii), 800.8(c)(1)(iv), 800.8(c)(2)(ii), and/or 800.11(c)(2).

431.    As a result, the BIA Defendants deprived the Tribes of their NHPA rights to engage in consultation with the BIA Defendants and the SHPO to:

(a) *identify* historic properties that might be affected by the Project and/or within APEs established for the Project;

(b) *evaluate* the eligibility of such identified properties for eligibility for listing on the National Register and, in so doing, (i) acknowledge that the Tribes possess special expertise in assessing that eligibility and (ii) acquiesce to the Tribes' right to ask the ACHP to seek an eligibility determination from the Secretary of Interior if the Tribes disagree with the BIA Defendants' eligibility determination;

(c) *assess* the adverse effects of the Project upon historic properties; and

(d) *resolve* any adverse effects of the Project upon historic properties by developing and evaluating alternatives or modifications to the Project that could avoid, minimize, or mitigate adverse effects to historic properties and, in so doing, acquiesce to the Tribes' right, at any time, to independently request the ACHP to participate in consultations to resolve such effects.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## FOURTH CLAIM FOR RELIEF

**(Violations of the National Historic Preservation Act, 54 U.S.C. §§ 306101 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 - Failure to Engage in Identification Efforts as Required by Law)**
**(Against the BIA Defendants)**

432.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

**A.    Failure to Consult with the SHPO, Wintu, and PBNI to Determine the Scope of Identification Efforts**

433.    The BIA Defendants relied *solely* upon AES to determine (various and inconsistent) APEs for the Project and to review existing information on historic properties within those APEs, including any data concerning possible historic properties not yet identified.

434.    The BIA Defendants did not involve the SHPO in that process and thereby violated 36 C.F.R. §§ 800.4(a)(1), 800.4(a)(2).

435.    The BIA Defendants failed to appropriately seek information from the Wintu and from PBNI to identify issues relating to the Project's potential effects on historic properties and thereby violated 36 C.F.R. § 800.4(a)(3).

436.    The BIA Defendants failed to gather information from PBNI to assist in identifying properties that might be of religious and cultural significance to PBNI and might be eligible for listing on the National Register and thereby violated 36 C.F.R. § 800.4(a)(4).

437.    The BIA Defendants failed to establish an APE, in consultation with the SHPO, for the Project area affected by the construction of the Utilities/Infrastructure Improvements.

438.    The BIA Defendants failed to establish an APE, in consultation with the SHPO, for the construction of 28 parking spaces along Bechelli Lane adjacent to the North Access Improvements area.

B.     **Failure to Consult with the SHPO or PBNI in Taking Steps to Identify Historic Properties**

439.    The BIA Defendants relied *solely* upon AES to undertake steps to identify historic properties within (the various and inconsistent) APEs established by AES.

440.    The BIA Defendants did not involve the SHPO in that process and thereby violated 36 C.F.R. § 800.4(b).

441.    The BIA Defendants did not consult with PBNI in taking steps to identify historic properties within any APEs and thereby violated 36 C.F.R. § 800.4(b).

C.     **Failure to Make Reasonable and Good Faith Efforts to Identify Historic Properties**

442.    The BIA Defendants violated the mandate of 36 C.F.R. § 800.4(b)(1) that, in consultation with the SHPO and "any Indian tribe that might attach religious and cultural significance to properties within the area of potential effects," namely, PBNI, they make reasonable and good faith efforts to carry out appropriate identification efforts, including as follows:

443.    The BIA Defendants failed to consult with PBNI in taking steps to identify historic properties within any APE—in particular, to identify the Six Wintu Villages; their relationships to each other; their relationship to Strawberry Fields; and their association, and that of Strawberry Fields, to the Fremont Massacre, all as part of a Wintu/Nomlaki district, traditional cultural property, and/or cultural landscape.

444.    The BIA Defendants failed to seek information from Wintu as a tribal organization, albeit not yet federally recognized, to identify issues relating to the Project's potential effects on historic properties—in particular, to identify the Six Wintu Villages; their relationships to each other; their relationship to Strawberry Fields; and their association, and that of Strawberry Fields, to the Fremont Massacre, all as part of a Wintu/Nomlaki district, traditional cultural property, and/or cultural landscape.

445.    Notwithstanding their knowledge of (a) Theodoratus & McBride, 2019; (b) the Tribes' DEIS comments summarizing Theodoratus & McBride; (c) Dotta 1980; (d) Kardell & Dotta 1980; (e)

the location Wintu village, CA-SHA-266, within the North Access Improvement Area; (f) the possibility that another Wintu village, *Nosono* (Curtin village #7) "may be in the project footprint," (g) the NEIC statements that the Site is Wintu aboriginal territory and that Defendants should consult with Native American representatives "regarding traditional cultural properties that may be located within project boundaries; (h) extensive discussions in AES 2016-2019 of Strawberry Fields as the Indigenous territory of the Wintu, but also "occupied" by the Nomlaki; (i) a plethora of Wintu statements that Strawberry Fields is Wintu aboriginal territory with village sites, articulated for nine years, between 2007 and 2016 (as documented in Crawford, 2007, AES 2016a, AES 2016b, and the Scoping Report); and other material information, the BIA Defendants failed to take reasonable steps to identify Strawberry Fields in relationship to the Six Wintu Villages and the association of the Six Wintu Villages and Strawberry Fields with John Fremont, Noel-putis, and the Fremont Massacre, all as part of a Wintu/Nomlaki district, traditional cultural property, and/or cultural landscape, under Criteria A, B and/or D.

446. Notwithstanding their knowledge of (a) Theodoratus & McBride, 2019; (b) the Tribes' DEIS comments summarizing Theodoratus & McBride; (c) Dotta 1980; (d) Kardell & Dotta 1980; (e) the location Wintu village CA-SHA-266 within the North Access Improvement Area; (f) the possibility that another Wintu village, *Nosono* (Curtin village #7), "may be in the project footprint"; (g) the likelihood that all of the Six Wintu Villages are as eligible for listing on the National Register as CA-SHA-266; and other material information, the BIA Defendants failed to make reasonable efforts to identify and evaluate *Nosono* and others of the Six Wintu Villages.

447. The BIA Defendants established intractably contradictory APEs:

- one (the "SHPO APE") to secure the SHPO's May 9, 2023 concurrence with Defendants' finding of "no historic properties affected," limited to the 221.41-acre Strawberry Fields Site (previously referred to as 245 acres);

- and another (the "Public APE"), for announcing to the public in the DEIS and the FEIS, made up of separate APEs for the 221.41-acre Strawberry Fields Site, the North Access Improvement Area, and the South Access Improvement Area.

448.    The SHPO APE violates the plain language of NHPA, defining "an area of potential effects" to include "areas within which an undertaking may directly or indirectly" affect historic properties, 36 C.F.R. § 800.16(d), as well as Congress's intent and purpose to protect historic properties through the Act.

449.    In persuading the SHPO to accept the illegal SHPO APE for the Project as set forth in the SHPO Letter, and at all other material times, the BIA Defendants failed to disclose material information to the SHPO, including:

- AES 2017, reporting the Project's adverse effects upon CA-SHA-266 in the North Access Improvement Area and the need to resolve them through consultation and agreement with the SHPO;

- DEIS sections describing Defendants' asserted efforts to identify historic properties in the North Access Improvement Area and the South Access Improvement Area;

- DEIS sections stating that CA-SHA-266 is a historic site within the Project's APE, eligible for National Register listing;

- DEIS sections stating that the Project's adverse effects upon CA-SHA-266 would need to be resolved through consultation and agreement with the SHPO;

- Dotta 1980, Kardell & Dotta 1980, and/or Theodoratus & McBride 2019;

- the Tribes' summary of Theodoratus & McBride in the Tribes' DEIS comments; and

- that BIA Defendants used the Public APE in the DEIS, published in 2018 and never changed it in the FEIS, published in 2024.

450.    Even if, notwithstanding the BIA Defendants' NHPA violations described above, the Public APE was held to be legal, the BIA Defendants (a) made no effort to identify historic properties in the southern half of the North Access Improvement Area, and did not enter into an agreement with the SHPO to defer such efforts; (b) claimed that they engaged in efforts to identify historic properties in the area for construction of Utility/Infrastructure Connections, which is near or overlaps with the southern half of the North Access Improvement Area, but did not engage in such efforts, and did not enter into an

agreement with the SHPO to defer such efforts; and (c) claimed that they engaged in efforts to identify historic properties in the South Access Improvement Area, but did not engage in such efforts, and did not enter into an agreement with the SHPO to defer such efforts.

**D.**     **Failure to Evaluate the Historic Significance of Identified Historic Properties as Required by Law**

451.    The BIA Defendants violated the mandate of 36 C.F.R. § 800.4(c)(1) that, in consultation with the SHPO and "any Indian tribe that attaches religious and cultural significance to identified properties," namely, PBNI, they apply National Register criteria to such properties and, in doing so, "acknowledge that Indian tribes . . . possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them" because (a) they excluded the SHPO from any such consultation regarding CA-SHA-266 and (b) they excluded PBNI from any such consultation regarding CA-SHA-266 and CA-SHA-4413.

452.    Even if the BIA Defendants did not so violate the mandate of 36 C.F.R. § 800.4(c)(1), they abused their discretion by not applying Criterion B to CA-SHA-266 and/or CA-SHA-4413 given the association of CA-SHA-266, and the likely association of CA-SHA-4413, with the Six Wintu Villages and, the likely collective association of these two properties "with the lives of persons significant to our past," namely, John Fremont, Jeremiah Curtin, and/or Norel-putis.

453.    Even if the BIA Defendants did not violate the mandate of 36 C.F.R. § 800.4(c)(1) as described above, they abused their discretion by not applying Criterion A to CA-SHA-266 and/or CA-SHA-4413 given the association of CA-SHA-266, and the likely association of CA-SHA-4413, with the Six Wintu Villages and their collective association with an event "that made a significant contribution to the broad patterns of our past," namely, the Fremont Massacre.

454.    Even if the BIA Defendants did not violate the mandate of 36 C.F.R. § 800.4(c)(1) as described above, they abused their discretion by applying Criterion D to CA-SHA-266 and/or CA-SHA-4413 in a vacuum, without considering the likely ability of CA-SHA-266 and/or CA-SHA-§4413 to

yield information important to prehistory or history because CA-SHA-266 is part of the Six Wintu

Villages transecting the Site and CA-SHA-4413 is in the immediate vicinity of the Six Wintu Villages,

and both are, therefore, likely part of a Wintu/Nomlaki district, traditional cultural property, and/or a

cultural landscape as described throughout this complaint.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## FIFTH CLAIM FOR RELIEF

**(Violations of the National Historic Preservation Act, 54 U.S.C. §§ 306101 *et seq.*, and the
Administrative Procedure Act, 5 U.S.C. §§ 701-706 - Failure to Assess and Resolve Adverse
Effects to Historic Properties as Required by Law)
(Against the BIA Defendants)**

455.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

456.    The BIA Defendants found that the Project will have adverse effects upon CA-SHA-266,

and violated NHPA's requirements to assess and resolve those adverse effects, including as follows:

457.    The BIA Defendants never gave notice of the adverse effects to CA-SHA-266 to the

SHPO and never invited the SHPO to give the SHPO's views about assessing or resolving them, thereby

violating 36 C.F.R. § 800.4(d)(2),

458.    The BIA Defendants never consulted with the SHPO to resolve the Project's adverse

effects upon CA-SHA-266, thereby violating 36 C.F.R. §§ 800.5(d)(2), 800.6(a), and 800.6(b)(1)(i).

459.    The BIA Defendants never notified the ACHP of their finding that the Project will have

adverse effects upon CA-SHA-266 and never provided the ACHP with the documentation specified in

36 C.F.R. § 800.11(e), thereby violating 36 C.F.R. § 800.6(1).

460.    The BIA Defendants never (a) made the documentation required by 36 C.F.R. §§

800.11(e) and 800.6(a)(4) available to the public, (b) afforded members of the public an opportunity to

express their views on resolving adverse effects of the Project upon CA-SHA-266, or (c) ensured that

the public's views would be considered, thereby violating 36 C.F.R. §§ 800.6(4), 800.11(e).

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SIXTH CLAIM FOR RELIEF

**(Violations of the National Historic Preservation Act, 54 U.S.C. §§ 306101 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 – Unlawful Use of the NEPA Process and Documentation in Lieu of the Section 106 Process and Documentation)**
**(Against the BIA Defendants)**

461.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

462.    The BIA Defendants purported to use the process required by NEPA and the NEPA Documents to comply with Section 106 in lieu of the procedures set forth in 36 C.F.R. §§ 800.3-800.6 without notifying the SHPO and the ACHP in advance of their intention to do so, thereby violating 36 C.F.R. § 800.8(c).

463.    In preparing the NEPA Documents, the BIA Defendants failed to follow the NHPA standards for developing environmental documents to comply with Section 106 and violated 36 C.F.R. §§ 800.8(c)(1)(i), 800.8(c)(1)(ii), 800.8(c)(1)(iii), and 800.8(c)(1)(v).

464.    The BIA Defendants did not submit the DEIS or the FEIS to Indian tribes that "might attach religious and cultural significance to affected historic properties" namely, PBNI, prior to or when making either document available to the public, thereby violating 36 C.F.R. § 800.8(c)(2).

465.    The BIA Defendants did not submit the DEIS or the FEIS to the SHPO prior to or when making either document available to the public, thereby violating 36 C.F.R. § 800.8(c)(2).

466.    The BIA Defendants did not submit the DEIS or the FEIS to the ACHP prior to or when making either document available to the public, thereby violating 36 C.F.R. § 800.8(c)(2).

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SEVENTH CLAIM FOR RELIEF

**(Violations of the National Historic Preservation Act, 54 U.S.C. §§ 306101 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 - Failure to Comply with Legal Standards for Public Involvement and Access to Information)**
**(Against the BIA Defendants)**

467.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

468.    The BIA Defendants have violated the directive of NHPA set forth in 36 C.F.R. § 800.2(d) that "the views of the public are essential to informed Federal decisionmaking in the [S]ection 106 Process" and that they "must, except where appropriate to protect confidentiality concerns . . ., provide the public with information about the undertaking and its effect on historic properties and seek public comment and input," including as follows:

469.    The BIA Defendants never consulted with the SHPO to develop a plan for involving the public in the Section 106 Process, thereby violating 36 C.F.R. § 800.3(e).

470.    The BIA Defendants never consulted with the SHPO or the ACHP to determine whether information that is material to the BIA Defendants' Section 106 Process, including AES 2016-2019 and the BIA Defendants' correspondence with the SHPO, other than the SHPO Letter, should be confidential or who may have access to such information, thereby violating 36 C.F.R. § 800.11(c).

471.    The BIA Defendants have wrongfully withheld from the public and from the Tribes their correspondence with the SHPO.

472.    The BIA Defendants completely sequestered AES 2017, AES 2019a, and AES 2019b from the public until April 2023, thereby depriving the public of any possible access to these reports in time to comment on the DEIS in June 2019.

473.    As of April 2023, the BIA Defendants only made AES 2017, AES 2019a, and AES 2019b available to members of the public who knew that the reports were housed at NEIC and could enlist a qualified individual or organization to obtain them.

474.    The BIA Defendants failed to make AES 2016a and AES 2016b available to the public in any manner until March 2017, and then, only to members of the public who knew that the reports were housed at NEIC and could enlist a qualified individual or organization to obtain them.

475.    At all material times, any concerns about the confidentiality of locations of historic properties or cultural resources in the AES reports could have addressed by providing the public with access to redacted versions of the reports.

476.    The BIA Defendants failed to disclose in the NEPA Documents the existence of one or more additional AES reports material to the Project and Section 106 Process.

477.    The AES reports, if obtained by members of the public, fail to explain which of at least five separate and inconsistent APEs that the reports identify constitute the operative APE for identifying historic properties that may be affected by the Project.

478.    As set forth above, in the DEIS and the FEIS, the BIA Defendants found that the Project will have adverse effects upon CA-SHA-266 and then violated NHPA by failing to properly inform the public of that finding with required documentation.

479.    The BIA Defendants' NEPA Documents do not depict on any map or figure the location of the natural gas pipeline or underground electricity transmission upgrades associated with the offsite Utility/Infrastructure Connections and fail to disclose that potential excavations could extend to 10 feet in order to accommodate utility trenching.

480.    On the face of the DEIS, the FEIS, and the ROD, the BIA Defendants made no finding of "no historic properties affected" for the Project within the Public APE other than with respect to CA-SHA-4413, but the BIA Defendants did not state that they have reduced, or plan to reduce, the Public APE to the SHPO APE.

481.    The only way for the public to discern that the BIA Defendants claim to have made a finding of "no historic properties affected" for the entire Project is to dig into Table 2 to Attachment 3 to

the ROD, only made available as of July 2024, and find the BIA Defendants' Response to Comment "T-2" of the Tribes' FEIS Comments, where Defendants, for the first time, disclose that they claim to have made that finding over a year earlier with SHPO concurrence on the basis of the SHPO APE.

482.    The BIA Defendants thereby not only foreclosed the public from commenting on their "no historic properties affected" finding, but left the public without any way to understand the BIA Defendants' process because the BIA Defendants failed to disclose correspondence between the BIA Defendants and the SHPO between March 2020 and April 2023.

483.    Thus, the public is left with intractable, unexplained contradictions between (a) the BIA Defendants' finding of adverse effects to CA-SHA-266 in the DEIS and FEIS, and (b) the BIA Defendants' purported finding of "no historic properties affected" through its described, but undisclosed, correspondence with the SHPO in Table 2, Attachment 3 to the ROD.

484.    Further, the BIA Defendants have failed to make comprehensible documentation available to the public to support their purported finding of "no historic properties affected" as required by 36 C.F.R. § 800.11(a) and § 800.11(d) because: (a) the basis for the BIA Defendants' finding is not spelled out on the face of the ROD, the FEIS, or the DEIS, (b) that finding stands in contradiction to the BIA Defendants' DEIS and FEIS "adverse effects" finding regarding CA-SHA-266, and (c) the DEIS and the FEIS use the Public APE, but the BIA Defendants' "no historic properties" finding rests upon reducing it to the SHPO APE, which can only be found by reading the SHPO Letter, Attachment P to the voluminous 2,518-page FEIS.

485.    In leaving the public bewildered by such documentation, the BIA Defendants have violated not only 36 C.F.R. §§ 800.11(a) and 800.11(d), but also NHPA's "essential" mandate that the BIA Defendants keep the public properly informed, 36 C.F.R. § 800.2(d).

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**III.    VIOLATIONS OF THE ESA, THE MSA, AND NEPA (EIGHTH THROUGH FOURTEENTH CLAIMS FOR RELIEF)**

    **A.    Statutory and Regulatory Framework of the ESA, MSA, and NEPA**

        **1.    The ESA**

486.    The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The statute's primary goal is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). "[T]he plain intent of Congress in enacting the [ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184.

487.    To receive the protection of the ESA, a marine species must first be listed by the Secretary of Commerce as "endangered" or "threatened." *See* 16 U.S.C. § 1533.[5] After a species is listed, the substantive obligations of the ESA apply to that species. These include the prohibition on take, the duty of federal agencies to consult with NFMS, and the duty to ensure that those agencies' actions do not jeopardize the continued existence of listed species or adversely modify critical habitat. *See Tenn. Valley Auth.*, 437 U.S. at 180-182.

488.    The ESA requires the Secretary of Commerce to designate critical habitat at the same time a marine species is listed, and such designation must be based on the "best scientific data available." 16 U.S.C. § 1533(a)(3)(A)(i), (b)(2), (b)(6)(C). Critical habitat may include both occupied and unoccupied areas that are "essential for the conservation of the species." *Id.* § 1533(b)(2). "Conservation" is defined in turn to include all methods that can be employed to "bring any endangered species or threatened species to the point at which" the protection of the ESA is "no longer necessary." 16 U.S.C. § 1532(3). As such, "the purpose of establishing 'critical habitat' is for the government to

---

[5] The Secretary of Commerce oversees ESA listing of marine species, which includes the anadromous species at issue in this case.

carve out territory that not only [is] necessary for the species' survival but also essential for the species' recovery." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004).

489.    Section 7(a)(2) of the ESA commands all federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . ." 16 U.S.C. § 1536(a)(2).

490.    To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

491.    "Destruction or adverse modification" of critical habitat means "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation or a listed species." 50 C.F.R. § 402.02. An adverse modification of critical habitat includes modifications that threaten not just the survival of a threatened or endangered species but also its recovery. *See id.*

492.    "Effects of the action are *all consequences* to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. . . . Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." 50 C.F.R. § 402.02 (emphasis added).

493.    Federal agencies must "use the best scientific and commercial data available" in assessing a proposed action's impact on a protected species. 16 U.S.C. § 1536(b)(3)(A).

494.    In order to ensure compliance with the ESA, the act and its implementing regulations require action agencies—the BIA, here—to consult with the appropriate federal fish and wildlife agency—NMFS, here—whenever their actions "may affect" an endangered or threatened species. *See*

50 C.F.R. § 402.14(a). If the action agency subsequently determines, in a biological assessment, that its action is "likely to adversely affect" a protected species or its critical habitat, it must engage in formal consultation. *Id.* The ESA's threshold for triggering the formal consultation requirement is "very low." *See* 51 Fed. Reg. 19,926, 19,949 (June 3, 1986).

495.    A biological assessment is inadequate if an agency fails to consider important aspects of a project's effects, or if the agency fails to consider relevant factors and articulate a rational connection between facts found and choices made. *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886 (9th. Cir. 2002).

496.    If the action agency determines that an action is "not likely to adversely affect" the species, it may attempt informal consultation. *See* 50 C.F.R. § 402.13(a). This does not end the consultation process. The consulting agency must issue a written concurrence in the determination or may suggest modifications that the action agency could take to avoid the likelihood of adverse effects to the listed species. *See* 50 C.F.R. § 402.13(b). If no such concurrence is reached, the regulations require that formal consultation be undertaken. *See* 50 C.F.R. § 402.14.

497.    Formal consultation requires that the consulting agency issue a biological opinion determining whether the action is likely to jeopardize the listed species and describing, if necessary, reasonable and prudent alternatives that will avoid a likelihood of jeopardy. *See* 16 U.S.C. § 1536(b)(3)(A).

498.    The ESA authorizes private enforcement of the consultation requirements through a broad citizen suit provision. "[A]ny person may commence a civil suit on his own behalf to enjoin any person, including . . . any . . . governmental instrumentality or agency . . . who is alleged to be in violation of any provision of [the ESA] . . .." 16 U.S.C. § 1540(g).

499.    The BIA Defendants and the NMFS Defendants failed to satisfy these requirements in numerous ways as outlined herein.

## 2.    **The MSA**

500.    Section 305(b)(2) of the MSA, U.S.C. § 1855(b)(2), and its enabling regulations, 50

C.F.R. §§ 600.920 *et seq.*, requires that federal agencies consult with NMFS "with respect to any action

authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by such agency

[or delegate] that *may* adversely affect any essential fish habitat." (emphasis added). The purpose of this

consultation is to protect habitat that managed fish species—in this case, Sacramento River fall-run,

Sacramento River winter-run and Central Valley spring-run Chinook salmon—need to complete their

life cycles.

501.    "Essential Fish Habitat" or "EFH", means:

[T]hose waters and substrate necessary to fish for spawning, breeding, feeding, or growth
to maturity. For the purpose of interpreting the definition of essential fish habitat:
"Waters" include aquatic areas and their associated physical, chemical, and biological
properties that are used by fish and may include aquatic areas historically used by fish
where appropriate; "substrate" includes sediment, hard bottom, structures underlying the
waters, and associated biological communities; "necessary" means the habitat required to
support a sustainable fishery and the managed species' contribution to a healthy
ecosystem; and "spawning, breeding, feeding, or growth to maturity" covers a species'
full life cycle.

50 C.F.R. § 600.10.

502.    "Adverse effect," in this context, "means any impact that reduces quality and/or quantity

of EFH. Adverse effects may include direct or indirect physical, chemical, or biological alterations of

the waters or substrate and loss of, or injury to, benthic organisms, prey species and their habitat, and

other ecosystem components, if such modifications reduce the quality and/or quantity of EFH." 50

C.F.R. § 600.910(a) (emphasis added). Furthermore, "[a]dverse effects to EFH may result from actions

occurring within EFH or outside of EFH and may include site-specific or habitat-wide impacts,

including individual, cumulative, or synergistic consequences of actions." *Id.* (emphasis added).

503.    All EFH assessments or "EFHAs" must contain: (a) a description of the action; (b) an

analysis of the potential adverse effects of the action on EFH and the managed species; (c) the action

agency's conclusions regarding the effects of the action on EFH; and (d) any proposed mitigation. 50 C.F.R. § 600.920(e)(3). An action agency can limit its EFH assessment to these minimum requirements, and thus engage in what are known as the "abbreviated consultation procedures" with NMFS, only if its action does not have the potential to cause substantial adverse effects on EFH. *Id.* § 600.920(h).

504.    However, if the action does have the potential to cause substantial adverse effects on EFH, the action agency must engage in what is known as "expanded consultation procedures" with NMFS. 50 C.F.R. § 600.920(i). These procedures are intended to "allow [] maximum opportunity for NMFS and the [action] agency to work together to review the action's impacts on EFH and to develop EFH Conservation Recommendations." *Id*. As appropriate, these expanded consultation procedures should involve: (a) an on-site inspection to evaluate the habitat and the site-specific effects of the project; (b) the views of recognized experts on the habitat or species that may be affected; (c) a review of pertinent literature and related information; (d) an analysis of alternatives to the action, including alternatives that could avoid or minimize adverse effects on EFH; and (e) analysis of other relevant information. 50 C.F.R. § 600.920(e)(4).

505.    If the action agency believes that its action would not result in substantial adverse impacts to EFH, it may submit an EFHA meeting the minimal requirements discussed above. 50 C.F.R. § 600.920(h)(2). However, if NMFS determines that, in fact, "the action may result in substantial adverse effects on EFH, or that additional analysis is needed to assess the effects of the action," NMFS must request that the action agency engage in expanded consultation. 50 C.F.R. § 600.920(h)(3).

506.    At all stages in this process, both the action agency—the BIA, here—and NMFS are required to "use the best scientific information available regarding the effects of the action on EFH and the measures that can be taken to avoid, minimize, or offset such effects."  50 C.F.R. § 600.920(b).

507.    The BIA Defendants and NMFS failed to satisfy these requirements in numerous ways as outlined herein.

### 3.    **NEPA**

508.    NEPA establishes a national policy to "prevent or eliminate damage to the environment and biosphere."  42 U.S.C § 4321. NEPA recognizes "the critical importance of restoring and maintaining environmental quality," declares the federal government has a continuing responsibility to use "all practicable means" to minimize environmental degradation, and directs that "to the fullest extent possible ... the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act."  42 U.S.C. §§ 4331(a), 4332(1). NEPA also recognizes the right of each person to enjoy a healthful environment. 42 U.S.C. § 4331(c).

509.    NEPA's implementing regulations are codified at 40 C.F.R. §§ 1500 *et seq.*

510.    NEPA requires all agencies to prepare a detailed environmental impact statement ("EIS") on every proposal for a major federal action that could potentially have a significant effect on the quality of the human environment. 42 U.S.C. § 4322(2)(c). Under NEPA, an agency must prepare an EIS when an action may have a significant environmental effect, 40 C.F.R. § 1508.3, or where there is a substantial question raised as to whether an action may have an environmental effect.

511.    NEPA also requires that, in preparing an EIS, that the agency amongst other things: (a) adequately consider, analyze, and disclose the individual and cumulative environmental impacts of the proposed action and alternatives to it, 42 U.S.C. § 4332(2)(C); 23 C.F.R. §§ 771.105; 40 C.F.R. § 1502; (b) adequately establish the purpose and need for the proposed action under review, 23 U.S.C. § 139(f); 40 C.F.R. § 1502.13; (c) rigorously explore and objectively evaluate all reasonable alternatives to the proposed action, 42 U.S.C. § 4332(2)(C)(iii); 23 C.F.R § 771.105; 40 C.F.R. § 1502.14; (d) rigorously explore and objectively evaluate appropriate mitigation measures not already included in the proposed action or alternatives, 23 C.F.R. § 771.119(b); 40 C.F.R § 1502.14(f); and (e) present the EIS for, and respond to, comments on any proposed major federal action that could significantly affect the quality of the human environment, 40 C.F.R. § 1503.2.

512.    To fulfill their obligations under NEPA, "agencies must take a 'hard look' at the environmental consequences of their actions, and provide for broad dissemination of relevant environmental information." *Pub. Emps. for Env't Resp. v. Hopper* ("PEER"), 827 F.3d 1077, 1082 (D.C. Cir. 2016) (cleaned up).

513.    An agency is required to evaluate cumulative impacts along with the direct and indirect impacts of a proposed action. *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (cleaned up). A "meaningful cumulative impact analysis must identify" five things: "(1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Grand Canyon Trust v. F.A.A.,* 290 F.3d 339, 345-46 (D.C. Cir. 2002) (citation omitted).

514.    The BIA Defendants failed to satisfy these requirements in numerous ways as outlined herein.

## EIGHTH CLAIM FOR RELIEF

**(Violations of the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* – Failure to Adequately Engage in ESA § 7 Consultation)**
**(Against the BIA Defendants)**

515.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

**A.    The Listed Species and Critical Habitat**

516.    As part of its review of the Project, the BIA Defendants drafted their BA/EFHA concerning the Project's impacts on the listed fish species and their critical habitat and provided that review to the NMFS Defendants to initiate ESA section 7 consultation, in March of 2019. The BA/EFHA concluded the Project will have no effect on any of the listed species or designated critical

habitat or EFH.

517.     The Project action area is adjacent to approximately one linear mile of the Sacramento River, which makes up the entire western boundary of Strawberry Fields. The Sacramento River is designated as critical habitat for four species of fish listed as either endangered or threatened under the ESA: winter-run Chinook, spring-run Chinook, steelhead, and green sturgeon (collectively, the "listed species").

518.     In 1989, NMFS listed the winter-run Chinook as threatened with extinction under the ESA. In 1994, recognizing the continuing decline of the remaining populations of the winter-run Chinook, NMFS reclassified winter-run Chinook as endangered under the ESA, and reaffirmed that listing, in 2005. Since time immemorial, winter-run Chinook have been born, matured, and then returned to spawn in the Sacramento River and its tributaries. Thus, in 1993, NMFS designated the Sacramento River, from Keswick Dam south to Sacramento-San Joaquin River Delta, and its tributaries as critical habitat for the winter-run Chinook. The 30-kilometer stretch south of Keswick Dam is considered the last remaining spawning habitat for the winter-run Chinook. Strawberry Fields abuts the eastern shore of the Sacramento River that is designated as critical habitat for winter-run Chinook, with portions of the planned multi-acre casino, hotel, retail, and event center complex to be built nearly 150 feet from the water's edge.

519.     In 1999, NMFS listed spring-run Chinook salmon as threatened with extinction under the ESA, and reaffirmed that listing. in 2005. Since time immemorial, spring-run Chinook have been born, matured, and then returned to spawn in the Sacramento River and its tributaries. Thus, in 2005, NMFS designated the Sacramento River, from Keswick Dam south to the Sacramento-San Joaquin River Delta, and its tributaries as critical habitat for the spring-run Chinook ESU. Strawberry Fields abuts the eastern shore of the Sacramento River that is designated as critical habitat for spring-run Chinook, with portions of the planned multi-acre casino, hotel, retail, and event center complex to be built nearly 150 feet from

the water's edge.

520. In 1998, NMFS listed the steelhead as threatened with extinction under the ESA, and reaffirmed that listing, in 2005. Since time immemorial, steelhead have been born, matured, and then returned to spawn in the Sacramento River and its tributaries. Thus, in 2005, NMFS designated the Sacramento River, from Keswick Dam south to the Sacramento-San Joaquin River Delta, and its tributaries as critical habitat for the steelhead. Strawberry Fields abuts the eastern shore of the Sacramento River that is designated as critical habitat for the steelhead, with portions of the planned multi-acre casino, hotel, retail, and event center complex to be built nearly 150 feet from the water's edge.

521. In 2006, the green sturgeon was listed by NMFS as threatened. Green sturgeon is a long-living species, only reaching sexual maturity after fifteen years that is spent mostly in marine habitats after hatching and rearing in their natal rivers and streams. Once sexually mature, green sturgeon spawn every three to four years, primarily in the Sacramento River. For this reason, in 2009, NMFS designated the Sacramento River as critical habitat for the green sturgeon. Strawberry Fields abuts the eastern shore of the Sacramento River that is designated as critical habitat for the green sturgeon, with portions of the planned multi-acre casino, hotel, retail, and event center complex to be built nearly 150 feet from the water's edge.

522. The Sacramento River, from Keswick Dam to Cottonwood Creek, is listed as impaired for temperature and unidentified toxicity on the Clean Water Act §303(d) list of impaired waterways.

523. In addition to the critical habitat in the mainstem of the Sacramento River that is adjacent to Strawberry Fields, approximately 2.15 acres of riverine habitat *in* Strawberry Fields, consisting of a backwater of the river and floodplain habitat, is also designated as critical habitat for the listed fish species.

524. The habitat on and adjacent to Strawberry Fields is critically important to the survival and

recovery of the listed species.

**B.**     **The Project and Potential Effects on Listed Species and Critical Habitat**

525.    Strawberry Fields, with the exception of approximately 2.5 acres that the Rancheria illegally graded and rocked to create a parking area and improve a dirt track immediately after the ROD was issued, is currently undeveloped, with no significant impervious surfaces and no sources of artificial light during day or night hours.

526.    The Project will require extensive earthmoving, grading, 94,000 cubic yards of cut and fill, paving and other alterations that will directly impact no less than 57 acres of what as currently an undeveloped natural habitat adjacent to the listed species' critical habitat.

527.    The Project will significantly affect the stormwater drainage patterns on the Site, particularly on the development portion, at least 57 acres, where grassland habitat will be replaced by impervious parking lots and massive structures housing the casino, hotel, restaurants, retail spaces, event center, and associated offices and infrastructure. As shown in the Site Plan (Illustration 2 above), the boundary of the construction envelope, and earthmoving, both cut and fill, and subsequent construction under the approved development, will in many areas be no more than 150 feet from the river.

528.    As depicted in Illustration 2 above and Illustration 20 below, moving from north to south, the Project places a parking lot, outdoor sports retail building, resort entry, hotel, outdoor pool and event center on the western edge of the development closest to the water's edge. The hotel, outdoor sports retail building and parking lot will be constructed 150 feet from the water, and the outdoor pool is located approximately 200 feet away. All of this construction will involve substantial cut and fill.



Illustration 20

529.    The Project includes a planned 40-foot-wide, 5-feet-deep vegetated swale, to be located

on the eastern side of the development, between the access road and I-5, that will purportedly convey

stormwater from the development area south to a 650,000 cubic foot retention pond (alternatively

referred to as the "wet pond"). The vegetated swale will also capture potential stormwater flow from

Churn Creek, situated to the east of the Project. During storm events smaller than a 100-year event,

approximately 600-700 cubic feet per second flows over I-5, through the Strawberry Fields Site and to the Sacramento River. The vegetated swale will purportedly capture these flows, in addition to the runoff from the Site, and convey the runoff to the retention pond.

530.    The retention pond will hold standing water throughout the year, at least during the wet season, and is located within the 100-year floodplain. According to the grading and drainage plan included in the BA/EFHA, during "rare extreme runoff events, the wet pond will spill and runoff will make its way south to the Sacramento River. The wet pond will be submerged when the Sacramento River is flooding." This means that during intense precipitation events, like those increasingly common in a climatic regime affected by climate change, the retention pond that stores all of the stormwater runoff from the Strawberry Fields Site will comingle with the Sacramento River which is designated critical habitat for the listed species and EFH for the Chinook salmon.

531.    As shown in Illustrations 2 and 20 above, the development area for the Project—the area of ground disturbance on which construction will occur—is set back from the edge of the Sacramento River by just over 150 feet in some places, with construction planned right up to the 150-foot streambank setback.

532.    The northern parking lot, the outdoor sports retail building, the hotel, outdoor pool and event center are all located on the western edge of the Project adjacent to the Sacramento River, and each of these are sources of artificial light at night ("ALAN") that poses potential deleterious effects to the quality of the critical habitat and the listed species found therein.

533.    A BIA response to public comments on the DEIS—released, in February of 2024, long after the NMFS Defendants concurred in the BA/EFHA's assessment and conclusions regarding Project effects on the listed species—states that lighting "will consist of pole-mounted lights up to a maximum height of 25 feet and use high pressure sodium or light-emitting diodes (LEDs) with cut-off lenses and downcast illumination, *unless an alternative light configuration is needed for security or emergency*

*purposes.*" (emphasis added). As this makes clear, any measures to reduce ALAN produced by the Project are purely optional and can be eliminated from the Project in the name of security and safety at the Rancheria's discretion.

534.    The BA/EFHA fails to utilize the best available science in disclosing and analyzing the Project's effects on the listed species and their critical habitat, and therefore the BIA Defendants failed to carry out their obligations under section 7 of the ESA.

### C.    The BIA Defendants Failed Their Section 7 Obligations in Assessing the Project's Effects on the Listed Species

535.    The BA/EFHA's analysis and conclusion concerning the Project's effects on the listed species is not supported by the best available science, and therefore the BIA Defendants' reliance on the BA/EFHA to satisfy its section 7 consultation obligations was arbitrary and capricious. Of its multiple failings, detailed below, the BA/EFHA fails to:

a)  Describe or assess the baseline condition of the listed species and their habitat on either a population-wide basis or in the vicinity of Strawberry Field;

b)  Disclose or assess the effects of Project-generated ALAN on the listed species, specifically the listed salmonids, in their critical habitat adjacent to Strawberry Field;

c)  Disclose or assess the effects of Project stormwater runoff introduced into the critical habitat during high flow events;

d)  Articulate a rational connection between relevant facts and the conclusion reached, by relying on the implementation and efficacy of mitigation measures to prevent stormwater runoff from reaching and affecting the critical habitat that are unenforceable, ineffective, and unlikely to be implemented—evidenced by the Rancheria's commencement of ground disturbing activities without implementing multiple mitigation measures and permit obligations.

536.    The BA/EFHA also does not provide a baseline description of the listed species, leaving

out a key component of an assessment of the Project's potential effect on the species and their continued survival and recovery, as required under the ESA. At a minimum, surveys should have been conducted to determine habitat use by spawning, incubating, rearing, and migrating winter-run Chinook, spring-run Chinook, steelhead, and green sturgeon.

537.    The BA/EFHA only contains a brief description of each species, generally highlighting life history traits and noting the species uses of the critical habitat, and whether the on-site backwater is adequate for certain life histories. There is no snapshot of the species' current status, population trends overall or within the area near the Site.

538.    The BA/EFHA also lacks an assessment of the specific qualities of the critical habitat that is adjacent to the Site. There is no presentation of the characteristics present that support the species survival and recovery. This omission precludes disclosure and analysis—by the consulting agency as well as the public—of the critical habitat's vulnerabilities, such as whether spawning and juvenile rearing that might be particularly susceptible to toxic runoff, or locations where intense ALAN will disrupt movement and foraging patterns or expose individual fish to heightened risks of predation.

539.    For example, the BA/EFHA does not mention that the 30-kilometer stretch of the Sacramento River below the Keswick Dam—the Strawberry Fields Site is approximately 18 kilometers below the Keswick Dam—is considered the last remaining quality habitat for winter-run Chinook and key spawning habitat for both winter-run Chinook and steelhead. The extent to which the Project may affect the critical habitat for the listed species cannot be accurately assessed without first identifying the elements of that habitat that contribute to the listed species' continued survival and recovery.

540.    Additionally, the BA/EFHA fails to characterize or include any existing information characterizing baseline habitat conditions (including physical habitat and substrate composition, water chemistry, and lower trophic level biota essential to salmonids and sturgeon). A thorough characterization of baseline conditions is essential to detect project impacts, measure mitigation

effectiveness, and inform adaptive management to ensure no harm or incidental take occurs of the listed species.

541.    The BA/EFHA also ignores the fact that the Keswick Dam-Clear Creek section of the Sacramento River is listed on the Clean Water Act's §303(d) list as impaired for temperature and unknown toxicity. As noted above, the stretch of the Sacramento River adjacent to the Site provides valuable spawning, migration and rearing habitat for salmonids, and it also runs through Redding, a city of nearly 100,000 residents and all the commercial and industrial land uses that accompany such a city, before reaching the Site. A baseline assessment of the water quality in the Sacramento River above and below the Site are necessary to measure the impacts of further developing the Sacramento River shoreline. The failure to address and identify the current threats posed to the listed species by toxins in the water undermines the analysis of the potential effects that Project-generated stormwater runoff will have on the listed species.

542.    An assessment of water quality impacts from current (pre-Project) site-born runoff is also missing from the BA/EFHA's baseline assessment. As the BA/EFHA notes, during rain events smaller than a 100-year storm, surface runoff from Churn Creek flows over I-5, across the Strawberry Fields Site, and into the Sacramento River. There is no discussion in the BA/EFHA of current sediment and contaminant loading from the Site to the adjacent stretch of the Sacramento River during significant rain events. This information is critical to understanding the baseline condition, and threats thereto, of the critical habitat, but also to reviewing the efficacy of the proposed erosion control measures.

543.    The missing baseline assessment is a threshold failure that invalidates and renders arbitrary and capricious the BA/EFHA's analysis and conclusions.

544.    Flowing from this threshold failure, the BA/EFHA's analysis of Project effects was limited to the potential indirect effects of Project stormwater runoff on the listed species critical habitat and EFH.

545.    Nowhere in the BA/EFHA is there any mention, let alone analysis, of the effects that ALAN produced by the Project will have on the listed species or critical habitat, rendering the BIA Defendants' conclusions in the BA/EFHA invalid and arbitrary and capricious

546.    There is robust scientific literature on the negative impacts of ALAN on fish species, and specifically with regards to salmonids. Despite this well documented and studied issue, and the fact that the Project will introduce significant new sources of ALAN to a previously undeveloped site on the banks of critical habitat for salmonid species, the BA/EFHA is devoid of any discussion or analysis of potential effects of ALAN on the listed species or critical habitat.

547.    Deleterious impacts have been observed in salmonid species that were up to 6 kilometers away from the source of ALAN. The Project will put 24-hour lighting in parking lots and the hotel, in addition to other ALAN, as little as 150 feet away from the water's edge.

548.    The unanalyzed harmful effects of ALAN from the Project on salmonids may include, amongst other things, the following:

a)  Altering out-migration of salmonids down the Sacramento toward the Sacramento-San Joaquin River Delta and then the ocean;

b)  Increasing the density of predator species and increasing the risk of predation by diminishing juvenile salmonids' ability to evade predation, and increasing juvenile salmonid density in shallow habitats thereby increasing predation success by resident trout and other fishes

c)  Altering physiology, movement, predator-prey relationships, stress responses, and natural evolutionary processes of salmonids and other fishes.

549.    As the BIA Defendants did not even mention ALAN in their BA/EFHA, none of the foregoing potential impacts of the Project on the resident listed salmonids were assessed therein, rendering their conclusions in the BA/EFHA invalid and arbitrary and capricious.

550.    The risks posed by ALAN from the Site potentially affect all life stages of the salmonid

species present in the critical habitat adjacent to the Site, including the riverine habitat that is used by juveniles as refuge from the threats already present in the main channel of the river.

551.    The BA/EFHA ignores the best available science by failing to discuss or analyze the deleterious effects that Project ALAN is likely to have on the listed species and critical habitat. This constitutes a failure by the BIA to meet their obligations under section 7 of the ESA, rendering the BIA Defendants' conclusions in the BA/EFHA invalid and arbitrary and capricious.

552.    The BA/EFHA's conclusion that the Project will have no effect on the listed species or critical habitat is additionally invalid and arbitrary and capricious for failure to analyze the impacts of contaminants and sediment from the Site flowing into the critical habitat during storm events.

553.    The Project will convert no less than 53 acres of what is currently grassland habitat to commercial uses associated with the casino development, much of this area will be paved or built on, dramatically altering the location, timing and intensity of stormwater runoff.

554.    The Project plans to direct the stormwater runoff, plus additional stormwater that flows over I-5 from Churn Creek to the Site, to a retention pond via a vegetated swale. The BA/EFHA acknowledges that the retention pond, which will be holding a significant portion of the sediment and contaminant-laden stormwater runoff from the area during storms, will inundate when the Sacramento River floods. The BA/EFHA fails to analyze the effects of this occurrence on the listed species or critical habitat.

555.    The impervious surfaces—parking lots, roadways, loading docks, I-5—from which the runoff in the retention pond originates are sources of contaminants, toxins and other materials that are potentially hazardous to the listed species and critical habitat. The BA/EFHA states that operation and construction will generate hazardous substances that could enter the Sacramento River via stormwater, but concludes the swale/retention pond will avoid those effects. However, at the same time, the BA/EFHA admits that the retention pond will spill into the Sacramento River during flood events,

undermining the design feature's provision of erosion control or water quality protection.

556.    Furthermore, the BA/EFHA also fails to assess the likelihood of the retention pond being inundated, and spilling into the Sacramento River, in a present and future marked by increasingly intense storm events driven by climate change. The frequency and intensity of precipitation events will continue to change, as is well-documented by scientific studies and the lived experiences of everyone in California and the western U.S., and the BA/EFHA's obligation to utilize the best available required an informed analysis of the potential impacts of siting a stormwater retention pond within the floodplain of the Sacramento River.

557.    The BA/EFHA bases its no adverse effect conclusion, in part, on the implementation of Project design features and mitigation measures that will purportedly prevent harmful substances from reaching critical habitat via stormwater runoff, but then acknowledges, without further analysis, that those features will in fact result in the introduction of Project stormwater into the critical habitat during intense storm events. That is arbitrary and capricious.

558.    The BA/EFHA's conclusion of no adverse effects ignores the best available science, is devoid of a rational connection to the relevant facts, and is therefore arbitrary and capricious.

559.    The BA/EFHA's conclusion that Project mitigation measures—creation and implementation of a Stormwater Pollution Prevention Plan and BMPs to combat erosion and stormwater runoff—will prevent any and all effects on listed species and critical habitat is flawed, as the efficacy of the proposed BMPs is also not supported and there are, moreover, serious questions concerning whether the measures will be implemented and enforced.

560.    The stormwater runoff generated by the Project will contain a complex mixture of contaminants that are particularly toxic to salmonids and other fish species, and multiple studies have shown that BMPs, like those proposed for the Project, are not effective in preventing such compounds and toxins from contaminating surface waterways. The BA/EFHA ignores this best available science

rendering its conclusions invalid and arbitrary and capricious.

561.    Best available science indicates that increased impervious surfaces are associated with increased loads of many pollutants including but not limited to:

    a.   Nutrients associated agricultural and, fertilizers used on lawns and golf courses, and treated human waste;

    b.   Hydrocarbon byproducts of trucks, cars, and other human activity;

    c.   Pesticides used for agriculture, residential and commercial landscaping, and for road maintenance;

    d.   Heavy metals that are byproducts of myriad human activities; and

    e.   Recently identified tire compounds that are not only toxic to most salmon species, but also highlight the likely dozens if not hundreds of other unidentified toxic chemicals produced by increasing human activity.

562.    The BA/EFHA's no adverse effect conclusion, which relies on the implementation of BMPs pursuant to a Stormwater Pollution Prevention Plan, as outlined in the ROD, is also arbitrary and capricious because the mitigation measures are unenforceable. The ROD does not provide the authority through which the BIA Defendants can enforce the ROD's prescribed mitigation. In fact, the Rancheria has already violated the terms of the ROD and its mitigation measures, as the Rancheria commenced ground-disturbing activities on the Strawberry Fields—the very activities that pose a threat to the listed fish species and their critical habitat—without first seeking coverage under the National Pollution Discharge Elimination System General Construction Permit and without drafting nor implementing a Stormwater Pollution Prevention Plan ; and neither the BIA Defendants nor any other agency has taken any action in response.

563.    Thus, BIA Defendants' preparation of the BA/EFHA and the conclusion that their actions will not have an adverse effect on the listed fish species or their critical habitat was arbitrary, capricious,

an abuse of discretion, and/or in violation of the law, including without limitation, ESA § 7.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## NINTH CLAIM FOR RELIEF

**(Violations of the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 – Failure to Adequately Engage in Endangered Species Action Section 7 Consultation)**
**(Against the NMFS Defendants)**

564.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

565.    The NMFS Defendants' decision to issue a letter of concurrence in response to the BIA Defendants' BA/EFHA, rather than requiring that the BIA Defendants engage in formal consultation and issuing a biological opinion, was arbitrary, capricious, an abuse of discretion, and/or in violation of the law, including without limitation, ESA § 7.

566.    The NMFS Defendants' concurrence was arbitrary and capricious because the BA/EFHA's analysis of the Project's likely effects on winter-run Chinook, spring-run Chinook, steelhead and green sturgeon is inadequate in the ways identified above.

567.    Because BA/EFHA is flawed in these and the other ways discussed herein, the NMFS Defendants should have required the BIA Defendants to engage in formal consultation concerning the Project's likely effects on the listed fish species, and the NMFS Defendants should have issued a biological opinion concerning these likely affects.

568.    In the alternative, the NMFS Defendants should have, at least, required that the BIA Defendants resolve these flaws in the BA/EFHA before it issued a letter of concurrence.

569.    Thus, the NMFS Defendants' issuance, instead, on May 7, 2019, a letter of concurrence concurring in a finding by the BIA that their actions will not have an adverse effect on the listed fish species or their critical habitat was arbitrary, capricious, an abuse of discretion, and/or in violation of the law, including without limitation, ESA § 7.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## TENTH CLAIM FOR RELIEF

**(Violations of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706)**
**(Against NMFS Defendants)**

570.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

571.    In 1999, the Pacific Fisheries Management Council, pursuant to the enabling regulations of the MSA, 50 C.F.R. §§ 600.805 *et seq.*, designated the Sacramento River as Essential Fish Habitat for Pacific salmon, including winter-run, fall-run, and spring-run Chinook salmon. The main channel of the Sacramento River adjacent to the Strawberry Fields, as well as the stretch of the river north of Strawberry Fields to Keswick Dam and the remainder of the Sacramento River downstream from Strawberry Fields, are included within this designation.

572.    In the BA/EFHA, the BIA Defendants concluded that the Project will have no adverse effects on EFH, in which the NMFS Defendants concurred. The BA/EFHA acknowledges the status of the main channel of the Sacramento River, but downplays the value and contribution to EFH by the riverine habitat on Strawberry Fields.

573.    This riverine habitat, a backwater that is hydrologically connected to the main channel, provides juvenile rearing habitat, which is a life history stage for which the designation of EFH is intended to serve under the MSA. *See* 50 C.F.R. § 600.10. The BA/EFHA and concurrence ignore the importance of the riverine habitat based on the arbitrary and capricious finding that it does "not contain the elements necessary for other life-stage uses[,]" providing no analysis specific to potential impacts to the riverine habitat or seasonal floodplain habitat that could result from the Project. This constitutes a failure to utilize the best available science and is arbitrary and capricious.

574.    The BA/EFHA's analysis of the impacts of Project's stormwater runoff on the EFH, and the NMFS Defendants' concurrence therein, is inadequate because it, amongst other things, failed to review and disclose the baseline condition of the EFH or the Chinook populations present therein, failed to use the best available science when reviewing potential impacts of stormwater-born toxins on the EFH; failed to address the impacts of runoff conveyed to the EFH from the on-site retention pond during storm events; and relied on ineffective and speculative mitigation measures to prevent stormwater runoff impacts.

575.    The BA/EFHA and concurrence completely ignores the effects of Project ALAN on the EFH, and particularly the Chinook salmon present therein, despite the fact that such effects are well established in the literature, as previously detailed herein. Once again, the practical effect of this omission was to confine its analysis to just a subset of the potential impacts—which were also inadequately analyzed—of the Project on the Chinook salmon EFH. The BIA Defendants and the NMFS Defendants ignored their obligations under the MSA to analyze the potential adverse effects of the Project on Chinook Salmon EFH in the vicinity of the Project.

576.    When it received the deficient BA/EFHA from the BIA Defendants, the NMFS Defendants should have required that the BIA Defendants engage in expanded consultation on the bases that there are significant grounds to believe that the Project may adversely affect Chinook salmon EFH and/or that additional analysis is needed to assess the effects of the action. *See* 50 C.F.R. § 600.920(h)(3). The NMFS Defendants also should have used the best scientific data available— including without limitation studies concerning the effects of construction and road runoff and ALAN on Chinook Salmon—in determining whether consultation was needed. Nonetheless, in the same May 9, 2019 letter of concurrence in the BIA Defendants' ESA §7 conclusions, the NMFS Defendants arbitrarily, capriciously, in an abuse of its discretion, and/or in violation with the law, including without

limitation the MSA, failed to require the BIA Defendants engage in consultation procedures concerning the Project's potential adverse effects on Chinook salmon EFH.

577.    Thus, the NMFS Defendants' issuance, instead, on May 7, 2019, a letter of concurrence concurring in a finding by the BIA Defendants that their actions will not have an adverse effect on the Chinook Salmon EFH was arbitrary, capricious, an abuse of discretion, and/or in violation of the law, including without limitation, MSA § 305.

Wherefore, Plaintiffs pray for relief as hereinafter set forth.

## ELEVENTH CLAIM FOR RELIEF

**(Violations of the National Environmental Policy Act, 42 U.S.C. §§ 4331 *et seq*., and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 - Failure to Adequately Describe the Project) (Against the BIA Defendants)**

578.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

579.    NEPA requires an EIS to define the action with a stable and sufficiently detailed description of the project at issue. An adequate project description is vital to the process of informed decision-making that is the heart of the NEPA process. The public cannot properly ascertain the type, intensity and scope of a Project's impacts without an adequate project description.

580.    Built into the required disclosure of a project's description and the scope of its impacts is an analysis of different alternatives. An adequate alternatives analysis presents the public and decision-makers with different proposals, each of which might have varying levels of effects on the human environment, while achieving a project's objectives to varying degrees. An alternatives analysis must be completed before a proposed project can be approved.

581.    The BIA, as the lead agency in this Project, was required to disclose what the Project will be and what it means for members of the public whose interests are potentially affected by the Project.

582.    The BIA Defendants failed in this obligation by, among other things, including in

identified alternatives different "options" for project construction and operation that, depending on which "option" was implemented, will result in significantly different final development features. These "options" were actually alternatives, and the BIA Defendants were required to analyze those different iterations as distinct alternatives in the FEIS.

583.    The Project, as approved by the BIA Defendants' July 1, 2024 ROD, fails to present a clear project description, instead approving a Project, in the form of the Alternative A, the preferred alternative, that contained numerous different development "options", each "option" creating layers of uncertainty for what the ultimate Project will look like, and how it will impact the human environment.

584.    The approved Project allows for the Rancheria, based on their own discretion and not subject to the BIA Defendants' control or review, to choose between several different development "options" (and combinations thereof) for the following major features of the Project:

a)    **Site Access**: The approved Project provides for two "Options" for vehicle access to the proposed casino, retail, hotel, and event center development on Strawberry Fields. Option 1 entails use of what is defined as "the North Access" only, via expansion of Bechelli Lane, including through private property, into the northern end of Strawberry Fields. Option 2 will utilize the North Access and what is defined as "the South Access", via expansion of Adra Way, again through private property to the south of Strawberry Fields;

b)    **Water supply**: The approved Project provides for two "Options" for supplying water to the proposed casino, retail, hotel, and event center development. Option 1, an offsite option, calls for the Rancheria to seek connection to the City of Redding's water supply infrastructure, by trenching running 777 linear feet of pipeline through private property. Option 2, the onsite option, entails the Rancheria installing groundwater wells and potable water treatment facilities on Strawberry Fields;

c)    **Wastewater service**: The approved Project provides for two "Options" for dealing with

the wastewater created by the proposed casino, retail, hotel, and event center development on Strawberry Fields. Option 1 is an offsite option where the Rancheria will seek connection to the City of Redding's wastewater infrastructure, by trenching and laying hundreds of feet of linear pipe through private property. Option 2 is an onsite option where wastewater will be treated, stored, then dispersed via a 33-acre leach field in the southern portion of Strawberry Fields;

d) **Fire Protection and Emergency Services**: The approved Project provides for two "Options" for dealing with fire protection and emergency services once the proposed casino, retail, hotel, and event center on Strawberry Fields was operational. Option 1, the offsite option, calls for service to be provided by Shasta County Fire Department, Cal Fire and/or Redding Fire Department pursuant to the Intergovernmental Agreement between the Rancheria and Shasta County—the validity of which is currently being litigated in state court. Option 2, the onsite option, has the Rancheria constructing, funding the operation, and staffing of a 10,500 sq. ft. public safety building to house fire and emergency services (as well as a police substation) on Strawberry Fields;

e) **Law Enforcement**: The approved Project provides for two "Options" for addressing law enforcement needs once the proposed casino, retail, hotel, and event center on Strawberry Fields are operational. Option 1, the onsite option, the Shasta County Sheriff's Office will provide law enforcement services pursuant to the Intergovernmental Agreement referenced above. Under Option 2 the Rancheria will fund construction and operation of a Public Safety Building on Strawberry Fields, from which the Redding Rancheria Law Enforcement—an entity that is not currently active, funded nor staffed—will provide law enforcement services, possibly with the assistance of third-party contractors, though who such contractors will be is not stated.

585.    The BIA Defendants were required to, but did not, individually analyze the potential effects of the many possible permutations of the Project that could result from the different combination of these various "options."

586.    The FEIS notes what each "option" might entail, but largely defers analysis of the impacts, and determination of whether the option is even feasible, to an unknown date after approval.

587.    The FEIS should have presented, but does not present, these "options" and combinations thereof as alternatives, and should have provided, but does not provide, individual analyses thereof in the same vein as the other Project alternatives that were reviewed.

588.    On the other hand, certain other development pathways were presented and analyzed as distinct alternatives, including with regards to the procurement of site access and utilities services. The FEIS does not explain why these development pathways are presented and analyzed as distinct alternatives, and why others are included in the approved Project as "options." This difference in treatment is arbitrary and capricious.

589.    In Section 2.10 of the FEIS, which addresses the alternatives that were eliminated from further consideration, a "Strawberry Fields site access option 3," was defined as an "alternative." It considered a south access via construction of a full interchange at the Smith Road-I-5 overcrossing. This "alternative" was eliminated because, among other concerns, the construction would "require a considerable amount of ROW [right-of-way] acquisitions from private property owners and would not meet [the California Department of Transportation's ('Caltrans')] interchange spacing requirements for rural areas." However, both of the site access "options" included in the approved Project (the "North Access option" and the "North and South Access option") will also require acquisition of private property for expanded right-of-way options, and the North Access right-of-way expansion will impinge on Caltrans' I-5 interchange spacing.

590.    The FEIS nowhere analyzes the impact of ROW acquisitions or interchange impingement

that will be attendant with either the "North Access option" or the "North and South Access option" or the Rancheria's ability to effectuate the necessary acquisitions or get approval for the impingements, let alone explain why the "Strawberry Fields site access option 3" was rejected as an "alternative" for similar reasons, but the Project with "Options" for both "North Access" only and "North and South Access" was preferable.

591.    The FEIS does not explain the different treatment of possible site access, nor does it explain why it could assess the feasibility of the site access alternative, but did not provide the same analysis concerning the right-of-way needs of the North and South Access options.

592.    The BIA Defendants' treatment of certain development possibilities as "alternatives," which were analyzed as such, while treating other possibilities as "options" to be selected after Project approval, was arbitrary and capricious and denied the public and decision-makers the ability to understand the scope and potential effects of the type of Project that will ultimately be constructed an operated.

593.    Thus, BIA's issuance on July 1, 2024 of the ROD taking Strawberry Fields into trust, based on the analysis and conclusions contained in the FEIS, was arbitrary, capricious, an abuse of discretion, and/or in violation of the law, including without limitation, NEPA.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## TWELTH CLAIM FOR RELIEF

**(Violations of the National Environmental Policy Act, 42 U.S.C. §§ 4331 *et seq*. and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 - Project's Stated Purpose and Need Are Not Reasonable)**
**(Against the BIA Defendants)**

594.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

595.    The FEIS states the purpose and need of the BIA Defendants' proposed action is to "facilitate tribal self-sufficiency, self-determination, and economic development[.]"

596.     There is nothing in the administrative record to indicate that the Rancheria is not already self-sufficient or on solid footing regarding its economic development. In fact, the record indicates the Rancheria and its members are already self-sufficient and economically successful.

597.     The Rancheria—which when the DEIS was prepared in 2017 had 182 adult members and 156 minor members, for a total of 338 enrolled members—operates the Win-River Casino and resort, which generates very significant revenues that fund a robust suite of Tribal services for its members, while allowing annual high per capita payments to them.

598.     The per capita payments paid to each tribal member, in 2017, was estimated to be approximately $67,668. The average annual household income for Shasta County, in 2017, was $65,722. Thus, a household with just one Rancheria member had an income from per capita payments alone that is higher than the average Shasta County household.

599.     In addition to per capita distributions, the Rancheria provides numerous services to its members, and other communities, including but not limited to the following:

a)  Redding Rancheria Tribal Health Care Center in Redding, CA;

b)  Redding Rancheria Trinity Health Care Center in Weaverville, CA;

c)  Churn Creek Healthcare in Redding, CA;

d)  Redding Rancheria Recovery and Wellness Program, offered at Churn Creek Wellness and Dental in Redding, CA;

e)  Head Start and Child Care programs offered through the Children's Center in Redding, CA.

600.     These facts—which were nowhere discussed in the FEIS but are available in the public record—demonstrate that the Rancheria and its members are not, in fact, lacking in economic development or self-sufficiency.

601.     The FEIS, not surprisingly, contains no analysis or description of facts that would support this stated purpose and need, providing *no* information regarding the socioeconomic condition of the

COMPLAINT

Rancheria or its members that would support the need for either economic development or self-sufficiency.

602.    Indeed, the *only* information provided in the FEIS under the heading "Socioeconomic Conditions of the Redding Rancheria" is an age breakdown of the Rancheria's approximate 340 members into four 20-year age ranges. The FEIS does not disclose, or analyze, the Rancheria's current economic status or provide a measure of the Rancheria's current self-sufficiency, let alone its need for economic development or increased self-sufficiency

603.    The BIA Defendants' stated purpose and need for the Project is unreasonable, as it is premised on non-existent concerns and unanalyzed assumptions, in particular that the Rancheria lacks economic self-sufficiency, needs economic development, and that gaming on Strawberry Fields is necessary to restore the Rancheria's land base. In fact, the record shows the Rancheria is more than economically self-sufficient already, and restoring its land base does not require Strawberry Fields, which is linked historically and culturally to the Wintu and Nomlaki, but not ancestors of the Rancheria's members.

604.    The BIA Defendants' unreasonable purpose and need determination was, therefore, arbitrary and capricious and, among other things, unreasonably constrained and narrowed the FEIS' alternatives analysis, in violation of NEPA and the APA.

605.    Thus, BIA's issuance on July 1, 2024, of the ROD taking Strawberry Fields into trust, based on the analysis and conclusions contained in the FEIS, was arbitrary, capricious, an abuse of discretion, and/or in violation of the law, including without limitation, NEPA.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## THIRTEENTH CLAIM FOR RELIEF

(Violations of the National Environmental Policy Act, 42 U.S.C. §§ 4331 *et seq*., and the
Administrative Procedure Act, 5 U.S.C. §§ 701-706 - Failure to Take the Required Hard Look at
Project's Effects on the Human Environment)
(Against the BIA Defendants)

606.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

**A.    The FEIS Failed to Take a Hard Look at Project Effects on the Local Community**

**1.    The FEIS's Conclusion That Project Effects on Public Law Enforcement and Emergency Services Will Be Less Than Significant Is Arbitrary and Capricious**

607.    The FEIS does not specify or adequately analyze how the Project effects on law enforcement and emergency services will be addressed, leaving the public and decision-makers in the dark on a critical Project element and rendering the BIA Defendants' conclusion that such impacts will be less than significant an arbitrary and capricious abuse of discretion.

608.    The FEIS provisionally concludes that the Project will have potentially significant impacts on law enforcement, fire protection, and emergency services, but that those impacts will be reduced to less than significant based on the Rancheria's implementation of various "options" for providing such services. Because the FEIS does not clearly state *which* law enforcement, fire and emergency services option will be selected, the BIA Defendants were required to provide a NEPA-compliant hard look analysis of each option individually, and the BIA falls well short with regard to each option. Thus, the BIA Defendants' conclusion, in the FEIS, that such impacts will be less than significant based on that inadequate analysis was arbitrary and capricious.

609.    The FEIS's analysis of Project impacts on law enforcement, fire and emergency services is legally inadequate because, amongst other things, it fails to take a hard look at:

a)    whether the Intergovernmental Agreement—on which "Option 1" for law enforcement, fire protection, and emergency services is premised—provides sufficient funding to County fire, law enforcement, emergency service agencies, as well as Redding Fire Department, such that these agencies will have sufficient resources to both provide the current level of service they provide

to the community and address the increased need for fire, law enforcement, and emergency services created by the Project;

b)  The impacts on community members and/or others within the relevant agency's jurisdiction if the levels of services were reduced as a result of the Project overburdening law enforcement and fire and emergency services;

c)  Whether and how the Rancheria can provide adequate law enforcement, fire, and emergency services needs to the Project under the on-site option; and

d)  The impacts of Project-generated demand for law enforcement and fire and emergency services that occurs outside of the Strawberry Fields, under either option.

610.    Under either option, as described in more detail below, the FEIS only analyzes the Project's impact on the provision of law enforcement, fire and emergency services *on Strawberry Fields*, and completely ignores the impacts of Project-generated service calls in the surrounding communities.

611.    Beyond failing to adequately analyze the impacts under each law enforcement, fire and emergency services option, the FEIS fails to disclose how the ultimate selection of an option will be made.

612.    The Project includes, among other elements, a gaming complex covering over 1,123,200 square feet, including a 9-story hotel, which will be the tallest building between Sacramento and Portland, Oregon.

613.    The casino will contain 1,300 electronic gaming devices, 36 gaming tables and is expected to generate between 4,000 and 5,000 vehicle round trips on Fridays and Saturdays, which could mean over 10,000 patrons daily.

614.    The hotel will contain 225 standard rooms and 25 suites, which will be among the largest hotels in the Redding area. The 130,000 square feet of retail space will generate upwards of 1,500 round trips on busy shopping days, bringing in thousands of customers, while the 10,080 square-foot conference center, with a capacity of 672 people, and 1,800-seat event center will host multiple events each week, adding thousands more to the area.

615.    The FEIS projects that on a typical Friday, all the Project components will combine to

generate approximately 13,521 new car trips, over 6,750 round trips, that will use local and regional roadways on the way to and from the casino complex.

616.    The Project, once operational, will draw large numbers of individuals, residents and travelers alike, to a rural residential area outside the city limits of Redding. The FEIS states that the Project will cause a 52% increase in law enforcement calls originating from Strawberry fields compared to the number of calls received from the Rancheria's currently-operating Win-River Casino and Resort. The FEIS anticipates there will be similar increases in demand for fire and emergency medical response services.

617.    In arriving at this projected increase in calls for service, the FEIS does not disclose the expected number of visitors to the Project on either a daily, weekly, monthly or annual basis, leaving the public in the dark as to accuracy of the expected increase in demand for law enforcement and emergency services.

618.    The increase in demand for law enforcement intervention, whatever the ultimate magnitude of the increase may be, which will occur on and off of Strawberry Fields, will require additional law enforcement capacity—more police officers, staff, equipment, and expanded facilities— which will create a financial burden on the entity providing the service.

619.    And any overburdening of law enforcement, fire and emergency services capacity by the Project's increased demand will result in negative outcomes for local residents and Project patrons and employees alike, who will all suffer from increased crime against people and property.

620.    If the provision of adequate law enforcement, fire and emergency services places a financial burden on the County or the City, those entities, and their taxpayers, will suffer negative impacts due to diminished capacity available to provide necessary services to other areas of the city and/or county.

621.    The FEIS fails to analyze the Project's impacts on law enforcement, fire and emergency

services in the event the proposed options are insufficient—which, as provided below, they are—to address Project-based demand for services.

622.    The FEIS acknowledges that the impacts of the approved Project on law enforcement, fire protection, and emergency services under Option 1 will be potentially significant without mitigation, but ultimately concludes that these impacts will be less than significant, as long as the Rancheria secures the provision of law enforcement, fire protection, and emergency services on Strawberry Fields via the Intergovernmental Agreement or a similar agreement if the Intergovernmental Agreement is terminated.

623.    Under "Option 1," the Shasta County Sheriff's Office ("County Sheriff") will provide law enforcement services pursuant to the Intergovernmental Agreement that is currently subject to legal challenge.

624.    "Option 1" has fire and emergency services provided by Shasta County Fire Department ("County Fire"), Cal Fire and/or Redding Fire Department pursuant to the Intergovernmental Agreement.[6]

625.    The Intergovernmental Agreement, executed between the Rancheria and the County, commits the County to providing law enforcement, fire and emergency services to the Project for up to 30 years.

626.    The Rancheria, for its part, will be required to make certain non-recurring and recurring payments. While the FEIS claims that these payments will mitigate the Project's impacts related to the provision of services to the Project and impacts to roads and traffic, there is no analysis of their sufficiency to do so, and the record demonstrates that they will, in fact, not be sufficient for that purpose.

627.    The *non-recurring* payments to be made by the Rancheria under the agreement for thirty

---

[6] While the Intergovernmental Agreement is between the Rancheria and the County, the FEIS treats Cal Fire and the Redding Fire Department as being bound by its terms due to a "mutual/automatic aid agreement" among the three fire-fighting entities.

years of fire, emergency, and law enforcement services are only as follows:

a) $1,600,000 over three installments ($300,000 upon breaking ground; $300,000 180 days prior to opening of gaming operations; $1,000,000 no later than 180 days after the opening of gaming operations) in lieu of property taxes and fees.

b) $1,000,000 paid upon breaking ground, to fund initial costs associated with providing law enforcement services for the Project.

c) $1,000,000 paid at least 365 days prior to opening of gaming operations, to help fund costs associated with providing fire and emergency services for the Project.

d) Yet-to-be-determined non-recurring payments for potential impacts to roads within the County's jurisdiction 180 days prior to the opening of gaming operations. The Tribe's fair share payments for traffic mitigation and construction may be determined by the ROD.[7]

628.    The recurring payments by the Rancheria under the agreement are only as follows:

a) Annual payments for every call for law enforcement received by the County Sherriff and to which the County Sherriff responds, multiplied by $1,000. Calls must originate from Strawberry Fields in order to qualify for a payment; thus, if law enforcement originated from off Strawberry Fields, e.g., from a neighbor concerned about drunken casino patrons driving at high speed in their neighborhood, the Rancheria will pay nothing for the call, regardless whether it was related to the operation of its casino and entertainment complex.

b) Annual payments for every call for fire and emergency services received by the County Fire and to which the County Fire responds, multiplied by $10,000. Again, calls must originate from Strawberry Fields in order to qualify for a payment; thus, e.g., if County Fire was called by a neighbor because a drunken casino patron ran off Bechelli Lane, the Rancheria will make no payment for such a call.

c) Tribal transient occupancy tax equal, after the opening of the hotel, to the County transient occupancy tax, to be collected and deposited in the Tribal tax fund.

d) $50,000 to maintain the County's roads and traffic controls. The County exercises discretion in how funds are allocated, provided that access to Strawberry Fields is secured and maintained by the County for commercial and business traffic.

629.    The FEIS acknowledges that a call for police service generated by the Project will cost an

estimated $1,978, nearly double the amount provided for such a call under the Intergovernmental

Agreement. The same projections estimate that Project-generated law enforcement calls for service will

---

[7] The ROD does not specify any amounts to be paid by the Rancheria for their fair share of proposed traffic mitigation. The FEIS and ROD do not specify which, if any, traffic mitigation will occur on roads within the County's jurisdiction.

cost the County Sherriff an estimated $300,700 annually.[8] However, nowhere in the FEIS is there any analysis of the effect that covering the resulting shortfall in reimbursement will have on the people of the County who fund the County Sheriff and depend upon it having adequate capacity to provide for their public safety needs.

630.    The FEIS states the approved Project's potentially significant impacts under "Option 1" will be reduced to less than significant pursuant to the Intergovernmental Agreement, but this conclusion is undermined by obvious funding shortfalls, and, given the lack of funds, the BIA Defendants' failure to assess the impact of such a shortfall on the relevant law enforcement agencies further undermines the validity of the FEIS.

631.    The Intergovernmental Agreement was negotiated without the involvement of, or consultation with, the County Fire Chief, County Sheriff or their staffs; and no adequate study was conducted to determine whether the funding provisions of the agreement will be adequate to address the Project's impacts on fire, emergency, or law enforcement services.

632.    The County Fire Chief and County Sheriff both stated, in advance of the issuance of the FEIS and ROD and in materials that were provided to the BIA before they issued the ROD, that the Intergovernmental Agreement does not provide nearly enough money to cover the increase in law enforcement, fire and emergency service calls the Project will cause. Nowhere, in the FEIS or the ROD is this issue or its impacts analyzed.

633.    The financial shortfalls in the Intergovernmental Agreement's that the County Sheriff described in the record include, among other things:

a)    The per-call recurring payments do not cover post-call investigation costs, and the Intergovernmental Agreement does not provide funding for this expense. An investigation of a

---

[8] The FEIS states that the proposed Project will result in an increase of 169 calls for service ("CFS") over the current 320 CFS experienced annually at Win-River. However, when calculating the new costs associated with additional CFS under the proposed Project, the FEIS calculates new costs based on 152 CFS, not 169 CFS. Using the 169 CFS figure, the total annual costs to the County Sheriff will be $334, 282, an increase of more than 10% over the $300,700 stated in the FEIS.

major crime can cost between $10,000 and $20,000;

b) The Intergovernmental Agreement's recurring per-call payment does not account for crimes that occur on Strawberry Fields, but are reported offsite;

c) The Intergovernmental Agreement does not account for proactive patrols conducted at and around Strawberry Fields; and

d) The Intergovernmental Agreement does not account for cost impacts to related local law enforcement agencies, including but not limited to the District Attorney's Office, Public Defender's Office, Probation Department, courts, local police departments and the local jail.

634.    The County Sheriff, speaking to the Board of Supervisors, said that "hastily passing an agreement like this is fiscally irresponsible to the citizens and long-term viability of this County."

635.    These statements and other related ones by the County Sheriff were provided to the BIA Defendants prior to their issuance of the ROD and FEIS, but were not anywhere acknowledged, analyzed, or considered in the FEIS or ROD.

636.    The County Fire Chief made similar statements that were provided to the BIA in advance of their issuance of the ROD. Those statements made clear that his department doesn't have the resources to address a significant event at the Site once the casino development is constructed and is operational, as County Fire does not possess an aerial ladder truck that is capable of reaching the ninth floor of the Project's proposed hotel.

637.    The cost of procuring a new aerial ladder truck is estimated at approximately $2.5 to $3 million, which is significantly greater than the $1 million non-recurring payment for fire and emergency services under the Intergovernmental Agreement. The County Fire Chief also noted that the recurring $10,000-per-call payments will not be sufficient to cover the annual $2.5 million in costs necessary to staff the new aerial ladder truck in order to respond to calls at the Site, nor will the recurring payments cover the costs of responding to a major emergency—such as a large fire with multiple trucks—at the Site.

638.    The District Attorney for the City of Redding made similar statements of concern about

the Project's potential impacts on her department, and the lack of evidence presented in support of

adequate funding under the Intergovernmental Agreement. These statements and other related ones by

the District Attorney for the City of Redding were provided to the BIA Defendants prior to their

issuance of the ROD, but are not anywhere acknowledge, analyzed, or considered in the FEIS or ROD.

639.    County staff, at the direction of the Board of Supervisors, also produced a staff report that

concluded the Intergovernmental Agreement "would not fully mitigate the anticipated costs" that the

County will incur providing law enforcement, fire and emergency services pursuant to the

Intergovernmental Agreement. The findings of the County staff report were provided to the BIA prior to

their issuance of the ROD, but are not anywhere acknowledged, analyzed, or considered in the FEIS or

ROD.

640.    The FEIS and ROD nowhere analyze whether if law enforcement, fire and emergency

services are provided pursuant to the Intergovernmental Agreement, i.e., "Option 1" in the approved

Project, there will be sufficient funding of the additional demand for such services created by the

Project, or analyze the impacts of what the record indicates will be significant shortfall funding shortfall.

641.    The FEIS and the ROD also fail to take a hard look (or any look) at what will happen to

the neighboring community or the County's residents more broadly as a result of this significant

shortfall of funding.

642.    For example, there is no analysis whether, because of this shortfall and the resulting

overburdening of law enforcement, fire, and/or emergency resources, when community members are in

need of law enforcement, fire, and/or emergency services, they will be made to wait for, or left entirely

without, the services they need. The FEIS and the ROD also fail to take a hard look (or any look) at

whether, as a result of this shortfall of funding, adequate law enforcement, emergency, and/or fire

services will be provided under "Option 1" to the planned casino, hotel, event and retail center itself, and

fails to take a hard look (or any look) at the impacts any inadequacies in that regard will have on guests

or staff at the facility or the broader community.

643.    The FEIS and ROD also fail to take a hard look (or any look) at whether the Intergovernmental Agreement may get invalidated as a result of legal challenge or analyze the impacts that such an invalidation might have on the ability for the public safety and related impacts of the approved Project to be mitigated as described in "Option 1."

644.    A Verified Petition for Writ of Mandate and Complaint was filed, on February 13, 2024, in the Superior Court of Shasta County, and captioned *California Land Stewardship Council LLC v. County of Shasta and its Board of Supervisors* (Case No. 204273). It alleges that the Intergovernmental Agreement is invalid and should be set aside based the inadequate funding issues described above and for running afoul of County policies in the manner in which it was approved. This petition was provided to the BIA Defendants in advance of their issuance of the ROD.

645.    In this way and others, numerous members of the public alerted the BIA Defendants to the legal infirmities of the Intergovernmental Agreement during the EIS process prior to the ROD being issued. The BIA Defendants were aware of the following legal defects of the Intergovernmental Agreement, in advance of their issuance of the FEIS:

a)    The County's approval of the Intergovernmental Agreement violated the County policy that requires non-standard contracts, such as the Intergovernmental Agreement, to be reviewed and approved as to form by County Counsel and reviewed and approved by the County Risk Manager before such a contract can be entered into by the County. The Board of Supervisors is not permitted to waive this requirement, but they purported to do so, without taking the necessary steps to affect a change in the policy precluding waiver. Prior to the Board of Supervisor's approval and execution of the Intergovernmental Agreement, neither County Counsel nor the County Risk Manager reviewed or approved the Intergovernmental Agreement prior to the Board of Supervisors' approval thereof;

b)    The decision to approve the Intergovernmental Agreement was devoid of any evidentiary support, such as (discussed above) whether or not the Intergovernmental Agreement provided adequate funding to address the Project's impacts on law enforcement, fire and emergency services; and

c)    The Intergovernmental Agreement constitutes illegal and wasteful expenditure, as the Intergovernmental Agreement commits the County to 30 years of providing services to the

Project, which will cost taxpayers significant sums of money, without any public benefit received by the County and its taxpayers.

646. The case is pending, and as of the filing of this Complaint, the County's demurrer was overruled as to each of the complaint's causes of action, the parties are proceeding with discovery, and a trial date is set for April of 2025.

647. Based on the shortcomings highlighted by County staff, the County Sheriff, County Fire Chief, among others, and the meritorious claims asserted by the Intergovernmental Agreement Complaint, there is a strong likelihood that the Intergovernmental Agreement will be invalidated.

648. However, despite the BIA Defendants being fully aware of the strong likelihood the Intergovernmental Agreement will be invalidated, nowhere in the FEIS or ROD is there any acknowledgement of this possibility or analysis of the potential impacts of its invalidation.

649. Under "Option 2" described in the FEIS, for providing law enforcement services on Strawberry Fields, the Rancheria will construct, staff, and operate a 10,500 square-foot Public Safety Building, from which the Redding Rancheria Law Enforcement Department—an entity that is not currently active, funded nor staffed—will provide law enforcement services, possibly with the assistance of third-party contractors.

650. The provision of fire and emergency services is addressed in a similar way under "Option 2", where the Public Services Building will also house emergency and fire services.

651. The inclusion in the FEIS of "Option 2," if intended as back-up to the flawed "Option 1," does not remedy the FEIS's analytical inadequacies.

652. As an initial matter, as elsewhere alleged herein, "Option 2" should have been treated as separate *alternative* to "Option 1" and analyzed as such, comparing the relative impacts of each alternative proposal for addressing this essential need of a massive casino, hotel, retail, and event center development. This was nowhere done.

653.    Because the FEIS does not specify which option will be utilized, it was required to provide a complete analysis of "Option 2" to comply with NEPA. The FEIS's conclusion that impacts to law enforcement services under "Option 2" will be less than significant is unsupported by evidence and analysis, and is therefore arbitrary and capricious.

654.    Nowhere does the FEIS or ROD take a hard look at the basic question of whether law enforcement, fire, or emergency services can be adequately provided on Strawberry Fields by the Rancheria, itself, as called for under "Option 2." Nor does the FEIS or ROD analyze the impacts on the local community and the development's patrons if the Rancheria is not capable of meeting Project demand for law enforcement, fire, or emergency services.

655.    The FEIS does not quantify the anticipated number of visitors to the Project, once operational, nor does it indicate periods of potential high volume visitorship that will generate a corresponding jump calls for service from law enforcement and fire and emergency services. The FEIS only discloses the expected annual increase in calls for service, which, as described above, appear to be underreported, without any specificity about the timing of these calls. This omission undermines any ability to ensure adequate law enforcement staffing under "Option 2."

656.    The FEIS also does not specify how, or by whom, law enforcement will be provided under Option 2. It acknowledges that the "Redding Rancheria Law Enforcement Department is not currently active but *could* be funded and staffed in order to provide law enforcement services under Option 2." (emphasis added). Nowhere in the FEIS or ROD is there any analysis that supports the assertion that this *could* happen or whether the law enforcement services provided by this inactive department—*if* stood up—will be adequate to protect the development's patrons or the community or what the impact will be if it was not adequate. The FEIS fails to conduct an industry-standard analysis, or any analysis, of the elements required to set up a new police force.

657.    The FEIS also posits the Rancheria "*may* also contract with one or more qualified third-

parties to provide [law enforcement] services." (emphasis added). It also throws out the possibility that "[t]hese third parties *could* include SCSO [the County Sheriff] or RPD [Redding Police Department]." (emphasis added).

658.    Nowhere in the FEIS or ROD is there any analysis of whether the County Sheriff or Redding Police Department *will* be willing to provide law enforcement service for hire or what impact them doing so might be on the law enforcement resources available for the rest of the community.

659.    Nor is there any indication with whom the Rancheria will contract to provide law enforcement services if the County Sheriff and Redding Police Department were unwilling to provide law enforcement service for hire or any analysis of a whole range of issues that will be presented by having an security contractor provide law enforcement services, which will presumably include the right to make arrests, issue citations, and take people into custody for infringements of law over the entire 221-acre area of Strawberry Fields that has been taken into trust and will include a massive casino resort development, or whether the (unidentified and hypothetical) security contractor will be up to the task or the consequences if it isn't.

660.    All that the FEIS says is that the Rancheria will staff five full-time law enforcement professionals on site, including one Chief Public Safety Officer and four sworn law enforcement staff, and will hire possibly one or more administrative staff. The FEIS does not describe any level of qualifications that the on-site law enforcement professionals will have or specify a requisite level of training. Thus, the public and decision-maker are left fully in the dark about who will fulfill this basic function and what will happen if they are incapable of doing so. Nor does it anywhere analyze whether this staffing level will be sufficient, because the FEIS' estimated calls for service for the Project, once operational, does not account for the type of incident, duration of response, or necessary follow-up investigation—all critical components for accurately assessing the needed police capacity.

661.    The FEIS also does not describe how many of these hypothetical five law enforcement

professionals will be on-site at any given time, or provide data on the number of calls for police service that might arise on the Project at a given time (e.g., during peak weekend hours or during high-volume events) or determine the level of on-site staff necessary to meet expected demand. And, accordingly, the FEIS nowhere analyzes the potential impacts if staffing levels are inadequate, both on the casino development's patrons and staff or on the local community.

662.    Also entirely unanalyzed in the FEIS is the severe jurisdictional limitations under which the new police force will operate, as they will be precluded from enforcing state laws on the Project site, or any laws off of the Project site. The FEIS therefore fails to disclose or analyze whether the Rancheria police force could handle a situation that crossed the boundary from the Strawberry Fields—trust lands which the tribal police force will presumably have limited authority—to lands to the north or the south—on which such a police force will have no authority—and what impact such a situation could have on the local community and others.

663.    The FEIS fails to adequately assess the Project's impacts to law enforcement services and the local community under "Option 2" in violation of NEPA.

664.    The FEIS and ROD are similarly deficient in their description and analysis of "Option 2" for fire and emergency services, under which a "Redding Rancheria Fire and Emergency Services Department" will be established and operate out of the newly constructed public safety building.

665.    According to the FEIS, this inchoate fire department will have two full-time staff on site and a team of volunteer firefighters to coordinate coverage of emergency services for the entire 221-acre area taken into trust, including the approximately 1.1 million square-foot casino, the 250-room nine-story hotel, the 130,000 square-feet of retail, and event center development.

666.    There is no analysis of whether the proposed number of staff is sufficient to meet the demands of the Project, whether and how they will be trained to do so. Nor is there disclosure or analysis of the equipment and other resources needed to provide adequate fire and emergency services to

the entire 221-acre area of Strawberry Fields taken into trust, including the casino, hotel, retail, and event center development. For example, nowhere is it indicated whether the "Redding Rancheria Fire and Emergency Services Department" will have an aerial ladder truck able to address a fire in the nine-story hotel planned for the site or whether and how this "Department" will staff such an aerial ladder truck. There is also no analysis of the impacts on the casino development's patrons and staff or local communities if this "Fire Department" is under-resourced, inadequately staffed, or underequipped.

667.    The ROD acknowledges the law enforcement and fire and emergency services under "Option 2" will not have jurisdiction to respond to calls originating outside the Site. But the neither the FEIS nor ROD assess the impact of Project-generated demand for services outside of Strawberry Fields on local law enforcement and emergency service providers. The FEIS and ROD only note that an impact mitigation fund will be established, into which 1% of "Net Win" funds will be deposited for distribution to local jurisdictions. There is no estimate of what the impact will be on neighboring jurisdictions nor is there analysis of whether the impact fund will be sufficient to offset the impacts caused by the Project.

668.    The Project will create significantly increased demand for law enforcement, fire and emergency services both on and off the Site, and the FEIS fails to take a hard look at offsite impacts— felt by both local law enforcement and emergency service providers, and the communities in which the impacts occur—under "Option 2."

669.    The FEIS fails to disclose, analyze, or discuss factors pertinent to informed decision-making concerning the Project's effects on law enforcement and fire and emergency services, under both "Options," in violation of NEPA.

670.    There is insufficient evidence in the record to support the BIA Defendants' conclusion that Project effects on law enforcement, fire and emergency services, under either "Option 1" or "Option 2," will be less than significant.

671.    It was further unreasonable for the BIA Defendants to rely on the Rancheria's

implementation of proposed design features and mitigation measures—including "Option 1" and "Option 2" regarding law enforcement, fire, and emergency services—without any indication or analysis whether the Rancheria will, in fact, do as promised. As alleged above, the Rancheria initiated earth disturbance and grading work on the Strawberry Fields Site without first getting the permits or doing the surveys that as required by the FEIS and ROD as mitigation measures.

2.      <u>The BIA Defendants Failed to Take a Hard Look at Traffic Effects</u>

672.     The FEIS admits, as it must, that construction and operation of the Project will dramatically increase traffic in the areas surrounding Strawberry Fields. However, the BIA Defendants failed to take a hard look at how this increase will negatively impact both people who live nearby to the Project and those who rely on the impacted road segments and intersections to get to and from work, to get their children's school, to get to the doctor, and to do all the various things that require transportation by car in the greater Redding area, which lacks any type of light rail or other similar public transportation.

673.     Specifically, the BIA Defendants made two fundamental errors in their analysis of traffic impacts.

674.     First, the BIA Defendants relied on a traffic report that omitted consideration of key information in determining the extent to which the Project will increase traffic, resulting in a substantial underestimation of its impact, which, even with this underestimate, was admitted by the BIA Defendants to be significant.

675.     Second, the BIA Defendants then compounded this error by relying on mitigation measures that neither the BIA Defendants nor the Rancheria have the ability to implement—as they all depend on work being conducted on land and roadways that are outside the boundaries of the lands taken into trust (and so are neither owned or controlled by the BIA Defendants or the Rancheria), that will be conducted by third parties (including the City and Caltrans), and that will have to be substantially

paid for by those third parties—without any acknowledgement of the possibility that such mitigation measures will not come to fruition or analysis of the impacts on community members and/or others if some or all of these mitigation measures never occurred.

676.    The Strawberry Fields Site, bounded by I-5 to the east and the Sacramento River to the west, is currently undeveloped, and surrounded by rural residential communities to the south and immediate north of the site.

677.    A recently completed complex containing a Costco Wholesale warehouse and other service and retail facilities is located northeast of the intersection of South Bonnyview Road and Bechelli Lane. This intersection is the entrance point for the Project's North Access, and is already burdened with heavy traffic, as multiple local residents described in comments to the BIA Defendants, and the congestion will be worsened by the Project.

678.    According to the FEIS, Project construction will generate up to 605 daily one-way trips, including the movement of heavy trucks, equipment, workers and vendors.

679.    The FEIS also discloses that Project operation will add approximately 1,139 trips to Bechelli Lane south of Bonnyview Road during a Friday PM peak hour under the North Access only option, and will add 822 trips Friday PM peak hour trips under the North and South Access option.

680.    The Project will substantially degrade what traffic engineers refer to as the "level of service" or "LOS" at multiple intersections and on numerous roadway segments, producing significant traffic impacts that will diminish the quality of life of residents and commuters dependent on the roads in the vicinity of the Site.

681.    The FEIS admits that, without mitigation—implementation of which is not certain, or likely, to occur, as discussed below—the addition of the Project-generated traffic will result in an unacceptable LOS at 6 different intersections based on local and regional standards, thus constituting a significant impact.

a.    **The BIA Defendants Failed to Address Factors Pertinent to Informed Decision-Making Regarding the Project's Traffic Impacts**

682.    The FEIS's traffic analysis omits critical information that undermines the validity of the analysis and, therefore, the BIA Defendants acted arbitrarily and capriciously in rendering traffic conclusions based on that flawed analysis.

683.    The FEIS's traffic analysis fails to accurately portray baseline conditions—the level of traffic currently experienced on roadways and intersections that will be affected by the Project once it is operational—by using outdated traffic counts that don't account for traffic associated with development such as the Costco Wholesale Center.

684.    Construction of the Costco Wholesale Center, and other facilities within that complex, began operating in 2022. The BIA Defendants were aware of the impending operation of the Costco Wholesale Center when conducting its analysis, and was aware it will impact area traffic, yet the FEIS traffic analysis relies on traffic counts taken before the Costco Wholesale Center was operational and fails to adjust those baseline counts to factor in the Costco-generated traffic.

685.    The FEIS's traffic analysis also utilizes an incomplete set of traffic counts. The traffic analysis was based on traffic counts conducted in July and September of 2016 that collected intersection traffic volumes during the 5:00 p.m. to 7:00 p.m. window on Friday and Saturday. The traffic impact analysis lacked any data from weekday morning and evening traffic patterns, omitting information regarding AM and PM commute periods where non-Project drivers are driving their kids to school and going to and from work, critical components of the typical traffic in the area. The omission of this data, and analysis thereof, precluded informed decision-making concerning the Project's effects on traffic, rendering the FEIS' conclusions arbitrary and capricious.

686.    The FEIS omits accurate analysis of traffic impacts at the intersection of South Bonnyview Road and Bechelli Lane, because the traffic analysis reviews an incorrect configuration that doesn't represent actual conditions at this intersection. The intersection of South Bonnyview Road and

Bechelli Lane is to be the main Project access point—and potentially the only access point if the North Access only option is utilized—and the failure to review the correct configuration of this critical intersection invalidates the FEIS's traffic analysis.

687.    The FEIS traffic analysis omitted, without discussion or justification, information and analysis concerning multiple intersections and roadway segments in the vicinity of Strawberry Fields that will be affected by Project traffic, undermining the validity of the BIA Defendants' conclusions concerning the extent of Project traffic impacts. The following roadways and intersections were excluded from the Project's traffic analysis:

Study Intersections

a)    Market Street (SR-273) at Kenyon Drive

b)    Market Street (SR-273) at Breslauer Way

c)    Market Street (SR-273) at Buenaventura Boulevard

d)    Market Street (SR-273) at Briggs Street

e)    Market Street (SR-273) at 3rd Street

f)    Market Street (SR-273) at Ox Yoke Road

g)    Market Street (SR-273) at Spring Gulch Road

Freeway Mainline locations

h)    I-5 Northbound, south of Knighton Road

i)    I-5 Northbound, north of Knighton Road

j)    I-5 Southbound, north of Knighton Road

k)    I-5 Southbound, south of Knighton Road

Freeway Merge/Diverge locations

l)    I-5 Northbound Off-Ramp to Knighton Road

m)    I-5 Northbound On-Ramp from Knighton Road

n)      I-5 Southbound Off-Ramp to Knighton Road

o)      I-5 Southbound On-Ramp from Knighton Road

688.    The FEIS traffic analysis study area, notwithstanding the omissions noted in the previous paragraph, includes state facilities used by heavy trucks, roadways such as I-5 and the SR-273 corridor. The FEIS traffic analysis omitted actual truck usage percentages from the traffic counts at intersections in the study area. This omission of actual truck traffic data precluded an informed analysis of traffic conditions and the Project's impacts thereon.

**b.     The BIA Defendants Failed to Take a Hard Look at Traffic Mitigation**

689.    The BIA Defendants concluded that the Project's effects on traffic will be reduced from significant to less than significant with the implementation of offsite mitigation, but failed to take a hard look, or any look at all, at whether that mitigation could actually be implemented. The BIA Defendants' conclusion was therefore unsupported by the evidentiary record and was arbitrary and capricious.

690.    Even based on its inadequate analysis that undercounted the Project's traffic impacts, the FEIS concludes that the Project will generate traffic conditions at multiple intersections and roadways near the Strawberry Fields Site that exceed acceptable levels of service, and thus concluded that, without mitigation, these impacts will be "significant." The FEIS and ROD concluded, however, that with the implementation of offsite mitigation (on lands and roads not owned and controlled by the BIA Defendants or the Rancheria and through projects that will depend on third party approval and funding), those significant impacts will be reduced to a less-than-significant level.

691.    The BIA Defendants, in concluding that the offsite traffic mitigation measures will reduce significant impacts to a less-than-significant level, failed to disclose and take a hard look at the obstacles to the measures' implementation.

692.    The BIA Defendants did not disclose or analyze the obstacles to construction and implementation of offsite mitigation measures included in the approved Project, a critical omission

considering that implementation of the mitigation measures specified in the FEIS and ROD will not be within the jurisdiction or control of either the BIA Defendants or Rancheria.

693.    The City, County, and Caltrans will have the discretion to approve or reject any proposed project in their jurisdiction, yet BIA does not disclose the possibility that the FEIS' mitigation through such projects could be rejected and never built. The FEIS's less than significant impact conclusion relies on the implementation of mitigation that is beyond the BIA Defendants' or the Rancheria's control, and may very well never be implemented, but never discloses nor discusses this very real possibility. This deprives the public and decision-makers of understanding the scope of the Project's impacts, in violation of NEPA.

694.    In addition to the foregoing failure, the BIA omitted analysis of specific obstacles to construction and implantation of the following offsite mitigation measures concerning access to I-5:

a)    Installation of southbound and northbound turn lanes at the north and southbound ramps of I-5 at Bonnyview Road during the 2025 Buildout Year, under either site access options 1 or 2; and

b)    Installation of a diverging diamond interchange at the I-5 north and southbound ramps to and from Bonnyview Road under Cumulative Year 2040, under either site access options 1 or 2.

695.    None of these locations are on Strawberry Fields, the lands that the BIA Defendants took into trust; thus, neither the BIA Defendants nor the Rancheria have jurisdiction over, or ownership of, any of these locations.

696.    As a threshold failure, the FEIS does not specify which entity, the City or the Caltrans, will have jurisdiction over the proposed I-5 mitigation. This omission precludes the public from understanding if, and how, the mitigation will be implemented.

697.    Nor does the FEIS analyze whether the City or Caltrans will be willing or able to acquire the additional property to support the expanded right-of-way under the Project's proposed I-5 mitigation plans on and around Bonnyview Road.

698.    The FEIS does not disclose the width of right-of-way needed for the proposed

interchange, nor does it assess whether there is enough space for the new facility, considering the planned expansion of Bechelli Lane immediately south of the current southbound ramp at Bonnyview Road.

699.    The FEIS also did not disclose nor analyze the potential that implementation of the I-5 onramp mitigation measures on and around Bonneyview Road, whether under the jurisdiction of the City or Caltrans, or a combination of the two, will rely on federal funding. If federal funding is to be utilized, the mitigation measure will be subject to Section 4(f) of the National Transportation Act (49 U.S. § 303, 23 U.S.C. § 138) which has substantive mandates—such as requiring selection of an alternative that avoids impacts to a listed property (like the historic sites at issue here)—that could preclude construction of the mitigation measures concerning I-5.

700.    The implementation of traffic mitigation calls for the Rancheria to pay only a portion of the cost of the required remedial construction, such as the reconfiguration and expansion of an I-5 onramp, adding turn lanes intersections, the addition of a traffic signal, or a combination of additional features.

701.    The FEIS presumes, without evidence or analysis, that the entities that have jurisdiction over, and/or ownership of, the intersections and roadways at which the FEIS calls for mitigation work—to whit, the City, the County, and Caltrans, respectively—will plan, fund the remainder of, and (as applicable) construct the called for mitigation that, absent the Project, would not be necessary.

702.    The FEIS does not acknowledge or address the risk that the City, the County, and/or Caltrans will be unable, or unwilling to implement the traffic mitigation measures upon which the BIA Defendants bases their conclusion that Project impacts will be reduced to less than significant.

703.    The BIA Defendants concluded the Project's significant traffic impacts will be reduced based on the implementation of mitigation, but failed to assess whether that mitigation will be implemented. The BIA Defendants failed to take a hard look at the Project's effects on traffic.

704.    The BIA Defendants omitted analysis of the obstacles to the implementation of mitigation measures on which their less than significant traffic impact conclusion was based. And they gave no consideration to how that mitigation will, or will not, work in the context of the surrounding area and the entities in control over such mitigation. This analytical flaw makes arbitrary and capricious the BIA Defendants' conclusion that traffic impacts will be less than significant.

705.    It was further unreasonable for the BIA Defendants to rely on the Rancheria's implementation of proposed design features and mitigation measures—including offsite traffic mitigation measures that entail the Rancheria paying their fair share of traffic improvements—without any indication or analysis whether the Rancheria will, in fact, do as promised. As alleged above, the Rancheria initiated earth disturbance and grading work on the Site without first getting the permits or doing the surveys that as required by the FEIS and ROD as mitigation measures.

### c.    The BIA Defendants Failed to Take a Hard Look at Aesthetic and Noise Impacts of the Project

706.    Neighborhood residents and passengers on I-5 currently enjoy the uninterrupted views of the river, and the majestic mountain ranges to the west and north of the Strawberry Fields.

707.    Recreational users of the Sacramento River, whether they are enjoying a ride in a motorized vessel, paddling in a kayak or quietly fishing near the banks of the river adjacent to the Site, all of them enjoy the beauty and peace of Strawberry Fields in its natural state.

708.    From the moment construction begins, the Project will significantly alter the landscape on and around the Site and will forever alter the aesthetic character and value of the area.

709.    Construction will entail earth-moving work on no less than 57 acres, producing over 94,000 cubic yards of cut and fill, and extensive grading and paving across the development footprint of approximately 32 acres. After the earthmoving and cut/fill operations are completed, concrete pouring and foundation work will give way to extensive above ground construction on over 1 million square feet

of building space. Heavy equipment—excavators, bulldozers, compactors, material hauling trucks, graders, tractors, trucks, pavers and forklifts, among others—will generate extensive dust, noise and traffic during the construction work. Construction is projected to last between 1.5 and 2.5 years, but will likely go on longer, as projects of such scale rarely finish on time.

710. Construction workers will commute to and from the site daily, further impacting local roadways and creating congestions for local residents. The FEIS notes up to 605 one-way trips will occur each day related to construction activities.

711. The large-scale construction activities will generate significant noise levels for neighbors to the north and south of the Strawberry Fields Site.

712. Strawberry Fields is currently undeveloped and construction of a massive casino complex, which will also include a 9-story hotel (which will be the tallest building within the I-5 corridor in Redding), over three acres of retail, an event center, restaurants and bars, all of which will produce artificial light at night that has never before existed on this site. This is a significant alteration of the area and will negatively affect residents of the area.

713. The FEIS fails to disclose or analyze the Project's aesthetic impacts on users of the Sacramento River, despite the fact the Project will dramatically alter the viewshed for those passing by the Site on the water. The FEIS addresses the Project impacts on viewsheds from perspectives north, south and east of the Project, but does not assess the dramatic alteration of Strawberry Fields and how that transformation will impact Sacramento River boaters. Strawberry Fields is one of the largest remaining, intact, natural habitat along the Sacramento River in the Redding area, and the experience of viewing the unadulterated riverbank and riparian habitat of Strawberry Fields is of significant value to passersby on the river.

714. The FEIS acknowledges that Project lighting spillover into surrounding areas is potentially significant, but concludes those potentially significant impacts are reduced to less than

significant mainly by incorporating certain design features, without acknowledging the strong likelihood that these design features will not be implemented. The Project design features that purportedly reduce light spillover are, according to the FEIS, purely optional, and in fact are likely to be ignored completely in favor of prioritizing safety on the Site. The FEIS notes that exterior lighting will be limited to 25-foot pole mounted pressure sodium or light-emitting diodes (LEDs) with "cutoff lenses and downcast illumination *unless an alternative light configuration is needed for security or emergency purposes*." (emphasis added).

715.    The FEIS relies on design features to concluded light impacts will be less than significant but allows for those design features to be completed ignored by the Rancheria when it constructs and operates the Project. This renders arbitrary and capricious the FEIS's conclusion that the potentially significant light pollution impacts of the Project will be completely mitigated in substantial part by these design features.

716.    The FEIS also claims that compliance with the Dark-Sky Associations' Model Lighting Ordinance and the Unified Facilities Criteria (UFC) 3-530-01 will prevent the casting of light or glare offsite but provides no information or detail about which features of the referenced guidance it will utilize. Simply stating the names of references, without any discussion or analysis, does not constitute taking the requisite "hard look" at the Project's potentially significant light effects.

717.    The FEIS acknowledges that Project construction noise will have a "temporary significant adverse effects to the ambient noise environment," but claims that the noise will be reduced to less than significant levels after the Rancheria implements construction BMPs.

718.    The FEIS is internally inconsistent in how it describes these construction noise impacts. The FEIS Summary Matrix states that construction noise impacts are "LS" for less than significant, but the FEIS later discloses the "significant adverse effects" that will occur but for the implementation of BMPs. This misleads the public as to the extent of the Project's impacts.

719.    Beyond the lack of clarity, the FEIS does not present evidence to support the conclusion that the proposed BMPs will reduce significant impacts, and therefore the BIA Defendants' conclusion concerning noise impacts is arbitrary and capricious.

720.    The FEIS does not discuss or explain how the BMPs differ from the standard construction operations on which the Project noise analysis—which determined that noise impacts will be significant—was based.

721.    The FEIS does not discuss, nor quantify, the reduction in noise that will be achieved by any one of the proposed BMPs, individually or collectively.

722.    The proposed noise BMPs, moreover, include discretionary measures that can be ignored, thus obviating any purported mitigation benefit, by construction workers based on a subjective view of what is "feasible."

723.    And the BMPs that limit construction to certain hours of the day do nothing to mitigate significant noise impacts during the hours of operation. For example, the cessation of heavy equipment operation at 8 p.m. does not affect in any way the significant noise impacts of that same equipment at 7 p.m., when local residents are likely eating dinner and potentially putting young children to bed.

724.    The BMPs, the implementation of which is necessary in order to support the BIA Defendants' conclusion of less than significant noise impacts, are not included in the ROD, and are thus not enforceable.

725.    It was further unreasonable for the BIA Defendants to rely on the Rancheria's implementation of proposed design features and mitigation measures—including design features to purportedly eliminate light spillover and construction noise mitigation measures—without any indication or analysis whether the Rancheria will, in fact, do as promised. As alleged elsewhere herein, the Rancheria initiated earth disturbance and grading work on the Site without first getting the permits or doing the surveys that as required by the FEIS and ROD as mitigation measures and measures.

**B.**     **The BIA Defendants Failed to Adequately Disclose or Analyze Offsite Work Called for by the Project to Provide Patrons and Others Access to Planned Casino, Hotel, Retail, and Event Center and to Connect the Development to Public Utilities**

726.    Strawberry Fields is the only land that was taken into trust as part of the Project and is the only relevant land over which the BIA and the Rancheria have ownership and control.

727.    Strawberry Fields is an undeveloped multi-acre plot of land in unincorporated Shasta County.

728.    Strawberry Fields is hemmed in to the west by the Sacramento River and to the east by I-5.

729.    Immediately to the north of Strawberry Fields is a residential property owned by a private party (and in which neither the Rancheria nor the BIA Defendants hold an interest) that extends from the Sacramento River, in the west, to Bechelli Lane, in the east.

730.    Bechelli Lane is a narrow two-lane road that occupies a sixty-three-foot-wide right-of-way, that is owned by the City of Redding and extends from the eastern edge this private property to the western edge of I-5 right-of-way, owned by Shasta County.

731.    To the South of Strawberry Fields, is a strip of land that runs from the Sacramento River in west to the I-5 right-of-way in the east. This strip of land is held as a tenancy in common, with 50% held by the Rancheria and 50% held by the owner of a private property to the south.

732.    Strawberry Fields is not connected to *any* public utilities: water, sewer, electric, or gas.

733.    Strawberry Fields is, thus, a proverbial island, as shown in Illustration 21 below:



Illustration 21

734.    Accordingly, and because the Project calls for a massive casino, hotel, retail, and event

center development to be built and operated on Strawberry Fields, the Project calls for extensive ground

disturbance and construction work to the north and potentially to the south of Strawberry Fields—*on*

*and through properties that neither the BIA Defendants nor the Rancheria owns or controls*—in order to provide patrons, staff, and others basic access to the planned development, to get electricity and gas to the development, and potentially to get water and sewer services to it.

735.    The FEIS fails, in a number of ways, to take a hard look at these offsite elements of the Project, including by: (a) failing to explain how the Rancheria or the BIA Defendants will attain the rights necessary to conduct the planned construction work on properties owned by private parties, the City, the County, and/or Caltrans; (b) failing to analyze the impact of such construction work on the owners of those private properties and the impacts of the involuntary taking of their properties (if that is the undisclosed plan for acquisition); and (c) in the case of electricity and gas connections, failing to disclose even the location of the necessary offsite construction work.

736.    NEPA demands that potential effects on the human environment are disclosed and assessed *before* a project is approved. The FEIS's discussion of the road access utility and work to be done offsite is riddled with unfulfilled and unacknowledged contingencies, unanalyzed impacts, and undisclosed basic details. Accordingly, the FEIS's treatment of this part of the Project does not meet the hard look standard and it was arbitrary and capricious for the BIA Defendants to approve the Project without that look.

### 1.    The BIA Defendants Failed to Take a Hard Look at Access to the Casino, Hotel, Retail, and Event Center Development by Patrons, Staff, and Others

737.    According to the FEIS, under either of the two "Options" the FEIS describes for access to Strawberry Fields—where the Rancheria intends to build its casino, hotel, retail, and event center development—patrons, staff, and others will mainly access the development from the north via an expanded Bechelli Lane. The FEIS describes this access to Strawberry Fields as the North Access.

738.    The FEIS states that creating the North Access will require expansion of the existing Bechelli Lane from a narrow two-lane road, with no sidewalks and minimal shoulders for much of its length, to a four-lane road with 12-foot lanes, a 4-foot shoulder on either side, plus a 6-foot sidewalk on

its west side. The FEIS also states that, an additional "20-foot corridor on either side" for the expanded Bechelli Lane will be necessary "to allow for construction and staging."

739.    Though not disclosed or discussed in the FEIS, public records indicate the right-of-way owned by the City of Redding for Bechelli Lane is only 63 feet wide for a substantial portion of its length. This leaves a deficit of 35 feet, as the proposed expansion will require 98 feet according to the FEIS.

740.    Moreover, though again not disclosed or discussed in the FEIS, public records indicate that if this additional 35 feet was distributed equally on either side of the of the City's existing right-of-way for Bechelli Lane, the eastern edge of the required 98 feet will be substantially within the I-5 right-of-way and will basically abut the highway's southbound onramp.

741.    The FEIS does not disclose or discuss whether or how the BIA Defendants or the Rancheria will seek sign-off from Caltrans and/or the County (which public records show, but the FEIS does not disclose, holds title to the I-5 right-of-way) to allow this impingement on the I-5 right-of-way or whether the BIA Defendants or the Rancheria will seek to gain the entire 35 feet from private property owners to the west.

742.    The FEIS also fails to discuss or analyze the apparent need—disclosed in an AES report concerning cultural resources—to demolish an existing Burger King that is on the corner of Bechelli Lane and South Bonnyview Road in order to facilitate the Bechelli Lane expansion. The AES reports were not included in the FEIS or publicly available documents provided by the BIA Defendants. There is no discussion in the FEIS of whether, or how, the Burger King owner, a private party not associated with the Project, would agree to this, nor is there any discussion of who owns the building.

743.    All that the FEIS states in regard to necessary off-site work is that the work necessitated by the planned expansion of Bechelli Lane "would require the acquisition of additional roadway right-of-way (ROW) from adjacent property owners."

744.    In addition to the lack of information about the extent of land that will be acquired, or from which "adjacent property owners," there is also no information provided about how the acquisition will be accomplished or by whom.

745.    Is the plan for the Rancheria to negotiate a purchase of an undisclosed (or undetermined?) portion of land from the private property owner to the west and from the County of Shasta to the east? Just from the private property owner to the west?

746.    What will happen if the private property owner to the west refused to sell? Will the Rancheria seek to have the City condemn that desired portion of land? What happens if the refuses to do so?

747.    Indeed, what if the City, more generally, refuses to expand Bechelli Lane?

748.    Nowhere in the FEIS or ROD is there any indication that the City has already agreed to expand Bechelli Lane, and nowhere in the FEIS or ROD are any of the above questions answered or even asked.

749.    And while the FEIS does present two "Options" for access to the casino, hotel, retail, and event center complex planned for Strawberry Fields, "Site Access Option 1 – North Access Only" and "Site Access Option 2 – North and South Access," both *assume* that Bechelli Lane will be expanded in the manner described.

750.    Similar problems and unanswered questions exist with regards to the planned South Access.

751.    According to the FEIS, the South Access will require construction of a new road consisting of two 12-foot lanes and a 4-foot paved shoulder on either side, and the acquisition of a 60-foot right-of-way.

752.    The FEIS acknowledges that creating The South Access option will require "ROW acquisitions" but provides no further information in this regard. The FEIS does not identify from whom

the acquisitions will be made or how.

753.    Is the plan (or hope?) that the private party who, public records indicate but the FEIS nowhere discloses, is the tenant in common with the Rancheria of the strip of land immediately to the south of Strawberry Fields will sell the Rancheria the right to build the road? No agreement to do so is disclosed in the FEIS. If its co-tenant refused to sell, will the Rancheria bring a partition action? What will the chances of success be for such a partition action? What will the Rancheria do if it was not successful? And what of the impacts to the co-tenant if the partition action is successful?

754.    None of these questions are answered or even presented.

755.    And when a commentor to the FEIS challenged the BIA Defendants regarding the Rancheria's lack of the necessary entitlements to build the South Access and the BIA Defendants' failure to take a hard look at that issue, the BIA Defendants responded, in essence, that because the FEIS provided an "Option" for access to Strawberry Fields that did not involve the South Access—i.e. "Option 1 – North Access Only"—it was not required to analyze or disclose how the Rancheria might gain the necessary entitlements to construct the South Access.

756.    Not only is "well, the Rancheria might do something else, so don't worry about it" an inadequate response to this concern or something that constitutes a hard look, this response wholly ignores the legion of similar unanswered questions regarding the planned North Access.

757.    Thus, on the critical question of how patrons, staff, and others will access the Rancheria's planned casino, hotel, retail, and event center development on the proverbial island of Strawberry Fields, the BIA Defendants essentially ask the public to just trust that the Rancheria will be able to get it done.

758.    The FEIS does not contain any evidence showing the Rancheria will be able to secure rights to the land necessary to allow either the North Access or South Access options to be constructed or examine the consequences if it is unable to. That is not a hard look.

759.    In addition, the FEIS does not disclose or analyze the impacts of either the North Access

or South Access "options" on the owners of the private properties through which some or all of the planned roadways will be constructed.

760.    If the plan is to force these private property owners to allow access, that's a very significant impact, at least for those persons, that should have been disclosed and analyzed but was not.

761.    Moreover, the FEIS provides scant details about the extent of work that will be required for either access "Option."

762.    Regarding the North Access, the FEIS simply states: "It is *assumed* that construction impacts would not exceed 4 feet below ground surface." (emphasis added).

763.    Limiting the discussion and "analysis" to this stated assumption is all the more troubling in light of indications contained in the record that the BIA Defendants had additional data concerning the extent of the work that will be needed but chose not to include such data or analyze the impacts suggested by it, in the FEIS.

764.    A grading and drainage study prepared for the Redding Rancheria by Sharrah Dunlap Sawyer, Inc. and included as an attachment to FEIS, states:

> Widening Bechelli Lane to access the Proposed Project Site as described in the Access Alternative Concepts Memorandum would require significant grading, retaining walls, and relocation/extension of existing facilities to avoid impacting the City of Redding's Sunnyhill Wastewater Pump Station infrastructure and the Anderson Cottonwood Irrigation District's (ACID) canal. Significant grading would be required to maintain access to the adjacent residential properties, Sunnyhill Wastewater Pump Station and the ACID canal. Additional grading may be required to mitigate the 28 lost parking spaces eliminated by the Bechelli Lane widening as described in the Access Alternatives Concepts Memorandum.

765.    The analysis of the impacts of North Access work in the body of the FEIS nowhere discloses or discusses any "significant grading, retaining walls, [or] relocation/extension of existing facilities" that will be necessitated by the North Access work, and the referenced "Access Alternative Concepts Memorandum" was not included in the DEIS or FEIS, and FOIA requests for the same to the

BIA Defendants have been simply ignored.[9]

766.    Moreover, while the FEIS's Site Plan figure for the Project (Illustration 2 above) simply highlights in yellow the existing Bechelli Lane right-of-way to show the area that will be impacted by the work required to effectuate the North Access, figures in a report created by the Rancheria's consultant in connection with the BIA Defendants' NHPA analysis (but not included in the FEIS) and in the above referenced drafting and grading report show a far greater extent of impact.

767.    Illustration 22, which is that portion of Illustration 2 from the FEIS that represents the work necessary in order to effectuate the North Access by more or less highlighting the existing ROW in yellow, is below:



Illustration 22

---

[9] An action to compel a response to this and other ignored FOIA requests has been filed.

768.    Figure 8 of AES 2017—upon which the BIA Defendants relied in the NHPA process, as described in paragraphs 276-280 above—is set forth below as Illustration 23. Illustration 23 shows in red an area that it defines as the area of potential effects of the work needed for the North Access that is significantly larger and cuts significantly deeper into adjacent properties than does yellow highlighted area from FEIS Figure 2-8-1.



Illustration 23

769.    Indeed, while the FEIS nowhere indicates from where the Rancheria or BIA intends acquire the additional 35 feet needed beyond the existing right-of-way to construct the North Access, Illustration 21 indicates that most or all of it is expected to come from private properties to the west.

770.    Further, set forth as Illustration 24 below is a portion of a figure from the above-referenced Sharrah Dunlap Sawyer grading and drainage study, which, while lacking a key, shows what appear to be retaining walls that will be constructed in several locations as part of the North Access construction, including on the private property immediately to the North of Strawberry Fields



Illustration 24

771.    The omission of this information from the FEIS's discussion of the construction that will be necessitated by the North Access suggests an intentional decision not to include information that would allow the public to gain a complete picture of the work and its impacts as opposed to negligence.

772.    Whether intentional or negligent, the BIA Defendants failed to take a hard look at the

COMPLAINT

impacts of securing land for, and constructing, offsite access roads to Strawberry Fields.

### 2.    The BIA Defendants Failed to Take a Hard Look at Providing Water and Wastewater Service to the Strawberry Fields Site

773.    The FEIS, as approved by the BIA Defendants, does not specify the mode by which water and wastewater services will be provided for the planned casino, hotel, retail, and event center development on Strawberry Fields, presenting, instead, two "Options."  "Option 1," will require cutting through a substantial portion of the private property immediately to the north of Strawberry Fields, in which neither the BIA Defendants nor the Rancheria have any interest.

774.    According to the FEIS, under "Option 1" for water supply, the Project will connect to the City's municipal water supply infrastructure, which will require approximately 777 linear feet of water pipelines from Strawberry Fields through private property to connect to an existing 24-inch water main at the intersection of Bechelli Lane and the driveway leading west to 5170 Bechelli Lane.

775.    According to the FEIS, under "Option 1" for wastewater, the Project will connect to the City's existing conveyance system by installing "a new lift station on the Strawberry Fields Site, and 702 feet of sewer forcemain pipelines between the new lift station located northwest of the casino and the existing Sunnyhill Lift Station, located at 5100 Bechelli Lane, currently operated by the City. From the Sunnyhill Lift Station, wastewater from [the Project] would be conveyed to the City's Clear Creek Wastewater Treatment Plant for treatment and disposal."

776.    Illustration 25, set forth below, is Figure 4.14-2 from the FEIS (slightly cropped for space), which shows the intended route of the water and sewer lines across private property.



Illustration 25

777.    The FEIS nowhere indicates that the Rancheria has procured rights to trench and install the water or sewer pipelines across private property that will be needed to access the City's water or sewer infrastructure. In fact, the FEIS nowhere even discusses the need for the Rancheria to procure such rights, let alone how it will procure them. It is apparently just assumed by the BIA Defendants that the Rancheria could procure them.

778.    It is also apparently just assumed that the City of Redding will agree to allow the Rancheria to connect to its sewer and water, as the FEIS nowhere indicates that such an agreement with the City has already been attained by the Rancheria or discusses any obstacles that the Rancheria might encounter in gaining that agreement.

779.    The City, in fact, has an official policy against the extension of city municipal services to properties that are outside the city limits, which will include Strawberry Fields, unless they the land is first annexed by the City. The rationale for this policy is, in part, to prevent the provision of services, paid for by the residents of Redding, to benefit those outside the city that do not contribute to the costs

COMPLAINT

of installing and maintaining municipal services, a concern that will seem to particularly apply to lands held in trust.

780.    The FEIS acknowledges the policy but concludes, without evidence or support, that the land being held in trust precludes annexation and is thus the sort of extraordinary situation in which the City can provide services outside city limits without annexation. There is no support in the record for the BIA's interpretation of the general plan policies, and this conclusion ignores the fact that, permissibility pursuant to the general plan notwithstanding, the City's provision of services outside the city limits is discretionary. The City highlighted this reality in comments that questioned the BIA's presumption that water, sewer and electrical service could, and would, be provided by the City. The FEIS fails to disclose or analyze the Rancheria's chances of gaining the sewer and water connections described as "Option 1" for the development, in light of the policy.

781.    The FEIS also contains no discussion of the impact that this Option 1 will have on the private property owner whose property will be torn up to lay the required pipes. In fact, other than the figure presented above and the description of the amount of linear feet of pipe that will be required, the FEIS discloses nothing about what this work will entail, such as even basic things like how wide or deep the trenches will be. This is despite the fact that non-public documents created by AES in connection with the BIA Defendants' NHPA analysis indicates that these trenches will ten feet deep. And, as the FEIS nowhere indicates how the Rancheria intends to gain the right to cut two large trenches through someone else's property and install large pipes therein, one can only guess whether the plan is to seek the rights to do so via condemnation by the City, the impacts of which are nowhere discussed or disclosed.

782.    The BIA Defendants failed to take a hard look at the impacts of the Rancheria's "Option 1" for attaining water and wastewater services for its casino, hotel, retail, and event center development.

3.      **The BIA Defendants Failed to Take a Hard Look at Providing Natural Gas Service to the Strawberry Fields Site**

783.    The FEIS states that the Rancheria's planned casino, hotel, retail, and event center development on Strawberry Fields will receive natural gas service from Pacific Gas and Electric Company ("PG&E") via connection to an existing gas line at some undisclosed location at the Hilton Garden Inn that is approximately a quarter mile north of the Strawberry Fields as the crow flies.

784.    The FEIS does not provide even the most basic information about how this will be accomplished, not even the planned location of the natural gas pipeline that will span the approximate quarter mile necessary to connect the development on Strawberry Fields to PG&E natural gas infrastructure.

785.    The properties between the Site and the Hilton Garden Inn include private residential properties in which neither the Rancheria nor PG&E hold an ownership interest, and other private residential properties are nearby.

786.    The FEIS does not disclose or analyze how the Rancheria will acquire the necessary rights to trench through those residential private properties and install a high-pressure natural gas line therein.

787.    The FEIS also does not assess the potential impacts on the residents of properties across which the Rancheria apparently intends to cut a trench (of an undisclosed depth and width) and install a high-pressure natural gas line or the potential impacts on residents of properties that will be near that high-pressure natural gas line. As the FEIS does not even disclose the proposed location of the line, a reader cannot even determine who the impacted people will be.

788.    The FEIS's failure to disclose a planned path for the proposed gas line also precludes analysis of potential impacts of the installation on cultural resources in the areas between Strawberry Fields and the undisclosed location of existing gas line at the Hilton Garden Inn.

789.    The BIA Defendants failed to take a hard look at whether, how, and the impacts of the Rancheria's plan for attaining a natural gas connection for its casino, hotel, retail, and event center development.

**C.    <u>The FEIS Fails to Take a Hard Look at Project Effects on Cultural Resources</u>**

790.    The BIA Defendants were required to disclose and analyze the Project's impacts on cultural resources potentially affected by Project construction and operation, including in areas off Strawberry Fields where the Project calls for extensive ground disturbing work.

791.    As set forth in detail above, the BIA Defendants have failed to take a hard look at the Project's impacts on historical properties.

792.    The analysis required under NEPA covers a set of cultural resources that are at least as broad as those covered under NHPA, as "cultural resources" under NEPA include sacred sites. The entire area where the Project calls for work (on and off of Strawberry Fields) is a sacred site as defined by NEPA. Therefore, in addition to the NHPA violations, the BIA Defendants violated NEPA by preparing an FEIS that failed to take a hard look at the Project's effects on cultural resources.

793.    The BIA Defendants' conclusion that impacts on cultural resources will be avoided (reducing the Project's impacts, according to the FEIS, from potentially significant to less than significant) by implementation of mitigation measures was arbitrary and capricious because the record does not contain evidence that the measures will be implemented, nor that they will be effective, in the event that they are enacted.

794.    For example, the ROD and FEIS require, as one of the mitigation measures that purportedly will reduce the impact of Project construction from potentially significant to less than significant, that the Rancheria develop and implement an Unanticipated Discoveries plan prior to ground disturbing activities. But in or around July 2024, the Rancheria, without preparing an Unanticipated Discoveries plan, commenced ground disturbing and grading activities on approximately 2.5 acres of the

Strawberry Fields site, in a known location of cultural resources.

795.    It was unreasonable for the BIA Defendants to rely on the Rancheria's implementation of proposed design features and mitigation measures—including preparation of an Unanticipated Discoveries plan—without any indication or analysis of whether the Rancheria will, in fact, do as promised. As alleged elsewhere herein, the Rancheria initiated earth disturbance and grading work on the Site without first getting the permits, doing the surveys, or preparing the plans as required by the FEIS and ROD.

D.    **The FEIS Fails to Take a Hard Look at Project Effects on Biological Resources**

796.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

797.    The 200-plus-acre Strawberry Fields Site is currently undeveloped, made up of grassland, foothill pine woodland, valley foothill riparian, valley oak woodland and riverine habitat types. Strawberry Fields provides habitat for numerous plant and wildlife species, and the adjacent Sacramento River, along which the Site's eastern border runs, is designated critical habitat for four federally-listed fish species and is designated EFH for others.

798.    In addition to the listed species and their critical habitat and EFH, Strawberry Fields also provides habitat for several California species of special concern, such as Western spadefoot toad, Western pond turtle, and numerous bird species including bald eagles that have been observed foraging on and around the site and bank swallows that are present in the banks of the Sacramento River on the western border of the Site. Both the bald eagle and bank swallow are listed under the California Endangered Species Act.

799.    The Site is also an important habitat for migratory birds and birds of prey that may nest and/or forage on and adjacent to the Site.

800.    The Strawberry Fields Site, visible from the I-5 highway that runs north-south to the east,

is valued by locals and out-of-towners alike for the scenic views of natural landscapes next to the free-flowing Sacramento River, set against the distant coastal mountains in the west and Klamath Mountain Range in the north, including Lassen Peak and Mt. Shasta.

801.    Located just south of the city of Redding, the natural habitat of the Site provides vital refuge for plants and wildlife, both resident and migratory, and the local residents who enjoy viewing them, amidst the growing development of the City and the surrounding communities. The City continues to expand and develop, slowly surrounding Strawberry Fields and slowly encroaching on the Sacramento River. This trend, which Strawberry Fields has, to this point, resisted, makes Strawberry Fields a valuable island of largely unspoiled habitat, providing a sanctuary for multiple species of wildlife scrambling to find a place of refuge amidst the rapidly changing greater Redding area.

802.    There are currently no significant impervious surfaces on the Site, no sources of artificial light during day or night hours, and no sources of noise other than what wildlife inhabitants produce.[10]

803.    The finished Project will significantly alter the landscape on and around the Strawberry Fields Site, and will forever alter the quality of habitat for multiple species of special concern, as well as forever changing the aesthetic character and value of the area.

804.    As detailed and alleged in Plaintiffs' ESA and MSA claims concerning the BA/EFHA flawed analysis of the Project's effects on listed fish species and their critical habitat, and incorporated by referenced herein, the BIA Defendants failed to take a hard look at the Project's potential effects on biological resources of Strawberry Fields and adjacent areas, including the listed fish species and their critical habitat, because, amongst other things, the FEIS:

  a)  Fails to disclose or analyze the impacts of Project-generated ALAN on wildlife on and around Strawberry Fields, including but not limited to the listed species and their critical habitat on and adjacent to the Project site, and

---

[10] As described herein, shortly after the ROD was issued, the Redding Rancheria engaged in grading and earth moving work on the Project site, without the required permit authorization, to install a parking area and install a flag pole. Plaintiffs do not know whether, and to what extent, impervious surfaces resulted from this work. The Project site was assessed as being undeveloped in the FEIS and ROD.

b) Fails to disclose or analyze the impacts on the habitat and wildlife of Strawberry Fields and adjacent areas, including without limitation on critical habitat and listed species, of Project stormwater runoff produced during periods of heavy precipitation and floodplain activity.

805.    The Project will introduce significant new sources of ALAN to a previously undeveloped site on the banks of critical habitat for salmonid species and amidst habitat for numerous other species of special concern, but, other than brief mention of potential effects on migratory birds, the FEIS is devoid of any discussion or analysis of potential effects of ALAN on wildlife on and around the Site. There is no discussion or analysis in the FEIS of the effects of ALAN on salmonids—including the listed fish species that the FEIS acknowledges use areas of the Sacramento River and its riverine environment that abut not just Strawberry Fields, generally, but the portion of Strawberry Fields where the Project calls for placement of the massive casino, hotel, retail, and event center development, including its acres of 24-hour lit parking.

806.    There have been numerous scientific studies and discussions of the negative effects ALAN can have on fish species, and particularly the salmonid species present in the Sacramento River on and adjacent to Strawberry Fields. ALAN can affect the listed species at multiple life history phases, but disrupting adult migration and spawning behavior, altering the timing and rate of juvenile migration, and exposing to juvenile salmonids to increased risk of predation. A few years before the Project DEIS was released, the effects of ALAN on listed salmonid species were addressed, and mitigation was required to lessen those effects, during a state-law environmental review process for a bridge project just upstream from Strawberry Fields.

807.    The deleterious effects of ALAN have been observed in salmonid species that were up to 6 kilometers away from the source of ALAN. The Project will put 24-hour lighting in parking lots and the hotel, in addition to other ALAN, just over 150 feet away from the water's edge.

808.    The FEIS fails to disclose and analyze the effects of ALAN on the listed fish species and

their critical habitat, on and around the Site.

809.    The FEIS' only reference to the impacts of light and glare on wildlife is the potential

effect on bird species, which the FEIS' concludes, with insufficient evidence and analysis, will be

reduced to less than significant by project design features that call for down-cast lighting and cut-off

lenses. But these measures are wholly voluntary, as the Rancheria has the discretion to use completely

different lighting designs if they deem it is necessary for security or emergency purposes.

810.    The only reference to the effects of ALAN on the listed fish species is the BIA

Defendants' response to comment, claiming the same non-mandatory design features will prevent the

(unassessed) potential effects of ALAN on listed fish species and critical habitat in the Sacramento

River on and adjacent to Strawberry Fields, without any analysis or acknowledgement of the non-

mandatory nature of these factors. This does not satisfy the BIA Defendants' obligations under NEPA.

811.    The FEIS' conclusion that the Project's potentially significant light and glare impacts on

migratory birds will be reduced to less than significant based on implementation of non-mandatory,

unenforceable design features—downcast lighting unless undefined security and safety concerns dictate

otherwise—violated NEPA's hard look requirement and was arbitrary and capricious.

812.    The BIA Defendants also failed to disclose and analyze the cumulative impacts of

Project-produced ALAN on any biological receptor, including but not limited to salmonids and birds.

There is significant development along the Sacramento River upstream from the Site within the city of

Redding, and the FEIS fails to consider the Project's light generation in the context of the cumulative

effects that already exist.

813.    The BIA Defendants also failed to take a hard look at the impacts of stormwater runoff

on the wildlife and sensitive habitats on and around the Site, including but not limited to the Sacramento

River and its critical habitat for the listed species.

814.    The FEIS concludes that implementation of design features and mitigation will reduce

Project construction and operational stormwater runoff impacts on habitat and wildlife from potentially significant to less than significant. But the FEIS fails to take a hard look at the impacts when the retention pond, located within the Sacramento River floodplain and designed to hold Project stormwater runoff conveyed by the vegetated swale, spills over into the Sacramento River during high flow events.

815.    The stormwater runoff contained in the retention pond, particularly during intense precipitation events, will likely contain toxins, other contaminants and sediment that, when introduced into the Sacramento River, will have potentially significant effects on wildlife species and their habitats. The BIA Defendants failed to take the requisite hard look at these impacts.

816.    In addition to the analytical failures, the BIA Defendants violated its NEPA obligations by unreasonably relying on mitigation measures that are of uncertain effectiveness, and not likely to be implemented by the Project proponent.

817.    The BIA Defendants' issuance of the ROD concluding less than significant effects, based on an assumption that the Mitigation Monitoring and Enforcement Plan will reduce the significance of multiple impacts on biological resources, was arbitrary and capricious in light of the lack of evidence that the ROD will be obeyed and the measures implemented, as demonstrated by the Rancheria's violation of the following biological resources mitigation measures, among other violations, within weeks of the ROD's issuance:

a)   Preconstruction surveys by a qualified biologist for bald eagle nests (must be done if ground disturbance occurs between Jan. 1 and Aug. 15);

b)   Preconstruction surveys by a qualified biologist for western spadefoot toads;

c)   Preconstruction surveys by a qualified biologist for foothill yellow-legged frog;

d)   Preconstruction surveys by a qualified biologist for migratory bird nests (must be done if ground disturbance occurs between Feb. 15 and Sept. 15); and

e)   Fencing of wetlands and jurisdictional water features.

818.    Concerning listed species and critical habitat, the FEIS concluded that potentially

significant effects on listed species and critical habitat will be reduced from potentially significant to less than significant by the Rancheria's compliance with the NPDES General Construction Permit and implementation of a Stormwater Pollution Prevention Plan and associated BMPs. The ROD contains a list of BMPs that will be included in the Stormwater Pollution Prevention Plan, and the Stormwater Pollution Prevention Plan must be prepared, approved, and implemented before any ground disturbing activities can commence.

819.     The Rancheria conducted ground-disturbing and grading work on the Site without first preparing a Stormwater Pollution Prevention Plan or implementing required BMPs, in violation of the Rancheria's obligations under the FEIS and ROD.

820.     It was unreasonable for the BIA Defendants to rely on the Rancheria's implementation of proposed design features and mitigation measures—including preparation of Stormwater Pollution Prevention Plan, implementation of BMPs and design features concerning light and glare—as a basis for its finding that the Project's impacts on biological resources will be reduced from potentially significant to less than significant, without any indication or analysis of whether the Rancheria will, in fact, do as promised. As alleged elsewhere herein, the Rancheria initiated earth disturbance and grading work on the Strawberry Fields Site without first getting the permits, doing the surveys, or preparing the plans that were purportedly required by the FEIS and ROD.

821.     The BIA Defendants' reliance on mitigation measures to support a conclusion of less than significant effects was arbitrary and capricious in light of the absence in the record of facts indicating the Rancheria will be likely to comply with such measures.

822.     The FEIS omits data and analysis that was necessary for informed decision-making and failed to take a hard look at the Project's impacts. The responses to public comments provided on the FEIS, contained in the ROD, cannot remedy the FEIS's informational and analytical failures. A supplemental EIS was the proper vehicle for fixing the FEIS's informational and analytical gaps, not the

ROD, and no such supplement was prepared.

823.   Even if additional information and/or analysis in a record of decision could fix a flawed FEIS, the ROD issued for the Project does not include the missing information or analysis.

824.   Thus, BIA's issuance on July 1, 2024, of the ROD taking Strawberry Fields into trust, based on the analysis and conclusions contained in the FEIS, was arbitrary, capricious, an abuse of discretion, and/or in violation of the law, including without limitation, NEPA.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### FOURTEENTH CLAIM FOR RELIEF

**(Violations of the National Environmental Policy Act, 42 U.S.C. §§ 3441 *et seq*., and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 - Failure to Adequately Respond to Public Comment)**
**(Against the BIA Defendants)**

825.   Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

826.   BIA had an obligation to provide substantive responses to the public comments concerning Project environmental review documents submitted by Plaintiffs and other interested parties.

827.   In responding to public comments, a lead agency can respond by: modifying alternatives including the proposed action; developing and evaluating alternatives not previously given serious consideration; supplementing, improving, or modifying its analyses; making factual corrections; or explaining why comments do not warrant further agency response.

828.   The BIA Defendants received hundreds of public comments over the course of multiple comment periods between 2019 and 2024, including dozens of comments from Plaintiffs and their members.

829.   The BIA Defendants repeatedly failed to adequately respond to public comments concerning, among other issues, Project impacts on cultural resources, biological resources, traffic

analysis and mitigation, the provision of public services such as police, fire and emergency services, and utilities connections.

830.    The BIA Defendants' responses to public concerns about off-site traffic mitigation and access to Strawberry Fields were particularly flawed, in that the responses to comments about the feasibility of key Project elements (e.g., whether there is sufficient space to expand Bechelli Lane as required for North Access options) repeatedly cite to the Kimley Horn Access Alternatives Concepts memorandum. This document was not attached to the FEIS, nor any supporting appendices, and it has not been made available to the public. The BIA Defendants dismiss the public's concerns about site access and traffic mitigation, but fail to present the evidence supporting their conclusions, in violation of NEPA.

831.    The BIA Defendants failed to adequately respond to public comments.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and further relief as follows:

1.    This Court declare that the BIA Defendants have violated the APA, IRA, IGRA, NHPA, ESA, MSA, and NEPA, as alleged herein;

2.    This Court declare that the BIA Defendants' violations of the APA, IRA, IGRA, NHPA, ESA, MSA, and NEPA constitute illegal actions, and are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, under the APA;

3.    This Court declare that the NMFS Defendants have violated the APA, ESA, and MSA, as alleged herein;

4.    This Court declare that the NMFS Defendants' violations of the APA, ESA, and MSA constitute illegal actions, and are arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law, under the APA;

5.      This Court declare and order that the Decision is unlawful and void;

6.      This Court set aside the BIA Defendants' approval of the Redding Rancheria Fee-to-trust Casino Project, the FEIS, Record of Decision (including certification of the Final Environmental Impact Report), the BA/EFHA, and all related findings and approvals, and require the BIA follow federal statutes and regulations, including without limitation the IRA, IGRA, NHPA, ESA, MSA, and NEPA in any further review of and decision for Redding Rancheria Fee-to-trust Casino Project;

7.      This Court set aside the NMFS Defendants' concurrence in the BIA Defendants' findings of no likely adverse impacts on Sacramento River winter-run Chinook salmon ESU, Central Valley spring-run Chinook salmon ESU, California Central Valley steelhead DPS, and Southern DPS of North American green sturgeon, and the species' critical habitat, contained in the BA/EFHA and require the NMFS Defendants follow federal statutes and regulations including without limitation the ESA in any review of and decision for Redding Rancheria Fee-to-trust Casino Project;

8.      This Court set aside the NMFS Defendants' determination that the Project contained measures sufficient to avoid, minimize, mitigate or otherwise offset the adverse effects of the Project on the Pacific Salmon EFH and require the NMFS Defendants follow federal statutes and regulations including without limitation the MSA in any review of and decision for Redding Rancheria Fee-to-trust Casino Project;

9.      This Court enjoin the BIA Defendants to engage in an analysis of, and consultation concerning, the Project that is compliant with the IRA, IGRA, NHPA, ESA, MSA, NEPA, and APA;

10.     This Court enjoin NFMS to engage in an analysis of, and consultation concerning, the Rancheria Fee-to-trust Casino Project that is compliant with the ESA, MSA, and APA;

11.     This Court grant interlocutory and permanent injunctive relief enjoining the BIA Defendants from engaging in any activity concerning the Project until the Project complies with all

applicable federal regulations and statutes, including requirements of NHPA, IRA, IGRA, NEPA, the ESA, the MSA, and the APA;

12.    This Court grant permanent injunctive relief requiring the BIA Defendants to take Strawberry Fields out of trust status;

13.    This Court award costs of suit herein, including attorney fees, as allowed by law; and

14.    This Court grant such other and further equitable or legal relief as the Court deems just and proper.


Dated: February 4, 2025                    By: */s/ Kaighn Smith, Jr.*_____
                                           KAIGHN SMITH, JR., ESQ.
                                           D.D.C. BAR NO. MI0027
                                           **DRUMMOND WOODSUM**
                                           84 Marginal Way, Suite 600
                                           Portland, Maine 04101-2480
                                           (207)772-1941
                                           ksmith@dwmlaw.com
                                           *Counsel for Plaintiffs, Wintu Tribe of Northern California, Paskenta Band of Nomlaki Indians, and Speak Up Shasta Association*


Dated: February 4, 2025                    By: */s/ Stuart G. Gross*_____
                                           STUART G. GROSS
                                           D.D.C. BAR NO. CA00210
                                           **GROSS KLEIN PC**
                                           305 Broadway, Suite 777
                                           New York, NY 10007
                                           (212) 658-1219
                                           sgross@grosskleinlaw.com
                                           *Counsel for Plaintiffs, Wintu Tribe of Northern California, Paskenta Band of Nomlaki Indians, and Speak Up Shasta Association*

COMPLAINT

184