# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WINTU TRIBE OF NORTHERN CALIFORNIA, PASKENTA BAND OF NOMLAKI INDIANS, AND SPEAK UP SHASTA ASSOCIATION**, | |
| Plaintiffs, | Case No. 1:25-cv-00329 |
| v. | Hon. |
| **DEPARTMENT OF THE INTERIOR; BUREAU OF INDIAN AFFAIRS; SECRETARY OF THE DEPARTMENT OF THE INTERIOR; ASSISTANT SECRETARY OF THE INTERIOR FOR INDIAN AFFAIRS; REGIONAL DIRECTOR FOR THE BUREAU OF INDIAN AFFAIRS – PACIFIC REGION; NATIONAL MARINE FISHERIES SERVICE; DEPARTMENT OF COMMERCE; SECRETARY OF THE DEPARTMENT OF COMMERCE; and ACTING ASSISTANT ADMINISTRATOR OF FISHERIES OF THE DEPARTMENT OF COMMERCE**, | |
| Defendants.[*] | |

**Hearing Requested**

**PLAINTIFFS' MOTION FOR ADMINISTRATIVE STAY**

---

[*] All officer Defendants are named in their official capacities only.  Due to the timing of the initiation of this case and filing of this Motion, the names of the individuals holding these offices have not been included in these initial captions.  The appropriate individuals will be substituted by operation of law under Rule 25(d).

Plaintiffs the Wintu Tribe of Northern California (the "Wintu"), the Paskenta Band of Nomlaki Indians ("PBNI" or the "Nomlaki," and collectively with the Wintu, the "Tribes"), and Speak up Shasta Association ("SUS," and collectively with the Tribes, "Plaintiffs") hereby move, pursuant to 5 U.S.C. § 705, for a stay until final disposition of the case on the merits of the BIA Defendants'[1] July 1, 2024 decision (the "Decision") to take 221.41 acres of land south of the City of Redding in Shasta County, California ("Strawberry Fields") into trust for the Redding Rancheria (the "Rancheria") and to approve the Rancheria's construction and operation of massive a casino, hotel, event center, and retail complex thereon (the "Project").

For the reasons set forth in the accompanying Memorandum of Law in support of this Motion, Plaintiffs are likely to succeed on the merits of their claims under the National Historic Preservation Act, the Endangered Species Act, the Magnuson-Stevens Fisheries Management Act, the National Environmental Policy Act, the Indian Gaming Regulatory Act, and the Indian Reorganization Act. Additionally, Plaintiffs will suffer numerous irreparable harms if the Decision is not stayed, and granting this Motion will preserve the status quo in order to allow the Court to fashion effective relief when, as is likely, it rules in Plaintiffs' favor on the merits. Issuing the stay will also serve the public interest and will cause no harm to the Defendants, nor to the Rancheria or another third party, that is of a sufficient type or quantity to overwhelm the factors in favor of a stay.

Accordingly, Plaintiffs respectfully request that the Court stay the BIA Defendants' Decision to take Strawberry Fields into trust for gaming purposes and to approve the Project thereon, *nunc pro tunc* to the date of the Decision.

Dated: February 4, 2025                                By: */s/ Kaighn Smith, Jr.*_____
                                                                            KAIGHN SMITH, JR., ESQ.
                                                                            D.D.C. Bar No. MI0027
                                                                            **DRUMMOND WOODSUM**
                                                                            84 Marginal Way, Suite 600

---

[1] The "BIA Defendants" are, collectively, the Department of the Interior; the Bureau of Indian Affairs; the Secretary of the Department of the Interior; the Assistant Secretary of the Interior for Indian Affairs; and the Director of the Pacific Regional Office of the Bureau of Indian Affairs.

Portland, Maine 04101-2480
(207)772-1941
ksmith@dwmlaw.com

*Counsel for Plaintiffs, Wintu Tribe of Northern California, Paskenta Band of Nomlaki Indians, and Speak Up Shasta Association*

Dated: February 4, 2025

By: */s/ Stuart G. Gross*
STUART G. GROSS
D.D.C. Bar No. CA00210
**GROSS KLEIN PC**
305 Broadway, Suite 777
New York, NY 10007
(212) 658-1219
sgross@grosskleinlaw.com

*Counsel for Plaintiffs, Wintu Tribe of Northern California, Paskenta Band of Nomlaki Indians, and Speak Up Shasta Association*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WINTU TRIBE OF NORTHERN CALIFORNIA, PASKENTA BAND OF NOMLAKI INDIANS, and SPEAK UP SHASTA ASSOCIATION**, | |
| Plaintiffs, | |
| v. | Case No. |
| | Hon. |
| **DEPARTMENT OF THE INTERIOR; BUREAU OF INDIAN AFFAIRS; SECRETARY OF THE DEPARTMENT OF THE INTERIOR; ASSISTANT SECRETARY OF THE INTERIOR FOR INDIAN AFFAIRS; REGIONAL DIRECTOR FOR THE BUREAU OF INDIAN AFFAIRS – PACIFIC REGION; NATIONAL MARINE FISHERIES SERVICE; DEPARTMENT OF COMMERCE; SECRETARY OF THE DEPARTMENT OF COMMERCE; and ACTING ASSISTANT ADMINISTRATOR OF FISHERIES OF THE DEPARTMENT OF COMMERCE**, | |
| Defendants. | |

**Hearing Requested**

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ADMINISTRATIVE STAY**

# TABLE OF CONTENTS

TABLE OF CONTENTS...........................................................................................i

TABLE OF AUTHORITIES ................................................................................ iv

TABLE OF ABBREVIATIONS ............................................................................ v

INTRODUCTION ................................................................................................1

BACKGROUND ..................................................................................................4

I.    The Project—A Massive Casino Resort Development by an Indian Tribe Already Operating a Lucrative Casino Elsewhere..............................................................4

    A.  The Planned Casino Resort.....................................................................4

    B.  The Rancheria Was Restored in 1984 and Has Been Operating a Highly Profitable Casino in Another Location Since the 1990s.........................................5

II.   Location of the Project—An Isolated Plot of (Mostly) Undeveloped Land, in Shasta County, California, that Was the Site of Six Wintu Villages and the Location of a Massive Massacre of Native Peoples and Which Borders and Contains Critical Sacramento River Habitat of Four ESA Listed Fish Species ....................................7

    A.  Strawberry Fields—The Lands Taken into Trust Where the Casino and Some of Its Supporting Facilities Would Be.........................................................7

    B.  Off-Site Areas—Neither Owned or Controlled by the BIA Defendants or the Rancheria—Where the Project Calls for Work in Order to Provide the Site Basic Vehicle Access and Utility Services, as well as Traffic Mitigation ......................7

    C.  Historical Importance of Strawberry Fields and Affected Offsite Areas as Locations of Six Wintu Villages and the Largest Massacre of Native Peoples in California ...........................................................................................8

        1.  The Six Wintu Villages.................................................................8

        2.  The Fremont Massacre..............................................................11

        3.  National Register and Sacred Site Registrations ....................................11

    D.  Ecological and Aesthetic Importance of Strawberry Fields and Bordering Riverine Areas ............................................................................................12

    E.  The Rancheria's Illegal Grading of a Portion of Strawberry Fields Almost Immediately After It Was Taken into Trust........................................................13

III.  Review and Approval of the Project Under: (A) the NHPA; (B) the ESA and MSA; (C) NEPA; and (D) IGRA and the IRA ........................................................................14

    A.  NHPA Review and Approval of the Project .................................................14

        1.  NHPA Staturoy and Regulatory Framework .........................................14

        2.  The NHPA Section 106 Process Conducted by the BIA Defendants .....16

            a.  The BIA Defendants Sidelined the SHPO, the Wintu, and PBNI .16

            b.  The BIA Defendants Failed to Engage in an Adequate Effort to Identify Historic Properties Located on Strawberry Fields or the Off-Site Access Improvement Areas ...........................................17

                i.  Strawberry Fields.....................................................17

                ii.  Offsite Access Improvement Areas and Utility Infrastructure Connections Area .......................................18

c.  To Gain SHPO Concurrence, the BIA Defendants Create a
Different SHPO-Specific APE and Withhold Critical Information
..................................................................................................19

B.  ESA § 7 and MSA § 305 Review of the Project....................................20

C.  NEPA Review and Approval of the Project ...........................................21

LEGAL STANDARD...............................................................................................21

ARGUMENT ..........................................................................................................22

I.    Plaintiffs Are Likely to Succeed on the Merits...............................................22

A.  Plaintiffs Are Likely to Succeed on Their NHPA Claim.......................22

1.  The BIA Defendants Improperly Used the NEPA Documents to Conduct
and Document Their NHPA Analysis, Without Providing the Required
Notice of Their Intent to Do So ...............................................23

2.  The BIA Defendants Failed to Properly Determine the Project's Area of
Potential Effects .....................................................................23

a.  In Order to Gain the SHPO's Concurrence in a Finding of No
Adverse Effects, the BIA Defendants Created a SHPO-Specific
APE That Contradicted the Public APE and Excluded Geographic
Areas that May Be Adversely Affected by the Project..................23

b.  The BIA Defendants Failed to Consult with the SHPO in
Establishing an APE and in Determining Whether Historic
Properties Were Contained Therein.............................................24

3.  The BIA Defendants Failed to Engage in Appropriate Efforts to Identify
Historic Properties That May Be Adversely Affected..........................25

4.  The BIA Defendants Failed to Provide PBNI or the Wintu the Required
Right to Consult in the NHPA Process ....................................26

B.  Plaintiffs Are Likely to Succeed on Their ESA Claims .........................28

C.  Plaintiffs Are Likely to Succeed on Their NEPA Claims.......................29

1.  The FEIS Fails to Assess Obstacles to Obtaining Private Property
Interests Necessary to Provide Vehicle Access to Strawberry Fields.....29

2.  The FEIS Fails to Take a Hard Look at the Provision of Utility
Connections to Strawberry Fields ...........................................30

3.  The FEIS Fails to Take a Hard Look at Obstacles that May Prevent
Planned Mitigation of the Project's Traffic Impacts..............................31

4.  The FEIS Fails to Take a Hard Look at the Project's Impacts on Law
Enforcement, Fire, and Emergency Services.........................................32

5.  The FEIS Fails to Take a Hard Look at Aesthetic and Noise Impacts ...34

6.  The FEIS Fails to Take a Hard Look at Impacts on Cultural Resources or
Listed Species .......................................................................34

D.  Plaintiffs Are Likely to Succeed on Their IGRA and IRA Claims........35

1.  The BIA Defendants Erred in Applying the Restored Lands Exception
..............................................................................................35

a.  The Project Does Not Satisfy the Statutory Requirement, for the
Restored Lands Exception, that the Acquisition Be Made "As Part
Of" the Tribe's Restoration........................................................35

    b. The BIA Defendants Properly Found that the Evidence Could Not Support the Required Finding of a Temporal Connection, but Then Erred in Waiving that Requirement ..............................................37

    c. The BIA Defendants Erred in Finding that the Rancheria Satisfied the "Significant Historical Connection" Requirement..................38

   2. The BIA Defendants Violated the IRA by Failing to Determine a "Need" for the Acquisition for Gaming..............................................................39

II. Plaintiffs Would Be Irreparably Harmed Absent an Administrative Stay........................40

  A. Project Construction Would Irreparably Harm Wintu/Nomlaki Historic Properties ....................................................................................................................40

  B. Project Construction Would Irreparably Harm Plaintiffs' Quality of Life ............41

   1. Project Construction Would Permanently Alter the Natural Character of Strawberry Fields, Harming SUS and Its Members...............................41

   2. Project Construction Would Irreparably Harm the Local Community Including SUS Members.........................................................................42

   3. Plaintiffs Have Suffered Procedural Injuries that Will Be Rendered Irreparable if the Project Is Allowed to Proceed....................................43

III. A Stay Would Not Injure Interested Parties or the Public Interest ....................................43

  A. No Bond Should Be Required................................................................................44

CONCLUSION ....................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*Amoco Prod. Co. v. Village of Gambell,*
   480 U.S. 531 (1987) ................................................................................................ 41

*Anglers of the AU Sable v. U.S. Forest Serv.,*
   402 F. Supp. 2d 826 (E.D. Mich. 2005) ................................................................ 44

*Attakai v. U.S.,*
   746 F. Supp. 1395 (D. Ariz. 1990) ........................................................................ 25

*Brady Campaign to Prevent Gun Violence v. Salazar,*
   612 F. Supp. 2d 1 (D.D.C. 2009) ........................................................................... 43

*Butte Cty. v. Chaudhuri,*
   887 F.3d 501 (D.C. Cir. 2018) ............................................................................... 39

*City of Roseville v. Norton,*
   348 F.3d 1020 (D.C. Cir. 2003) ............................................................................. 36

*Colo. River Indian Tribes v. Marsh,*
   605 F. Supp. 1425 (C.D. Cal. 1985) ...................................................................... 24

*Comm. of 100 on Fed. City v. Foxx,*
   87 F. Supp. 3d 191 (D.D.C. 2015) ......................................................................... 29

*Conservation Law Found. v. Ross,*
   422 F. Supp. 3d 12 (D.D.C. 2019) ......................................................................... 44

*Fallon Paiute-Shoshone Tribe v. United States DOI,*
   No. 3:21-cv-00512-RCJ-WGC, 2022 U.S. Dist. LEXIS 7465 (D. Nev. Jan. 14, 2022) .......... 42

*Faust v. Vilsack,*
   519 F. Supp. 3d 470 (E.D. Wis. 2021) ................................................................... 44

*Finca Santa Elena, Inc. v. U.S. Army Corps of Engineers,*
   62 F. Supp. 3d 1 (D.D.C. 2014) ............................................................................. 44

*Florida v. Mayorkas,*
   672 F. Supp. 3d 1206 (N.D. Fla. 2023) .................................................................. 44

*Food & Water Watch v. FERC,*
   28 F.4th 277 (D.C. Cir. 2022) ................................................................................ 29

*    *Hualapai Indian Tribe v. Haaland,*

No. CV-24-08154-PCT-DJH, 2024 WL 4678059 (D. Ariz. Nov. 5, 2024) .......... 24, 35, 40, 41

*Lee Lumber & Bldg. Mat. Corp. v. NLRB,*
    117 F.3d 1454, 1460 (D.C. Cir. 1997) .................................................................................. 23

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ............................................................................................................ 22

\*   *Mont. Wilderness Ass'n v. Fry,* 310 F. Supp.2d 1127 (D. Mont. 2004) ................................ 24, 25

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th. Cir. 2002) ............................................................................................ 28

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.,*
    422 F.3d 782 (9th Cir. 2005) ............................................................................................. 28

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................................... 22

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n,*
    896 F.3d 520 (D.C. Cir. 2018) .......................................................................................... 41

*Penn. Cent. Transp. Co. v. City of New York,*
    438 U.S. 104 (1978) ........................................................................................................... 22

*Pub. Emps. for Env't Resp. v. Hopper,*
    827 F.3d 1077 (D.C. Cir. 2016) ........................................................................................ 21

*Pueblo of Sandia v. United States,*
    50 F.3d 856 (10th Cir. 1995) ............................................................................................. 26

*Pursuing America's Greatness v. Fed. Election Comm'n,*
    831 F.3d 500 (D.C. Cir. 2016) ..................................................................................... 22, 43

\*   *Quechan Tribe v. Dept. of Interior,*
    755 F. Supp. 2d 1104 (S.D. Cal. 2010) ............................................................. 26, 40, 41, 43

*Redding Rancheria v. Jewell,*
    776 F.3d 706 (9th Cir. 2015) .............................................................................................. 6

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ..................................................................................................... 31, 32

\*   *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior,*
    ("Shoshone"), 588 F.3d 718 (9th Cir. 2009) ...................................................... 31, 32, 33, 34

*San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*,
   657 F. Supp. 2d 1233 (D. Colo. 2009) ................................................................ 42

*Serv., Inc. v. Am. Pharm. Ass'n*,
   636 F.2d 755 (D.C. Cir. 1980) ............................................................................ 45

*Sierra Club v. DOE*,
   867 F.3d 189 (D.C. Cir. 2017) ............................................................................ 29

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ............................................................................ 41

*Tohono O'odham Nation v. DOI*,
   No. 24-00034, 2024 WL 1639160 (D. Ariz. Apr. 16, 2024) .............................. 15

*Tribes of Grand Ronde Cmty. of Or. v. Jewell*,
   830 F.3d 552 (D.C. Cir. 2016) ............................................................................ 39

*Weiss v. Sec'y of Dep't of Int.*, 459 Fed. App'x 497 (6th Cir. 2012) ........................... 44

*Wildlife v. Babbitt*,
   130 F. Supp. 2d 121 (D.D.C. 2001) .................................................................... 35

**Statutes**

5 U.S.C. § 705 ............................................................................................... 22, 44

5 U.S.C. § 706(2)(A), (D) ................................................................................... 22

16 U.S.C. § 1536(a)(2), (b)(3)(A) ................................................................. 20, 28

16 U.S.C. § 1855(b)(2) ........................................................................................ 20

16 U.S.C. § 1531 .................................................................................................... 2

16 U.S.C. § 1801 .................................................................................................... 2

23 U.S.C. § 139(f) ............................................................................................... 21

25 U.S.C. § 476(f) ............................................................................................... 38

25 U.S.C. § 2719(b)(1) ............................................................................. 5, 35, 36

25 U.S.C. § 2701 .................................................................................................... 3

25 U.S.C. § 5101 .................................................................................................... 3

42 U.S.C. § 4332(2)(C) .............................................................................................. 21

42 U.S.C. § 4321 ........................................................................................................ 2

54 U.S.C. § 300101 .................................................................................................... 14

54 U.S.C. § 306101 .................................................................................................... 2

54 U.S.C. § 306108 .................................................................................................... 14

54 U.S.C. § 302706(a) ............................................................................................... 15

**Regulations**

23 C.F.R. § 771.105 ................................................................................................... 21

25 C.F.R. § 1.2 .......................................................................................................... 37

25 C.F.R. § 292.12 .................................................................................................... 5

25 C.F.R. § 292.12(c) ................................................................................................ 6

25 C.F.R. § 292.12(c)(2) ........................................................................................... 37

25 C.F.R. § 151.10(b) ............................................................................................... 39

36 C.F.R. § 800.16(d) ................................................................................... 15, 23, 24

36 C.F.R. § 800.3(f)(2) .............................................................................................. 26

36 C.F.R. § 800.3(f)(3) .............................................................................................. 26

36 C.F.R. § 800.4(a) ....................................................................................... 15, 16

36 C.F.R. § 800.4(a)(1) .............................................................................................. 24

36 C.F.R. § 800.4(a)(3) .............................................................................................. 27

36 C.F.R. § 800.4(b) ................................................................................................. 25

36 C.F.R. § 800.4(b)(1) .............................................................................................. 26

36 C.F.R. § 800.4(c)(1) ..................................................................................... 16, 26

36 C.F.R. § 800.5(a)(1) .............................................................................................. 41

36 C.F.R. § 800.6(a) ........................................................................................ 16, 26

36 C.F.R. § 800.8(c)............................................................................................. 14, 23

36 C.F.R. §§ 60.4, 800.1(a), 800.16(i) ................................................................. 14, 15

40 C.F.R. §§ 1502.13, 1503.2 ................................................................................... 21

50 C.F.R. § 402.14(a).................................................................................................. 20

73 Fed. Reg. 29354 (2008) ......................................................................................... 36

## <u>TABLE OF ABBREVIATIONS</u>

ACHP – Advisory Council on Historic Preservation

AES – Analytical Environmental Services

ALAN – Artificial Light at Night

APE – Area of Potential Effects

BA/EFHA – Biological Assessment / Essential Fish Habitat Assessment

DEIS – Draft Environmental Impact Statement

FEIS – Final Environmental Impact Statement

I-5 – U.S. Interstate Highway 5

IGRA – Indian Gaming Regulatory Act

IRA – Indian Reorganization Act

MSA – Magnuson-Stevens Fisheries Management Act

NAIA – North Access Improvement Area

NEPA – National Environmental Policy Act

NHPA – National Historic Preservation Act

NRHP – National Register of Historic Places

PBNI – Paskenta Band of Nomlaki Indians

ROD – Record of Decision

SAIA – South Access Improvement Area

SHPO – State Historic Preservation Office

## INTRODUCTION

Plaintiffs[1] request a stay until final disposition of the case on the merits of the BIA Defendants'[2] July 1, 2024 decision (the "Decision") to (a) take 221.41 acres of land south of the City of Redding in Shasta County, California ("Strawberry Fields" or the "Site") into trust for the Redding Rancheria (the "Rancheria") and (b) approve the Rancheria's construction and operation of massive a casino, hotel, event center, and retail complex thereon (the "Project").

Strawberry Fields is a geographically isolated parcel of land located at a bend of the Sacramento River. The river—the largest in California and designated critical habitat for four endangered or threatened fish species—forms the western border of Strawberry Fields. I-5 forms its eastern border. To the north and the south are privately owned properties, through which the basic vehicle access and utility connection infrastructure for the Project would run. Until the Rancheria's recent unpermitted (and illegal) grading of approximately 2.5 acres of the parcel (discussed herein), Strawberry Fields has remained undeveloped for approximately 150 years.

But that was not always the case. For over 1,500 years up until the Gold Rush, six well-documented Wintu villages, inhabited by approximately 1,000 Wintu, sat along the bank of the Sacramento River in the area now known as Strawberry Fields and its environs. Plaintiff the Wintu's members are descended from these villagers, and the ancestors of Plaintiff Nomlaki's members had close economic and social ties with them. It was also the site of the worst "Indian massacre" in California and one of the worst in the United States, in which hundreds of Wintu, and likely Nomlaki visitors, were slaughtered as they fished for and prepared salmon.

The Rancheria's members, on the other hand, are descendants of Native Americans from other areas of California who migrated to the area to work in the ranches and orchards of White settlers. Currently—unlike the Wintu—the Rancheria already has a highly profitable casino that,

---

[1] Plaintiffs are the Wintu Tribe of Northern California (the "Wintu"); the Paskenta Band of Nomlaki Indians ("PBNI" or the "Nomlaki," and collectively with the Wintu, the "Tribes"); and Speak up Shasta Association ("SUS," and collectively with the Tribes, "Plaintiffs").
[2] The "BIA Defendants" are, collectively, the Department of the Interior; the Bureau of Indian Affairs; the Secretary of Interior; the Assistant Secretary of Interior for Indian Affairs; and the Director of the Pacific Regional Office of the Bureau of Indian Affairs. At all relevant times, Bryan Newland was the Assistant Secretary of Interior for Indian Affairs.

since the mid-90s, has operated on the lands where the Rancheria was established in the 1920s.

This historical, environmental, and political context imposed on the BIA Defendants (as well as the NMFS Defendants[3]) numerous legal requirements and restrictions in determining whether to take Strawberry Fields into trust and in evaluating the Project's impacts. As described below, these requirements and restrictions were violated at almost every step of the process.

***National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 306101 et seq.*** The existence of six interrelated ancient Wintu villages located within Strawberry Fields and adjacent lands and of the large scale massacre of Wintu, and likely Nomlaki, citizens that occurred there required that the BIA Defendants engage in what is known as a Section 106 Process under the NHPA. The BIA Defendants violated virtually every procedural requirement of Section 106, thereby flouting their legal responsibilities to the Tribes, state officials, and the public, and placing in harm's way the integrity of one of the last remaining intact Indigenous cultural landscapes in northern California, one that holds the unique, millennia-old story of the Wintu and Nomlaki Peoples, including their historic connection to the Sacramento River and surrounding natural environment and their near annihilation from the first "Indian massacre" in California.

***Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq. and Magnuson-Stevens Fisheries Management Act ("MSA"), 16 U.S.C. §§ 1801 et seq.*** The sprawling casino, hotel, retail, and event complex called for under the Project's plans would be built just one hundred and fifty feet away from a portion of the Sacramento River that provides critical and essential habitat to four listed salmonids and sturgeon, and would generate extensive artificial light at night ("ALAN") among other impacts to those fishes. However, among other basic failures, the BIA Defendants failed to even mention ALAN in their ESA § 7 and MSA review, let alone analyze its impacts on these listed fishes; and the NMFS Defendants concurred in that flawed analysis.

***National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq.*** The BIA Defendant's NEPA analysis of the Project was flawed in many more ways that can be

---

[3] The "NMFS Defendants" are, collectively, the Secretary of Commerce and the Assistant Administrator for Fisheries of the Department of Commerce.

enumerated in this brief. Among the major problems in their environmental review is the failure to acknowledge (let alone analyze the impacts of) the fact that basic vehicle access and fundamental traffic mitigation measures are hypothetical and may never occur because they require the consent and/or action of third parties. The analysis moreover completely glosses over how the Rancheria is going to provide police, fire, and emergency services on Strawberry Fields.

*Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 et seq., and Indian Reorganization Act (the "IRA"), 25 U.S.C. §§ 5101 et seq.* Because the Rancheria already has a casino that it has operated for over thirty years on other land, its application for the BIA Defendants to take a different parcel of land into trust so that it could build a replacement casino triggered, under IGRA, the requirement that the BIA Defendants conduct what is known as the "two-part determination," in which local officials, including those of PBNI and City of Redding—who have voiced very significant concerns about the Project—would have been allowed input on the decision. The BIA Defendants, however, with no apparent purpose other than to avoid this process, with a stroke of the pen, waived the two-part determination requirement. Instead, they made the Decision under what is known as the "restored lands" exception that can only be used *for Indian tribes that don't already have a casino*. They further justified the Decision under the IRA on the purported ground that it was necessary to do so to ensure the economic development of the Rancheria, despite the record showing that each member of the Rancheria has, for many years, received an annual check of almost $70,000, in addition to other benefits from profits generated by the Rancheria's extant casino.

Accordingly, under any or all of these laws, Plaintiffs are very likely to succeed on the merits of their claims. However, if the Court does not grant an administrative stay of the Decision to take Strawberry Fields into trust and to approve the construction and operation of the proposed casino resort development there, Plaintiffs will suffer numerous irreparable harms prior to the Court's likely finding in their favor on the merits, including: (1) the destruction of historic properties that are highly important to the Wintu and Nomlaki; (2) the destruction of the natural character of Strawberry Fields; (3) the significant disruption and disturbance of local

community members' lives by the massive construction project; and (4) the permanent loss of important procedural rights and opportunities that Plaintiffs are owed, including, without limitation, the Wintu's and Nomlaki's rights to participate in the Section 106 review of a Project that threatens to destroy their ancestors' village sites and graves.

Granting Plaintiffs' Motion will prevent these irreparable harms from occurring and will allow the Court to fashion effective relief when, as is likely, it rules in Plaintiffs' favor on the merits. Issuing the stay will also serve the public interest and will cause no harm to the Rancheria or another third party that is of a sufficient type or quantity to overwhelm the factors in favor of a stay. Accordingly, Plaintiffs respectfully request that the Court stay the BIA Defendants' Decision to take Strawberry Fields into trust and to approve the Project thereon.

## BACKGROUND

I. **The Project—A Massive Casino Resort Development by an Indian Tribe Already Operating a Lucrative Casino Elsewhere**

A. **The Planned Casino Resort Development**

The Project calls for grading of at least 57 acres to accommodate a development envelope of approximately 32 acres. Declaration of Kaighn Smith Jr. ("Smith Dec.") ¶¶ 5-6 & Ex. E ("FEIS"), Vol. II at 2-11.[4] The casino and resort complex will have a footprint of 380,000 square feet, *id.* at 2-11, consisting of a nearly 70,000 sq. ft. casino, 130,000 sq. ft of retail locations, 30,000 sq. ft. of food and beverage locations, a 10,000 sq. ft. conference center, a 1,800-seat event center, and a 250-room, 9-story, 120-foot tall hotel, along with various other related structures and facilities. *Id.* at 2-15 & Table 2-1. Accounting for the parking structure and surface parking, the Project includes well over a million square feet of built surfaces and structures. *Id.* The outdoor sports retail facility, outdoor pool, hotel, and parking lots will be constructed within 150 feet of the banks of the Sacramento River. *Id.* at 2-12 & Fig. 2-8.1. As Strawberry Fields is undeveloped, there are currently no utility connections to the site, *id.* at 4.10-1 to -9; the only

---

[4] The BIA Defendants' action of taking the Site into trust for the Rancheria to construct and operate the Project is a "major federal action" under the NEPA, requiring the BIA Defendants to prepare and publish a Notice of Intent ("NOI"), Scoping Report, a Draft Environmental Impact Statement ("DEIS" or "Draft EIS"), a Final Environment Impact Statement ("FEIS" or "Final EIS"), and a Record of Decision ("ROD") (collectively, the "NEPA Documents").

road access to Strawberry Fields is a narrow country road, Bechelli Ln. *Id.* at 2-3.

The casino development will host over ten thousand patrons and employees, brought to and from Strawberry Fields by as many as 13,521 car trips a day. FEIS Vol. II at 4.8-11. Strawberry Fields is bound by private property—rural residential to the north and south—I-5 and related easements to the east, and the Sacramento River to the west, meaning that work related to providing basic vehicle access and utility connections would require acquisition of land, or permission to use land, held by third parties. *Id*. at 2-5 to -6, 2-12, 2-16 to -17.

**B.** **The Rancheria Was Restored in 1984 and Has Been Operating a Highly Profitable Casino in Another Location Since the 1990s**

The original Redding Rancheria was purchased by the United States in 1922. *See* Smith Dec. Ex. B ("2010 Indian Lands Opinion") at 1. The United States established the Rancheria to provide housing for "homeless Indians" who migrated to the area to work on settler-owned ranches and fruit farms. Smith Dec. ¶ 10 Ex. G at 12; *see also* Joint Declaration of Dorothea Theodoratus, Ph.D., and Kathleen McBride, M.A. ("Theodoratus & McBride Dec.") Ex. C ("Theodoratus & McBride 2019") at 1. In 1965, Congress terminated the Rancheria, but the Rancheria was restored to federal recognition in 1984. Decision at 3.

In IGRA, Congress prohibited gaming on lands taken into trust after the date of IGRA's enactment, October 17, 1988, unless, in pertinent part, (a) the lands at issue are "taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition," 25 U.S.C. § 2719(b)(1)(B)(iii) (the "restored lands exception") or (b) the Secretary, after consultation with the tribe seeking to engage in gaming on such lands and with state, local, and tribal officials, determines that (1) the gaming will be in the best interests of the tribe and (2) not be detrimental to the surrounding community, and the Governor concurs in both determinations," 25 U.S.C. § 2719(b)(1) (the "two-part determination exception"). Under the DOI's regulations, to invoke the restored lands exception, a tribe must demonstrate that it has a "significant historical connection" to the land and that there is "a temporal connection between the date of the [trust] acquisition of the land and the date of the tribe's restoration." 25 C.F.R. § 292.12.

The Rancheria first acquired trust lands in 1992. 2010 Indian Lands Opinion at 2. The

Rancheria has, since the 1990s, engaged in Class III (casino-style) gaming pursuant to IGRA at its Win-River Resort & Casino. *See Redding Rancheria v. Jewell,* 776 F.3d 706, 715 (9th Cir. 2015). The Rancheria expanded the Win-River casino in 2008 and 2013 with additional gaming and a hotel property. *See* Smith Dec. Ex. D ("DEIS") Vol II, App'x A at 3.

**C.**    **The Secretary Has Repeatedly Recognized that the Rancheria's Request to Take Strawberry Fields Into Trust for Gaming Does Not Satisfy the Restored Lands Exception Under IGRA**

In 2003, the Rancheria filed its original trust Application with respect to Strawberry Fields. *Jewell*, 776 F.3d at 710. On December 22, 2010, the Secretary issued a formal opinion that the Rancheria could not establish the temporal connection between its restoration and its requested trust lands acquisition for gaming. 2010 Indian Lands Opinion at 7-8. The Secretary explained that because "the Tribe's existing gaming facility [Win-River] preclude[d] a finding" that the Rancheria "is not gaming on other lands" as required by the plain terms of 25 C.F.R. § 292.12(c), Strawberry Fields "[is] not eligible for the restored lands exception." *Id.* at 8. The Rancheria appealed to the Ninth Circuit, which vacated the 2010 Indian Lands Opinion and, without opining on the question, ordered the Secretary to consider "the Tribe's proposal to close its existing gaming operation upon construction of a new facility." *Jewell,* 776 F.3d at 715.

The BIA's July 1, 2024 Decision to take Strawberry Fields into trust for the Rancheria to implement the Project is the culmination of that remand. In it, the BIA Defendants observed that the Application did not satisfy the temporal connection requirement, writing that "[a] strict application of this limitation would again result in the Department denying the application as we did in the [2010 Indian Lands Opinion]." Decision at 8. Nevertheless, despite properly finding that the Rancheria could not establish the requisite temporal connection, the BIA Defendants simply waived that requirement. Decision at 8-9.

The BIA further grounded the Decision in a finding that taking Strawberry Fields in Trust was necessary for the Rancheria's economic development, Decision at 10-11, despite extensive evidence in the record that the Rancheria and its members had no such need, given its existing profitable casino, *see* FEIS Vol. I at T6, Ex. A. That casino generates around $15 million of

revenue for the Rancheria per year, with per-capita distributions to its members in the order of more than $67,000 per year; by way of comparison, the median household income in Shasta County is $99,291. *See* FEIS Vol. I, Cmt. Letter T6 – Ex. H ("GMA 2017 Win-River Performance Analysis") at 2-3; *see also* Smith Dec. Ex. N at 3.

**II.      Location of the Project—An Isolated Plot of (Mostly) Undeveloped Land, in Shasta County, California, that Was the Site of Six Wintu Villages and the Location of a Massive Massacre of Native Peoples and Which Borders and Contains Critical Sacramento River Habitat of Four ESA Listed Fish Species**

      **A.      Strawberry Fields—The Lands Taken into Trust Where the Casino and *Some* of Its Supporting Facilities Would Be Built**

The 221.41-acre Strawberry Fields site is located just south of the City of Redding (the "City") in Shasta County (the "County"), between I–5 to the east and the Sacramento River to the west. FEIS Vol. II at 1-1 & Fig. 2-2. Strawberry Fields is bordered by rural residential communities to the south and immediate north of the site. *Id.* at 2-3. A residential property owned by a third party stretches along the Site's northern border until the right-of-way for Bechelli Ln. (owned by the City), which stretches just 63 feet from the boundary of private property to the I-5 right-of-way. *See* Smith Dec. ¶ 15 Ex. P. Along the entirety of the Site's southern boundary is a parcel that the Rancheria owns as a tenant in common with the owner of parcels further south. Smith Dec. Ex. F ("ROD") Att. 3, I-21 at 9, Ex. C.

While the Project calls for the bulk of the casino development's facilities to be concentrated in the northern portion of Strawberry Fields, it also calls for various support facilities, including a wet pond for stormwater and potentially a leach field for onsite septic, to be built in the southern portion of the Site. *See* FEIS Vol. II at 2-21 & Fig. 2-8.1.

      **B.      Off-Site Areas—Neither Owned or Controlled by the BIA Defendants or the Rancheria—Where the Project Calls for Work in Order to Provide the Site Basic Vehicle Access and Utility Services, as well as Traffic Mitigation**

While the lands taken into trust by the BIA are limited to Strawberry Fields, the Project calls for extensive work to be conducted on and through private properties to the north and south of the Site, as well as at various intersections on roadways under the jurisdiction of the City, the County, and the California Department of Transportation ("Caltrans").

The FEIS defines, and includes in its assessment of Project impacts, two "Offsite Access

Improvement Areas," at which major road and intersection construction is to be conducted to allow vehicle access to Strawberry Fields from the north ("North Access Improvement Area" or "NAIA") and from the south ("South Access Improvement Area" or "SAIA"). *Id*. at 2-3 to -6. In the NAIA, Bechelli Ln. will be expanded to a 4-lane (each 12 feet wide) road with 4-foot shoulders on either side and a 6-foot sidewalk on the north side, requiring 102 feet of right-of-way. *Id*. at 2-16-17. (The current right-of-way is just 63 feet, with a private property to the west and I-5 to the east. Smith Dec. Ex. P.) It will also require "significant grading, retaining walls, and relocation/extension of existing facilities" to avoid impacting an irrigation canal and a City wastewater pump station, and to maintain access to residential properties and the aforementioned existing facilities. FEIS Vol. II, App'x N at 5. In the SAIA, the Project calls for the expansion of Adra Way, an existing rural driveway, *id*. at 2-17, which crosses the property to Site's south, in which the Rancheria holds only a tenancy in common. ROD Att. 3, I-21 at 9, Ex. C.

The Project also calls for significant *offsite* traffic mitigation, in the form of a new diamond interchange (including expanded on- and offramps) for the I-5 at South Bonnyview Road, and construction at other intersections impacted by the Project. FEIS Vol. II at 5-11 to -14.

The FEIS fails to explain how Strawberry Fields would be connected to gas or electric service other than to indicate that both would come from the points north of the parcel, *see id.* at 4.10-8, which would necessitate crossing privately owned properties, *id.* at 4.10-8 to -9, 2-5 & Fig. 2.3. If the casino development is serviced by the City water and/or sewer, which are presented as "options" in the FEIS, the connections would require trenching across the privately owned property to the north. *Id.* at 4.14-11 to -13, 2-5 & Fig. 2-3. Though not revealed in the FEIS, this trenching would be 10 feet deep. Smith Dec. ¶¶ 9-10 & Ex. K at 1-5.

**C.    Historical Importance of Strawberry Fields and Affected Offsite Areas as Locations of Six Wintu Villages and the Largest Massacre of Native Peoples in California**

**1.    The Six Wintu Villages**

Strawberry Fields and the surrounding area, including locations where offsite work is to be done (particularly the North Access work), is the Indigenous territory of the Wintu and, to a

lesser extent, the Nomlaki. Theodoratus & McBride 2019 at 3-5, 9, 12.[5] The Wintu and Nomlaki are closely related by language, culture, and ancestral ties. *Id.* at 12 & n.1.

Strawberry Fields and adjacent lands  to the north and south are the location of six "pre-contact" Wintu villages (the "Six Wintu Villages"), bordered by the Sacramento River to the west and Churn Creek to the east. *Id.* at 4-12. Between 760 and 950 Wintu citizens resided within about 190 Wintu homes in these villages, relying upon the salmon runs in the Sacramento River for their subsistence. *Id.* at 9. The Nomlaki, indigenous to lands to the south, regularly migrated to the Site to take part in the salmon harvests and to engage in economic and related ceremonial activities with the Wintu. *Id.* at 9, 12. The Six Wintu Villages were occupied for over 1500 years well into the middle of the nineteenth century when a genocidal campaign, and intrusions from the Gold Rush, caused the Wintu to disperse. *Id.* at 12, 19-21.

These villages were documented in the 1880s by eminent ethnographer and linguist, Jeremiah Curtin, and renowned Wintu elder, Norel-putis, who worked together to identify, map, and record, in great detail, 239 Wintu villages along the Sacramento River. *Id.* at 9. Around 1980, anthropologist James Dotta mapped the locations of these 239 Wintu villages along the Sacramento River and its tributaries, including the Six Wintu Villages, which are identified in Dotta's and Curtin's work as villages # 4 through 9. *Id.* at 5-8; Theodoratus & McBride Dec. ¶¶ 14-17. Dotta published this work in two separate volumes, referred to herein as "Dotta 1980" and "Kardell & Dotta 1980." *See* Theodoratus & McBride Dec. ¶¶ 14-17.

The BIA Defendants concede that Curtin's Village # 7, *Nosono,* "may be in the project footprint." FEIS Vol. I at 4-31; *see* Smith Dec. Ex. K at 38 Fig. 16. The BIA Defendants also concede that a known historic property, with archaeological designation CA-SHA-266,[6] will be

---

[5] Theodoratus & McBride 2019, titled *Report on Tribal Historical Connections to the "Strawberry Fields" Site Near Redding California*, was submitted to the BIA Defendants in 2019 as an exhibit to the Tribes' DEIS comments, and was cited by the BIA Defendants as a reference in the FEIS. FEIS Vol. II at 8-18.

[6] The BIA Defendants identify CA-SHA-266 as Curtin's Village #9, *Yonotŭmnomsono,* but it appears to in fact be Curtin's Village #8, *Kĕ'nkodi. See* Theodoratus & McBride Dec. ¶ 18. It is immaterial whether CA-SHA-266 is *Yonotŭmnomsono* or *Kĕ'nkodi,* as it is undisputed that (a) it is part of a string of Six Wintu Villages transecting the Site and lands adjacent to the Site from

adversely affected by construction of the NAIA. FEIS Vol. II at 4.6-2. Between 1940 and 2002, other construction in that location, including by the Rancheria, unearthed over 15 Wintu burials associated with CA-SHA-266, most of them intact, and Wintu representatives were involved in caring for them. Theodoratus & McBride 2019 at 13-15.



Filippini Dec. ¶ 14 & Ex. D.

In fact, as shown above in an image that superimposes the Six Wintu Villages (in white)

north to south, (b) it is eligible for listing on the National Register of Historic Places, and (c) it will be adversely affected by the undertaking. For the purposes of this Motion, the village that the Defendants identify as *Yonotǔmnomsono* will be referred to by its archaeological trinomial designation, CA-SHA-266.

from the Kardell & Dotta 1980 map onto a satellite image of the Strawberry Fields Site (outlined in red), the planned casino resort development will be built directly on top of Curtin's Village # 7, work in the North Access Improvement Area (which extends directly north of Strawberry Fields to the first large east-west road), would occur directly on top of Curtin's Village #8, i.e. CA-SHA-266, and Curtin's Village #6 is in the southern portion of Strawberry Fields where the construction of various support facilities is planned.

### 2.    The Fremont Massacre

Strawberry Fields is also the location of one of the largest massacres of Indigenous people in American history and the first in California. Theodoratus & McBride 2019 at 19-21; Theodoratus & McBride Dec. ¶¶ 19-34. This massacre, carried out by John Fremont and his forces on April 8, 1846, involved the outright slaughter of Native people, mostly women and children, who were processing a fish catch. *Id.* at 3, 20. Fremont's contemporaneous diary entries, along with other primary sources, directly place the massacre within the boundaries of Strawberry Fields. Theodoratus & McBride Dec., ¶¶ 23-31; *see* Filippini Dec., ¶¶ 15-17 & Ex. E; Theodoratus & McBride 2019 at 20. It is likely that every family in the Six Wintu Villages transecting Strawberry Fields and the lands adjacent to it would have had some direct involvement with this massacre. Theodoratus & McBride 2019 at 3, 19. Due to the frequency of Nomlaki visits to the Site, particularly during salmon runs, it is also likely that ancestors of the present-day PBNI perished in this massacre. *Id*.

Because of their important historic, cultural and ceremonial connections to the Site, and the deaths suffered by their ancestors there, Strawberry Fields is of unique cultural and religious significance to the Wintu and Nomlaki. *Id.* at 4, 19; Declaration of Gary Rickard ("Rickard Dec.") ¶ 19; Declaration of Brandin Paya ("Paya Dec"), ¶¶ 6-9; Declaration of Dr. Brian Daniels ("Daniels Dec.") ¶¶ 16-26.

### 3.    National Register and Sacred Site Registrations

The BIA Defendants acknowledge that CA-SHA-266 is eligible for listing on the National Register of Historic Places ("National Register" or "NRHP") and is, therefore, a "historic property," deserving, as described further below, specific protections under the NHPA.

FEIS Vol. II at 3.6-8. The other villages of the Six Wintu Villages are likely similarly eligible for listing on the National Register because they share the same archaeological and ethnographic characteristics as CA-SHA-266. Theodoratus & McBride 2019 at 4.

Furthermore, the entirety of Strawberry Fields with adjacent lands to the north and south encompassing the Six Wintu Villages, including the NAIA, meets the criteria for listing on the National Register as a Wintu/Nomlaki "district," "traditional cultural property," and/or "cultural landscape." *See id.* at 3-4; Daniels Dec. ¶¶ 16-26. This is because, as explained below, amongst other things, it is "associated with events that have made a significant contribution to the broad patterns of our history," the Fremont Massacre, and is "likely to yield information important to prehistory or history," and accordingly meet criteria A and D for listing on the National Register. *See id.* at 4; Daniels Dec. ¶¶ 16-26.

Given the cultural, religious, and historic importance of Strawberry Fields and adjacent lands encompassing the Six Wintu Villages, to the Wintu and Nomlaki, the Tribes have successfully listed it with the California Native American Heritage Commission ("NAHC") as a sacred site in the NAHC's Sacred Lands Files under the name, "The Sacramento River Massacre Site," Rickard Dec. ¶ 23; Paya Dec. ¶ 10; Daniels Dec. ¶¶ 10-13, and the Tribes are separately working to nominate the Site for listing as a historic property on the National Register, *see* Rickard Dec. ¶ 24; Paya Dec. ¶ 11; Daniels Dec. ¶¶ 14-15.

> ### D. <u>Ecological and Aesthetic Importance of Strawberry Fields and Bordering Riverine Areas</u>

Strawberry Fields is currently zoned agricultural, and contains a mix of grassland, riparian, woodland, and riverine habitat, whose western border is made up of over 1,000 feet of Sacramento River shoreline. FEIS Vol. II at 3.5-5-11. There are currently no structures or impervious surfaces within Strawberry Fields, *id*. at 3.5-7; and the different habitat types support multiple resident and migratory species of wildlife, *id*. at 3.5-11. As acknowledged in the BIA's Biological Assessment/Essential Fish Habitat Assessment contained in Appendix D to the DEIS ("BA/EFHA"), the stretch of Sacramento River adjacent to Strawberry Fields, in addition to the seasonal backwater and portions of the floodplain onsite, is designated as critical habitat for four

fish species that are listed under the ESA: Sacramento River winter-run Chinook salmon ESU[7] ("winter-run Chinook"), Central Valley spring-run Chinook salmon ESU ("spring-run Chinook"), California Central Valley steelhead DPS[8] ("steelhead"), and Southern DPS of North American green sturgeon ("green sturgeon," collectively with the winter-run Chinook, spring-run Chinook and steelhead, the "listed species"). BA/EFHA at 9-14. It is also designated as Essential Fish Habitat ("EFH") under the MSA for Pacific Salmon. *Id.* at 9-12.

The stretch of river between Clear Creek (which is downstream of Strawberry Fields) and Keswick Dam (which is upstream) is where approximately 95% of winter-run Chinook spawn, making the area fundamental to the continued survival of the species. Declaration of Charles Hanson ("Hanson Dec.") ¶¶ 11, 13, 30. While the BA/EFHA acknowledges that development in and adjacent to critical habitat poses risks of stormwater contamination and erosion for the listed species, *see* BA/EFHA at 14-16, development that generates ALAN near occupied habitat also can have significant negative impacts on resident listed salmonid species, Hanson Dec. ¶¶ 5, 31-36, which is nowhere acknowledged in the BA/EFHA.

**E.    The Rancheria's Illegal Grading of a Portion of Strawberry Fields Almost Immediately After It Was Taken into Trust**

The BIA's Record of Decision ("ROD") includes a Mitigation Monitoring and Enforcement Plan ("MMEP"), specifically to address the Project's impacts on sensitive habitat and cultural resources on and around Strawberry Fields. ROD Att. 1 at 2-7. The MMEP requires the Rancheria to, among other things, acquire authorization under the Clean Water Act by preparing and implementing a Stormwater Pollution Prevention Plan before commencing ground-breaking activity; to conduct pre-construction biological surveys; and to prepare an Unanticipated Discoveries plan to address any cultural resources discovered during construction. *Id*. at 2-6. As of the filing of this Motion, the Rancheria has not yet received CWA authorization, nor has it apparently conducted any pre-construction biological surveys or prepared an Unanticipated Discoveries Plan. Declaration of Stuart G. Gross ("Gross Dec."), ¶¶ 2-4. However,

---

[7] Evolutionarily Significant Unit.
[8] Distinct Population Segment.

in July 2024, within weeks of BIA issuing the ROD, the Rancheria brought heavy equipment to Strawberry Fields and conducted groundbreaking and grading work on 2.5 acres of undeveloped grassland, before installing an approximately 1.5-acre gravel parking lot and a flagpole. Declaration of Todd Giles ("Giles Dec.") ¶¶ 9-15, Ex. A; Gross Dec., ¶¶ 5, 7, Ex. B.  While the BIA is apparently trying to keep a lid on the grading work, the Rancheria, despite violating its obligations under the ROD and CWA, publicized its "moving dirt" on social media and held a flag raising ceremony on the newly created parking lot within a month of the ROD being issued. Gross Dec. ¶ 7, Exs. C-E.

### III. Review and Approval of the Project Under: (A) the NHPA; (B) the ESA and MSA; (C) NEPA; and (D) IGRA and the IRA

#### A. NHPA Review and Approval of the Project

The Project and the related Decision to take Strawberry Fields into trust constitute an "undertaking," subject to the requirements of the NHPA, 54 U.S.C. §§ 300101 *et. seq.* and related regulations, 36 C.F.R. Part 800 (collectively "NHPA"). FEIS Vol. II at 3.6-1-2.

##### 1. NHPA Statutory and Regulatory Framework

Pursuant to Section 106 of NHPA, "prior to" to the Decision, the BIA Defendants were required to "take into account the effect" of the Project "on any historic property." 54 U.S.C. § 306108. This is known as the "Section 106 Process." A federal agency is allowed to combine its Section 106 Process with its NEPA process and documentation, as long as it notifies the State Historic Preservation Office ("SHPO") and the Advisory Council on Historic Preservation ("ACHP") in advance of its intention to do so and then follow certain procedures. 36 C.F.R. § 800.8(c).

Under the NHPA, a "historic property" is a property that is either listed on the National Register or eligible for listing on the National Register under one or more of four criteria. *See* 36 C.F.R. §§ 60.4, 800.1(a), 800.16(i). This includes: a "*site*," which is defined as "the location of a significant event [or] a prehistoric or historic occupation or activity, . . . where the location itself maintains historical or archeological value," *id.* § 60.3(l), and a "*district*," which is defined as "a geographically definable area . . . possessing a significant concentration, linkage, or continuity of sites . . . united by past events," *id.* § 60.3(d). A site or district may be eligible for listing on the

National Register under criterion "A" if "associated with events that have made a significant contribution to the broad patterns of our history," under criterion "B" if "associated with the lives of persons significant in our past," or under criterion "D" if it "ha[s] yielded, or may be likely to yield, information important [to] prehistory or history." *Id.* § 60.4.

Congress specifically provided that a "[p]roperty of traditional religious and cultural importance to an Indian tribe . . . may be determined to be eligible for inclusion on the National Register." 54 U.S.C. § 302706(a). A "traditional cultural property" ("TCP") may be a "site" or "district" that is "associat[ed] with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." Dept' of Interior, Nat'l Park Serv., National Register Bulletin 38 at 1 (1998). TCPs include "cultural landscapes." *Tohono O'odham Nation v. DOI*, No. 24-00034, 2024 WL 1639160, at *2 (D. Ariz. Apr. 16, 2024).

As part of the Section 106 Process, the agency involved in an undertaking is required to consult with the SHPO to establish and document an "area of potential effects" ("APE") of the Project. 36 C.F.R. § 800.4(a). The APE is the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties." 36 C.F.R. § 800.16(d). The agency must then, as part of the Section 106 Process:

- make a good faith effort to identify Indian tribes "that might attach religious and cultural significance to properties within the area of potential effects" and "[g]ather information" from such tribes "to assist in identifying properties, . . . which may be of religious and cultural significance to them and may be eligible for the National Register"; and

- "[s]eek information, as appropriate, from . . . organizations likely to have knowledge of, or concerns with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties."

36 C.F.R. § 800.4(a)-(b). The NHPA defines Indian tribes as those that are federally recognized like PBNI. *Id.* § 800.16(m). The Wintu, which is not yet federally recognized, qualifies, here, as an organization that has knowledge of or concerns with the historic properties at issue.

Based on the information gathered from such tribes and organizations, the agency is next required, "in consultation with the SHPO . . . and any Indian tribe . . . that might attach religious

and cultural significance to properties within the [APE]," to make "a reasonable and good faith effort" to identify historic properties in the APE, *id.* § 800.4(b)(1), and to "apply the National Register criteria . . . to properties identified within the [APE] that have not been previously evaluated for National Register eligibility." 36 C.F.R. § 800.4(c)(1).

If, in this process, the agency finds "there are historic properties which may be affected by the undertaking," it is required to "notify all consulting parties, including Indian tribes . . . , invite their views on the effects[,] and assess adverse effects." *Id.* § 800.4(d)(2). To then "resolve" any such adverse effects, the agency is required to consult with the SHPO and other consulting parties, including Indian tribes, "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate" those effects. 36 C.F.R. § 800.6(a); *see also id.* § 800.6(c) (providing for memorialization of agreement to resolve effects); *id.* § 800.7 (providing for consultation with the ACHP to resolve in the absence of an agreement).

## 2. The NHPA Section 106 Process Conducted by the BIA Defendants

The BIA Defendants combined their Section 106 Process with their NEPA review of the Project without notifying either the SHPO or the ACHP in advance of their intention to do so. *See* FEIS Vol. II at ES-1, 3.6-1. They then continued to violate the NHPA throughout the Section 106 Process.

### a. The BIA Defendants Sidelined the SHPO, the Wintu, and PBNI

The BIA Defendants, through their consultant Analytical Environmental Services ("AES"), purported to establish a variety of APEs for the Project, identify and evaluate historic properties within those various APEs, and assess potential effects of the Project on them, all without consulting with the SHPO, the Wintu, or PBNI. The BIA Defendants did not commence any consultation with the SHPO until *after* AES completed this work and issued five reports for the BIA Defendants—a process that spanned from 2016 through 2019. *See* FEIS V. II at 8-1 (referencing five AES Reports); *compare* FEIS Vol. I, App'x P.[9]

---

[9] The AES reports, though referenced therein, are not appended to the NEPA Documents. The Tribes independently obtained certain of these reports, which are identified herein as the "2016-2019 AES Reports" and are attached to the Smith Declaration. *See* Smith Dec. ¶¶ 9-10.

The BIA Defendants did not consult with the Wintu or PBNI in the process. By letter dated June 4, 2019 to then-Director of the BIA's Pacific Regional Office, the Wintu requested to participate in the Section 106 Process as a consulting party. Rickard Dec. Ex. A. The Wintu received no responses to this request. Rickard Dec ¶ 28. By letter dated January 15, 2020, well after the BIA Defendants completed efforts to identify and assess historic properties affected by the Project, the BIA Pacific Regional Office wrote to PBNI, extending "an invitation to the Paskenta Rancheria [sic] to participate as a consulting party" for the Section 106 Process. FEIS Vol. I App'x P. The letter stated only that the PBNI was welcome to submit additional information for the BIA Defendants to consider as they "initiate the Section 106 process with the . . . SHPO." *Id.* Defendants made no offer to PBNI to discuss, advise, or participate in the identification or evaluation of historic properties, or to resolve adverse effects to historic properties on a government-to-government basis. *See id*. There was no further follow-up to this letter. Paya Dec. ¶ 13. By email to the BIA Pacific Regional Office in August 2023, the PBNI separately requested consulting party status. *See* ROD, Att. 3, Table 2 at 16. The BIA Defendants made no effort to accommodate that request; in the ROD they suggested the request was too late because the SHPO had already signed off on a "no historic properties affected" determination. *See id.*

> **b.** **The BIA Defendants Failed to Engage in an Adequate Effort to Identify Historic Properties Located on Strawberry Fields or the Off-Site Access Improvement Areas**

Throughout their approximately eight-year combined NEPA/Section 106 Process, the BIA Defendants consistently defined the APE for the Project, in the NEPA Documents, as including not only Strawberry Fields, but also the Offsite Access Improvement Areas to the north and south of the Site and the areas to the north, where utility infrastructure work is required. *See* FEIS Vol. II at 3.6-5 & Fig. 2-8.1. Their effort to identify historic properties in all of these areas was woefully inadequate.

> **i.** **Strawberry Fields**

With respect to Strawberry Fields' 221.41 acres, the BIA Defendants claimed that their

17

Section 106 Process for identifying historic properties there would be conducted under a presumption that "construction and staging may occur anywhere within" Strawberry Fields and up to 8 feet below the surface. FEIS Vol. II at 3.6-5. However, notwithstanding this statement, their knowledge of Dotta 1980, Kardell & Dotta 1980, and consistently-stated Wintu concerns, the BIA Defendants confined their ground surveying efforts for identifying historic properties within Strawberry Fields to just 37 of the 222.41 acres. Smith Dec. Ex. G at 2, 7, 18-25; Ex. H at 18-20; Ex. J at 5; see also Dkt. 1 ¶¶ 300. They made no reasonable efforts to identify historic properties anywhere else on the Site, including within a 49-acre area of the southeastern portion of the Site identified as a potential location for additional infrastructure construction. *See* Dkt. 1. ¶¶ 305-307.

  **ii.**  **Offsite Access Improvement Areas and Utility Infrastructure Connections Area**

   In 2017, without any involvement by PBNI, Wintu, or the SHPO, the BIA Defendants set out, through AES, to identify and evaluate historic properties that could be affected in the Offsite Access Improvement Areas. Smith Dec. Ex. I. The BIA Defendants made no effort to survey "the southern half of the footprint" of the NAIA, where the Project calls for very significant roadwork and trenching and pipe work for the utility infrastructure connections. FEIS Vol. II at 3.6-10; Smith Dec. Ex. L at i. ("the footprint for utility connections falls into the footprint for the northern access route"); FEIS Figure 4.14-2 (showing utilities connections in southern part of NAIA). But they represent that they did. *Compare* FEIS Vol. II at 4.14-14 – 15. Nor did they make survey efforts within the SAIA: AES inaccurately represented that *an on-site* 2007 "pedestrian survey" was sufficient to rule out the existence of historic properties there. *See* Dkt. 1, ¶¶ 310-315 and *compare* FEIS V. II at 3.6-8.

   On March 29, 2024, the BIA Defendants published the FEIS, in which they also purported to describe the results of their Section 106 Process. The FEIS makes no mention of any Wintu or Nomlaki historical connection to Strawberry Fields or Fremont's unprecedented "Indian massacre" associated with the Site, other than in dismissive responses to the Tribes' DEIS comments. *See generally* FEIS Vol. II; *see also* FEIS Vol. I at 4-31 to -32, 4-34. This is

despite knowing for at least five years about (a) Theodoratus & McBride 2019; (b) the Tribes'

DEIS comments summarizing Theodoratus & McBride 2019; (c) Dotta 1980; (d) Kardell &

Dotta 1980; (e) the location of Wintu village, CA-SHA-266, within the NAIA; (f) the possibility

that another Wintu village, *Nosono,* "may be in the project footprint"; (g) extensive discussions

in AES 2016-2019 of Strawberry Fields as the Indigenous territory of the Wintu, but also

"occupied" by the Nomlaki; and (h) a plethora of Wintu statements that Strawberry Fields is

Wintu aboriginal territory with village sites. The FEIS also announces that Project work in the

NAIA will adversely affect CA-SHA-266 and that the NHPA required the BIA Defendants to

enter into an agreement with the SHPO to resolve those adverse effects, but it does not explain or

further discuss that required consultation. FEIS Vol. II at 4.6-2.[10]

> ### c.    To Gain SHPO Concurrence, the BIA Defendants Create a Different SHPO-Specific APE and Withhold Critical Information

By letter dated May 9, 2023, the SHPO stated its concurrence in the BIA Defendants'

purported Section 106 determination of "no historic properties affected" by the Project. FEIS

Vol. II, App'x P. However, the BIA Defendants obtained that concurrence using an APE that

was limited "only [to] potential historic properties in the 232-acre site." FEIS Vol. II, App'x P at

2. In other words, in their communications to the SHPO, the Defendants described the APE as

limited to the Strawberry Fields Site alone, without the Offsite Access Improvement Areas or the

off-site areas where utility connection infrastructure work will be conducted. *See* Smith Dec. ¶

14 & Ex. O. Thus, the BIA Defendants *used two separate APEs for the Project*: one to secure the

SHPO's "no historic properties affected" concurrence, limited to the Site alone (the "SHPO

APE"), *see id.,* and another in the DEIS and FEIS that represented to members of the public that

---

[10] Referring to and referencing Kardell & Dotta 1980, AES had determined, in 2017, that this work will adversely affect CA-SHA-266, which it described as "eligible for listing" on the National Register. Smith Dec. Ex. I at 2, 16-17. AES further determined that because the Project will have adverse effects upon CA-SHA-266, "Section 106 of the NHPA requires that the BIA consult with the SHPO and other parties to negotiate and execute a Section 106 agreement document that sets out the measures the federal agency will implement to resolve those adverse effects through avoidance, minimization, or mitigation." *Id.* at 20. The BIA Defendants memorialized these determinations through almost identical language in the DEIS and the FEIS. *See* DEIS Vol. I at 3.6-7 to -8, 4.14-6; FEIS Vol. II at 3.6-8 to -9, 4.6-2.

these off-site areas were included (the "Public APE"), FEIS Vol. II at 3.6-5 to -9 & Fig. 2-8.1.

Further, in obtaining the SHPO's concurrence, the Defendants did not (a) provide the SHPO with Theodoratus & McBride 2019; (b) inform the SHPO that CA-SHA-266 would be adversely affected by the Project; (c) explain that they established a different Public APE in the DEIS and FEIS, which included the Offsite Traffic Improvement Areas and offsite areas where utility infrastructure work would be conducted; (d) disclose that *Nosono,* one of the Six Wintu Villages, may be in the footprint of the planned casino complex, or (e) consult with the SHPO about the above-referenced written requests of the Wintu and PBNI to be consulting parties. *See* Smith Dec ¶ 14 & Ex. O.

## B. ESA § 7 and MSA § 305 Review of the Project

In order to ensure compliance with the ESA, the act and its implementing regulations require action agencies—the BIA here—to consult with the appropriate federal fish and wildlife agency—NMFS, in this case—whenever their actions "may affect" an endangered or threatened species. *See* 50 C.F.R. § 402.14(a). Federal agencies must "use the best scientific and commercial data available" in assessing a proposed action's impact on a protected species. 16 U.S.C. § 1536(a)(2), (b)(3)(A). Similarly, under the MSA, federal agencies are required to consult with NMFS if a federal action may adversely affect essential fish habitat. 16 U.S.C. § 1855(b)(2). The first step in this combined process is the preparation by the action agency of a biological assessment under the ESA and an essential fish habitat assessment under the MSA (a "BA/EFHA"), which is submitted to NMFS and based on which it is determined whether formal consultation is necessary. *See* 50 C.F.R. §§ 402.10 to 402.14, 600.920.

In July 2018 the BIA prepared its BA/EFHA to analyze Project effects on the listed species, their critical habitat, and EFH. Among other omissions, the BA/EFHA includes no discussion of ALAN produced by the Project (which will involve very significant 24/7 outdoor lighting) or its potential impacts on the listed species. *See* BA/EFHA *passim*. On May 7, 2019, NMFS, acting as the consulting agency, issued a Concurrence Letter, concurring in BIA's conclusion that "the proposed action is not likely to adversely affect the subject listed species

and designated critical habitats." FEIS Vol. II App. O-1 at 6. The Concurrence Letter also

contained no mention ALAN or its potential impacts on the listed species. *See id. passim*.

### C.  **NEPA Review and Approval of the Project**

NEPA requires all agencies to prepare a detailed environmental impact statement ("EIS")

on every proposal for a major federal action that could potentially have a significant effect on the

quality of the human environment. 42 U.S.C. § 4332(2)(C). In preparing an EIS, the agency

must, *inter alia*: (a) adequately consider, analyze, and disclose the individual and cumulative

environmental impacts of the proposed action and alternatives to it; (b) adequately establish the

purpose and need for the proposed action under review; (c) rigorously explore and objectively

evaluate all reasonable alternatives to the proposed action; (d) rigorously explore and objectively

evaluate appropriate mitigation measures not already included in the proposed action or

alternatives; and (e) present the EIS for, and respond to, comments on any proposed major

federal action that could significantly affect the quality of the human environment. 23 U.S.C. §

139(f); 42 U.S.C. § 4332(2)(C); 23 C.F.R. §§ 771.105, 771.119(b); 40 C.F.R. §§ 1502.13,

1503.2. NEPA requires agencies "take a 'hard look' at the environmental consequences of their

actions, and provide for broad dissemination of relevant environmental information." *Pub. Emps.*

*for Env't Resp. v. Hopper*, 827 F.3d 1077, 1082 (D.C. Cir. 2016) (cleaned up).

The BIA issued its DEIS for the Project in April of 2019, and the Plaintiffs, members of

the public, public agencies, and local governments, submitted extensive comments highlighting

its informational and analytical shortcomings. The FEIS was released on March 29, 2024, and

again the Plaintiffs and members of the community submitted comments pointing out continued

flaws in the BIA's environmental review. ROD at 4; *id*. Att. 3, T-1 to -3, I-4, I-21. Without

correcting these flaws, the BIA issued the ROD, and its Decision to officially take Strawberry

Fields into trust and approve the Project, on July 1, 2024. Decision at 1.

### LEGAL STANDARD

The APA gives the Court broad power to retroactively postpone the effective date of an

agency action to avoid irreparable injury. "On such conditions as may be required and to the

extent necessary to prevent irreparable injury," courts reviewing agency action "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

While an administrative stay is considered a less drastic remedy than a preliminary injunction, *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 165 (2010), the Court assesses the same factors: (1) whether the applicant has made a strong showing of likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder,* 556 U.S. 418, 434 (2009). Where a government agency is the party opposing the motion, the third and fourth factors merge, "because the government's interest is the public interest." *Pursuing America's Greatness v. Fed. Election Comm'n,* 831 F.3d 500, 511 (D.C. Cir. 2016). Plaintiffs easily meet these standards.

## ARGUMENT

### I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Pursuant to the familiar standards of the APA, this Court must hold unlawful and set aside agency actions that are arbitrary, capricious, involve an abuse of discretion, or are "otherwise not in accordance with law," or "without observance of procedure required by law," 5 U.S.C. § 706(2)(A), (D). Plaintiffs are likely to prevail under this standard on multiple fronts.

#### A.    Plaintiffs Are Likely to Succeed on Their NHPA Claims

The National Historic Preservation Act involves "a series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance." *Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 108 n.1 (1978). In this case, despite being presented with extensive and unrebutted expert evidence that the area where the Project calls for work to be conducted—including Strawberry Fields, the Offsite Access Improvement Areas, and offsite utility infrastructure areas—has great historical and cultural significance to the Tribes and others, the BIA Defendants flagrantly violated or simply ignored a number of the obligations imposed on them by NHPA.

1. **The BIA Defendants Improperly Used the NEPA Documents To Conduct and Document Their NHPA Analysis, Without Providing the Required Notice of Their Intent To Do So**

While the law allows agencies to combine their NEPA analysis and NHPA Section 106 analysis, they must first notify the SHPO and the ACHP that they intend to do so. 36 C.F.R. § 800.8(c). The BIA Defendants combined the two analyses, *see* FEIS Vol. II at 3.6-1 to -12, without providing the SHPO advance notice of their intent to do so, *see* Smith Dec. ¶ 14 Ex. O.

2. **The BIA Defendants Failed To Properly Determine the Project's Area of Potential Effects**

   a. **In Order to Gain the SHPO's Concurrence in a Finding of "No Historic Properties Affected," the BIA Defendants Created a SHPO-specific APE That Contradicted the Public APE and Excluded Geographic Areas that May Be Adversely Affected by the Project**

When an agency makes two fundamentally contradictory statements concerning a matter material to its decision, it has acted arbitrarily and capriciously. *See, e.g.*, *Lee Lumber & Bldg. Mat. Corp. v. NLRB*, 117 F.3d 1454, 1460 (D.C. Cir. 1997). The BIA Defendants did just that. In the Public APE, they defined the Project's APE to include Strawberry Fields, the Offsite Access Improvement Areas, and the offsite areas where utility infrastructure work would be conducted. Within this APE was site CA-SHA-266, a historic property that the BIA Defendants concede is eligible for listing on the National Register and will be adversely affected by the Project. *See* FEIS Vol. II at 3.6-8 to -9, 4.15 to -18. However, seemingly for the sole purpose of persuading the SHPO to concur in a finding of no adverse effects on historic properties, the BIA Defendants employed the SHPO APE with only the Strawberry Fields parcel, omitting the Offsite Access Improvement Areas and areas where offsite utility connection work will be conducted, which contained site CA-SHA-266. Smith Dec. Ex. O. That was both arbitrary and capricious.

It was also in violation of the law. The NHPA defines the APE that must be evaluated in a Section 106 Process as the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties." 36 C.F.R. § 800.16(d). As the BIA Defendants' own findings in the DEIS and FEIS make explicit, the Project may (in fact, will) directly cause alterations of historic properties outside the boundaries

of Strawberry Fields, specifically site CA-SHA-266, which is squarely within the Offsite Access Improvement Areas. FEIS Vol. II at 3.6-8 to -9, 4.15-18. Thus, even ignoring its duplicitousness, the BIA Defendants' exclusion of CA-SHA-266 from the APE provided to the SHPO was in violation of the NHPA and the APA.

In short, the SHPO APE is illegal, and the BIA Defendants' use of it to obtain the SHPO's concurrence in their finding of "no historic properties affected" requires that their Decision be set aside. *See Hualapai Indian Tribe v. Haaland,* No. CV-24-08154-PCT-DJH, 2024 WL 4678059, at *12 (D. Ariz. Nov. 5, 2024) (granting preliminary injunction when APE failed to account for effects on tribal historic property, in contradiction to finding in NEPA documents); *Mont. Wilderness Ass'n v. Fry,* 310 F. Supp. 2d 1127, 1153 (D. Mont. 2004) (federal agency approving lease for oil and gas production is "obligated" to consider a wide "affected area," not just the pipeline right-of-way); *Colo. River Indian Tribes v. Marsh,* 605 F. Supp. 1425, 1438 (C.D. Cal. 1985) (federal agency that limits area of potential effects "permit area" alone without considering affected area "breached its responsibility under the NHPA").

**b.** **The BIA Defendants Failed to Consult with the SHPO in Establishing an APE and in Determining Whether Historic Properties Were Contained Therein**

The BIA Defendants were required, "*[i]n consultation with the SHPO,*" to "[d]etermine and document the area of potential effects, as defined in § 800.16(d)," 36 C.F.R. § 800.4(a) (emphasis added), and to "[r]eview existing information on historic properties within the area of potential effects, including any data concerning possible historic properties not yet identified," *id.* § 800.4(a)(2). The BIA Defendants did neither of those two things in their establishment of either of their two contradictory APEs (i.e., the Public APE and the SHPO APE). Rather, they undertook that work solely through AES, leaving the SHPO out of it, initiating consultation with the SHPO only after completing that work. *See* Smith Dec. Ex. O. And upon doing so, the BIA Defendants (a) failed to inform the SHPO of the Public APE and (b) persuaded the SHPO to concur in their "no historic properties affected" determination based on the reduced SHPO APE. Defendants appear to have intentionally kept the SHPO in the dark about their contradictory

APEs. These actions were "without observance of procedure required by law" and arbitrary and capricious, requiring vacatur of the BIA Defendants' decision. *See Montana Wilderness,* 310 F. Supp.2d at 1153 (failure of federal agency to consult as required by NHPA warrants vacatur); *Attakai v. U.S.,* 746 F. Supp. 1395, 1407 (D. Ariz. 1990) (same).

      **3.**      <u>**The BIA Defendants Failed to Engage in Appropriate Efforts To**</u>
                 <u>**Identify Historic Properties That May Be Adversely Affected**</u>

Agencies are required to conduct a "reasonable and good faith effort to carry out appropriate identification efforts" of historical properties, "in consultation with the SHPO" and interested Indian Tribes. 36 C.F.R. § 800.4(b). The BIA Defendants failed to do so with regards to the areas covered by both of the two APEs that they varyingly (and illegally) established.

With regards to identification efforts on Strawberry Fields itself—to which the SHPO APE was limited—the BIA Defendants, as described above: (a) failed to consult with PBNI in such efforts; (b) made no effort to identify the Six Wintu Villages and their association with the Fremont massacre as part of a district, traditional cultural property, and/or cultural landscape eligible for listing on the National Register, notwithstanding the BIA Defendants' extensive knowledge of the archaeological and historical data related thereto; (c) failed to share relevant information with the SHPO, including Theodoratus & McBride 2019; (d) limited archeological survey work to a 37-acre portion of an over 221-acre area, despite acknowledging that "construction and staging may occur anywhere within the Strawberry Fields Site" up to 8 feet below ground, FEIS Vol. II at 3.6-5; (e) relied solely on a "pedestrian survey" of the eastern half of Strawberry Fields, despite acknowledging its ineffectiveness because "ground surface visibility was poor (10-50%)," Crawford 2007 at 13; and (f) made no effort to identify the historic Wintu village *Nosono*, despite acknowledging that "*Nosono* may be in the project footprint" (meaning the location of the casino and entertainment complex), FEIS Vol. I at 4-31.

Material shortcomings in the BIA Defendants' identification efforts conducted in Offsite Access Improvement Areas and offsite areas where utility connection infrastructure work would occur—which the Public APE contains in addition to Strawberry Fields—include: (a) failing to make a reasonable or good faith effort to identify historic properties in the southern half of the

NAIA and overlapping offsite areas where utility infrastructure work would be conducted, while claiming to have done so, *see* 36 C.F.R. § 800.4(b)(1); (b) failing to make a reasonable and/or good faith effort to identify properties in the SAIA, while claiming to have done so, *see id.*; and (c) failing to "consult with the SHPO . . . to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects" to CA-SHA-266, after acknowledging the Project will cause such adverse effects, *id.* § 800.6(a).

The BIA Defendants' identification efforts were, therefore, patently unreasonable. *See Pueblo of Sandia v. United States,* 50 F.3d 856, 861-62 (10th Cir. 1995) (when an agency has information about a traditional cultural property likely associated with an APE, and fails to engage in further investigation, agency "did not make a reasonable effort to identify historic properties"). Further, their failure to provide the SPHO with the above-referenced, highly material information renders their identification efforts lacking in good faith. *See id.* at 862.

### 4. The BIA Defendants Failed to Provide PBNI or the Wintu the Required Right To Consult in the NHPA Process

The NHPA requires that a tribe who requests in writing to serve as a consulting party "shall be one." 36 C.F.R. § 800.3(f)(2). That mandate is not a mere formality, but marked by the federal government's "fiduciary duty" to Indian tribes. *Quechan Tribe v. Dept. of Interior,* 755 F. Supp. 2d 1104, 1110 (S.D. Cal. 2010). So important is this tribal role that in evaluating any historic properties, that agencies are required to "acknowledge" that tribes "possess[] special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them." 36 C.F.R. § 800.4(c)(1). Nonetheless, the BIA Defendants simply ignored the PBNI's written request to consult in the Section 106 Process concerning the Project, Paya Dec. ¶ 13, violating the plain terms of the NHPA and rendering its process "without observance of procedure required by law." *Quechan Tribe*, 755 F. Supp. 2d at 1119-20.

As for the Wintu, the BIA Defendants were required to consider their written request "and, in consultation with the SHPO," determine whether to accept it. 36 C.F.R. § 800.3(f)(3). But the Defendants simply ignored it and never brought it to the attention of the SHPO. Smith Dec. Ex. O. Further, the BIA Defendants were required to "[s]eek information" from

26

"organizations likely to have knowledge of, or concerns with, historic properties in the [APE] and identify issues relating to the undertaking's potential effects on historic properties." 36 C.F.R. § 800.4(a)(3). The Wintu is just such an organization, but the BIA Defendants failed to seek information from the Wintu as a tribal entity to identify such issues. Other than in brief, dismissive responses to the Wintu's DEIS comments, the BIA Defendants failed to account for any Wintu connection to Strawberry Fields *at all*.

The BIA Defendants' failure to consult with the Wintu and PBNI was all the more arbitrary and capricious in light of their extensive knowledge of the Tribes' connection to the historic properties that could be affected by the Project. The AES Reports acknowledge that "the Proposed Project region" was "occupied" by "the Wintu in the immediate vicinity" and "the Nomlaki to the south." Smith Dec. Ex. H at 9-10; Smith Dec. Ex. K at 8-9 (same). And, for its assessment, AES relied on Dotta 1980 and Kardell & Dotta 1980 (on the latter, in particular, to identify CA-SHA-266 as a Wintu "ethnographic village" that is eligible for listing on the National Register and will be impacted by construction in the NAIA). AES 2017 at 2. Both Dotta 1980 and Kardell & Dotta 1980 depict the Six Wintu Villages transecting the Site. *See* Theodoratus & McBride Dec. ¶¶ 14-17. Moreover, as early as 2007, Wintu representatives had expressed concerns to the BIA Defendants about the Project's impacts upon "known sensitive resources" and an "unrecorded [prehistoric] site" in the "northwestern corner of the APE." Crawford 2007 at 10; see Smith Dec. Ex. H at 17. And the BIA Defendants' 2016 Scoping Report for the Project—also prepared by AES—reported multiple Wintu statements of concern, including fourteen comment letters variously stating that the Strawberry Fields Site "is Wintu Territory" and that "the Wintu . . . should be the lead tribe in charge of any and all cultural monitoring of the [Strawberry Fields] property."  Scoping Report, App'x B, Cmt. Letters F1-1 to F2-10; *see also* Scoping Report, App'x C at 30-32 (testimony from Wintu council member that the Strawberry Fields Site is "Wintu aboriginal territory," that "large amounts of aboriginal people were there," and that there are "burial grounds there").

For all or any of these reasons, the Plaintiffs are likely to succeed on their NHPA claims.

**B.      Plaintiffs Are Likely to Succeed on Their ESA Claims**

Plaintiffs are likely to succeed in their claims that the BIA Defendants and NMFS
Defendants violated their ESA section 7 obligations to assess the Project's effects on listed
species and critical habitat. If an agency fails to consider important aspects of a project's effects
or relevant factors, the agency's biological assessment will be inadequate. *See Native Ecosystems*
*Council v. Dombeck,* 304 F.3d 886 (9th. Cir. 2002). An agency's decision concerning effects on
listed species is not owed deference when the agency "completely failed to address some factor
consideration of which was essential to making an informed decision." *Nat'l Wildlife Fed. v.*
*Nat'l Marine Fisheries Serv.,* 422 F.3d 782, 798 (9th Cir. 2005). Here, among other failings, the
BIA and NMFS "completely failed to address" a factor essential for making an informed
decision—ALAN that will be generated by the Project and its potential deleterious effects on
listed salmonid species that occupy critical habitat on and adjacent to Strawberry Fields.

Federal agencies must "use the best scientific and commercial data available" in
assessing a proposed action's effects on listed species. 16 U.S.C. § 1536(a)(2), (b)(3)(A). And
ample literature demonstrates the deleterious effects of ALAN on sensitive fish species,
particularly salmonids, as ALAN can negatively impact juvenile salmon's ability to migrate,
forage for food, and avoid predation, while it also alters the migratory behavior of adult salmon.
*See* Hanson Dec. ¶¶ 31-36. There is, furthermore, no disputing that the critical habitat on and
adjacent to Strawberry Fields is occupied and utilized by multiple life history phases of the listed
species. *Id.* ¶¶ 6-30; BA/EFHA at 9-14. Nor is there disputing that the Project locates ALAN-
producing structures approximately 150 feet away from that habitat on and adjacent to
Strawberry Fields, *see* BA/EFHA at 5 & Fig. 3, or that the Project mandates that parking areas
and areas around gaming facilities (including those approximately 150 feet from the Sacramento
River) will be "well lit" to aid law enforcement services, *id.* at 2-23. Thus, ALAN is an essential
factor that the BIA and NMFS should have considered in assessing the Project's potential
effects. Hanson Dec. ¶¶ 6-30, 37-41. However, the BA/EFHA contains *no discussion* of any
lighting impacts on any fish species. *See* BA/EFHA.

### C.    Plaintiffs Are Likely to Succeed on Their NEPA Claims

The BIA failed to disclose or analyze the impacts of key elements of the Project, in dereliction of its duty under NEPA. NEPA "requir[es] federal agencies to take a hard look at their proposed actions' environmental consequences." *Sierra Club v. DOE,* 867 F.3d 189, 196 (D.C. Cir. 2017). An agency also violates NEPA where it "entirely failed to consider an important aspect of the problem[.]" *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 201 (D.D.C. 2015). If there are significant obstacles to implementing key components of a project, lack of analysis thereof constitutes ignoring an "important aspect of the problem" when failure to overcome the obstacle leads to reasonably foreseeable impacts. *Id.* (quotation marks omitted); *see also Food & Water Watch v. FERC*, 28 F.4th 277, 285 (D.C. Cir. 2022) (effects are reasonably foreseeable if "sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision"). The BIA failed to take a hard look, and in many instances, *any look at all,* regarding basic questions about the Project's impacts related to infrastructure critical to site access, traffic mitigation, and utility services, the provision of law enforcement, fire, and emergency services, the aesthetic quality of the area, or cultural and biological resources; thus, plaintiffs are likely to prevail on their NEPA claims.[11]

1.    **The FEIS Fails to Assess Obstacles to Obtaining Private Property Interests Necessary to Provide Vehicle Access to Strawberry Fields.**

To get in or out of Strawberry Fields by any vehicle (other than a canoe, a kayak, or the like) you must go north or south. And to the north and south there are private properties owned in whole or part by third parties (i.e., not the BIA Defendants or the Rancheria) that impede such access. Nowhere does the FEIS take a hard look at how the obstacles this presents will be overcome or what will happen if those obstacles are not overcome.

The FEIS presents only two vehicle access options, both of which depend upon the

---

[11] In addition to these "hard look" failures, Plaintiffs also bring claims under NEPA based on the BIA Defendants' failure to properly establish the Project's purpose and need, Dkt. 1 ¶¶ 594-605, improper inclusion in their preferred alternative various "options" that should have been analyzed as alternatives, *id.* ¶¶ 578-93, and failure to adequately respond to comments, *id.* ¶¶ 825-31. Plaintiffs are also likely to prevail on the merits of those claims, but because of space limitations have not focused on them here.

Project's North Access plan, which requires the expansion of Bechelli Ln. from two lanes to four lanes and the addition of sidewalks and shoulders. FEIS Vol. II at 2-12, 2-16-17. However, neither the Rancheria nor BIA own or have rights to use the property necessary for the expanded right-of-way ("ROW") needed for the road widening at the southern portion of Bechelli Ln. *Compare* Smith Dec., ¶ #, Ex. # (current Bechelli Ln. ROW is 63 feet) *with* FEIS Vol. II at 2-16 to -17, 3.6-9 (102 feet of ROW needed for expansion). Other than stating that North Access "would require the acquisition of additional [ROW] from adjacent property owners," FEIS Vol. II at 2-16 to -17, the FEIS is silent on: the method by which such an acquisition will be achieved—purchase? condemnation?; who will acquire the land—the BIA or Rancheria (neither of which have eminent domain authority)? the City?; the impact that such an acquisition will have on the affected private property owner; whether existing land use constraints render the expansion impossible; and what the environmental impacts will be if this expansion (whose fruition is out of the control of the BIA Defendants and Rancheria) never occurs. The Bechelli Ln. expansion called for under the North Access plan will also require the demolition of an existing, privately-owned Burger King at the intersection with South Bonnyview Road, which is not even mentioned in the FEIS, generating yet more questions about how and whether the necessary space can be obtained to complete the North Access construction and what will happen if it isn't obtained. *Compare* AES 2017 at 2 *with* FEIS Vol. II at 2-16 to -17.

The FEIS similarly fails to address the significant, perhaps insurmountable, roadblocks to constructing the proposed South Access option. The South Access option calls for the expansion of an existing rural driveway (Adra Way) to a two-lane county road. FEIS Vol. II at 2-17. However, this expansion will occur, in part, on a property in which the Rancheria holds only a tenancy in common interest. ROD Att. 3 Ex. 1, T-2 Ex. D. The FEIS's discussion of this issue is limited to the same "right-of-way acquisitions would be required" statement, leaving the same questions as above unanswered. FEIS Vol. II at 2-17.

**2. The FEIS Fails to Take a Hard Look at the Provision of Utility Connections to Strawberry Fields.**

The BIA Defendants failed to disclose or analyze the feasibility or impacts of providing

utility services to Strawberry Fields, which is an island of undeveloped agricultural land with no current utility connections. The FEIS includes "options" whereby the Project seeks to connect to the City wastewater and water systems by new service lines—construction of which would entail digging 10-foot trenches—to run directly through private property not owned or controlled by the Rancheria or the BIA. *Id.* at 4.10-1 to -4. The FEIS does not address whether, or how, the necessary private property will be obtained, nor is there any discussion of whether the City has agreed to allow connection to its service lines, a critical factor considering the City's standing policy against extending utility services beyond the city limits. *See id.* at 4.10-1.

Regarding the provision of natural gas service to the Project, the FEIS lacks any specificity about the location of the new pipeline, how private property will be obtained for the unspecified location, or the human environmental impacts of providing that service. The FEIS only states that the Project would run a line to connect somewhere on the Hilton Garden Inn site, approximately 1,100 feet north of Strawberry Fields, but is silent on where the new high-pressure gas line will go. *Id.* at 4.10-8-9. The area between the Hilton Garden Inn and Strawberry Fields is private residential property, *id.* at 2-3-4, and there is no discussion of how or where the pipeline will be sited, whether a landowner would sign off on PG&E running gas line through their property, or what the impacts of that siting will be, *see id. passim.*

### 3. The FEIS Fails to Take a Hard Look at Obstacles that May Prevent Planned Mitigation of the Project's Traffic Impacts.

The FEIS concludes that the Project would have significant traffic impacts but claims that the impact would be reduced to less than significant by certain mitigation measures. *See* FEIS Vol. II at 4.8-12, ES-23.[12] Mitigation measures in an EIS must "be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 353 (1989). This necessarily includes "an assessment of whether the proposed mitigation measures can be effective." *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior* ("*Shoshone*")*,* 588 F.3d 718, 727 (9th Cir. 2009). The

---

[12] As alleged in the Complaint, the method by which the BIA Defendants calculated this impact (and thus the extent of the mitigation necessary to address it), is also flawed, which is another claim on which Plaintiffs are likely to prevail. *See* Dkt. 1 ¶¶ 682-88.

FEIS fails this standard, as it nowhere analyzes the implication of the fact that the proposed traffic mitigation measures must be implemented by entities other than the BIA Defendants and the Rancheria and so may never be done. FEIS Vol. II at 1-7, 5-10 to -14. The FEIS also omits discussion of how the construction of the proposed mitigation at the S. Bonnyview Road and I-5 interchange would be constrained, perhaps precluded, by existing and planned road configurations. *Compare* Smith Dec. ¶ 8 *with* FEIS App'x Q at 45.

While NEPA accepts uncertainty in the implementation of mitigation measures, this is only the case where the agency first concludes the impacts will be adverse, even if the mitigation measures are implemented, and discloses and analyzes obstacles to the mitigation's implementation. *Cf. Robertson,* 490 U.S. at 352-53 (finding that mitigation proposed to address adverse impacts that was not within the jurisdiction of the lead agency did not violate NEPA, because the degree of the adverse impacts was fully disclosed and analyzed and the discussion of mitigation, including the obstacles to implementation, was sufficient). This is not the case, here, as the BIA Defendants told the public that traffic impacts would be less-than-significant based on the implementation of mitigation measures that are beyond its control, and to which numerous undisclosed obstacles to implementation exist. This misled the public and decision-makers concerning the underlying significance determination, in violation of NEPA.

4.    **The FEIS Fails to Take a Hard Look at the Project's Impacts on Law Enforcement, Fire, and Emergency Services**

The BIA Defendants predict that the Project will increase the demand for law enforcement by at least 50% over the demand of the Rancheria's currently operating Win-River casino. FEIS Vol. II, App. L at 3-4. The FEIS proposes two "options" for the provision of law enforcement, fire and emergency services to Strawberry Fields, but the FEIS does not take a hard look at either, leaving unanswered basic questions regarding either option's effectiveness and related impacts on the surrounding communities and the broader community. *See* FEIS Vol. II at 2-18 to -19, 4.10-5 to -8; *contra Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 530 (D.C. Cir. 2018) ("The environmental effects that must be assessed include 'aesthetic, historic, cultural, economic, social, or health' effects.").

The FEIS concludes impacts to law enforcement, fire and emergency services under "option 1"—where the Rancheria pays local governments to provide services pursuant to an intergovernmental agreement—will be less than significant. FEIS Vol. II at 4.10-5 to -8. However, this conclusion ignores two critical facts, the implications of which are nowhere analyzed. First, the agreement is the subject of pending litigation alleging the agreement violates a number of Shasta County policies and may be invalidated. ROD Att. 3, Ex. 1, Cmt. Ltr. I21 at 2-4, Ex. B; ROD Att. 1 at 29-33. Second, if the agreement survives, the record demonstrates that the agreement's per-call payments for law enforcement, which only apply to calls on Strawberry Fields, are well below the expected costs of each call, *compare* FEIS Vol. II App. L at 3-4 *with* App. R at 4, and the one-time payment for fire and emergency services is not sufficient to cover the costs of new equipment the Project would mandate, let alone the increased staffing, ROD Att. 3, Ex. 1, Cmt. Ltr. I21 at 2-4. Again, the FEIS entirely ignores the potential implications of this on the casino development's staff, patrons, and neighbors, let alone the broader community.

The Project's "option 2" purports to activate the heretofore non-existent Redding Rancheria Law Enforcement Department to address demand on Strawberry Fields, FEIS Vol. II at 4.10-5 to -6, but the FEIS fails to disclose and analyze numerous elements of setting up a new police force.[13] The FEIS posits that 5 full-time officers will handle onsite incidents, but fails to conduct any kind of assessment of the adequacy of that staffing level, omitting consideration of basic information like detailed calls for service data (i.e., that includes the type of incident, duration of response, follow up investigation) that is commonly used to determine staffing levels for a new police department. Declaration of Mark Meredith ("Meredith Dec.") ¶¶ 7-17. The FEIS also fails to address the jurisdictional limitations on the hypothesized new police force, which preclude the new police force from enforcing state laws on the Project site or enforcing any laws off of the Project site. *Id.* ¶¶ 18-28. Thus, the FEIS's analysis of "option 2" does not account for how much assistance will be needed from local departments, nor the resulting financial or

---

[13] As alleged in the Complaint, similar omissions exist with regards to the presented "option" in which the Rancheria would provide fire and emergency services in-house. *See* Dkt. 1 ¶¶ 659-68.

community burden by directing officers away from other non-Project incidents.

     5.     **The FEIS Fails to Take a Hard Look at Aesthetic and Noise Impacts**

The Project will place a massive casino development on a large parcel of land that has been undeveloped for over a century and a half and abuts a stretch of river that is commonly used by recreational boaters. *See* FEIS Vol. I at 3-26 to -27 & Cmt. Ltr. T6 at 68; FEIS Vol. II at 2-3, 4.13-1. As part of the BIA's hard look at the Project's environmental impacts, it was required to consider the Project's aesthetic and noise impacts. *Oglala Sioux*, 896 F.3d at 530.The BIA Defendants failed to do so in several ways.

*First,* the FEIS, while relying on mitigation measures (i.e., project design features) to reduce what it acknowledges would be a potentially significant impact from hotel and signage illumination at night, and daytime glare, to less than significant levels, *see* FEIS Vol. II at 4.13-9 to -12, fails to analyze whether these measures would be effective, *contra Shoshone,* 588 F.3d at 727 ("An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective"). This is particularly egregious in light of the disclosure elsewhere in the FEIS that implementation of those mitigation measures will be left completely to the discretion of the Rancheria. *See* FEIS Vol. II at 2-17 to -18.

*Second,* the FEIS commits the same failing with regard to construction noise. The FEIS concludes, without any analysis or detailed discussion, that implementation of "best management practices" ("BMPs") will successfully reduce significant adverse construction noise effects to less than significant. *Id.* at 4.11-3. But the FEIS does not quantify the noise reduction of any of these BMPs, individually or collectively, nor are the BMPs included in the ROD as required mitigation measures, leaving it entirely to the Rancheria's discretion whether or not to implement them. *See id.* at 2-27 to -28, 4.11-3; *contra Shoshone,* 588 F.3d at 727.[14]

     6.     **The FEIS Fails to Take a Hard Look at Impacts on Cultural**
                    **Resources or Listed Species**

The BIA Defendants combined their NEPA analysis of Project impacts on cultural

---

[14] As discussed in Background Section II.E above, the Rancheria blatantly disregarded similar BMPs that were supposedly part of mandatory obligations under the FEIS/ROD when it conducted grading work on Strawberry Fields in July 2024.

resources with their Section 106 analysis of its impacts on historic properties. *See* FEIS Vol. II at ES-1, 3.6-1. And the same failures to properly identify historic properties that render their Section 106 Process analysis inadequate, discussed above, violate their obligations to take a hard look at the Project's impacts on cultural resources. *Hualapai Indian Tribe v. Haaland*, No. 24-08154, 2024 WL 4678059, at *18 (D. Ariz. Nov. 5, 2024) (plaintiff's NHPA and NEPA claims likely successful on the merits, based on failure to take a "hard look" at impacts to a historic property).

Similarly, the FEIS's analysis of the Project's impacts on the listed fish species mirrors the analysis contained in the BA/EFHA, and is thus plagued by the same omissions indicated in the ESA and MSA discussion above. BIA's failure to provide any analysis of the ALAN impacts on the listed species and critical habitat, in addition to violating the ESA and MSA, also constitutes a failure to take a hard look under NEPA. *See Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 138 (D.D.C. 2001) (finding that defendant agencies violated NEPA and the ESA by failing to provide analysis of the nature and extent of the impacts on a listed species).

Accordingly, Plaintiffs are likely to succeed on their NEPA claims.

**D.    Plaintiffs Are Likely To Succeed on Their IGRA and IRA Claims**

**1.    The BIA Defendants Erred in Applying the Restored Lands Exception**

It is undisputed that the Rancheria has not satisfied the two-part determination exception; thus, in applying to have the Secretary take Strawberry Fields into trust for the Rancheria's casino resort project, the Rancheria sought to invoke IGRA's restored lands exception. However, under both the plain language of the statute ("as part of" the restoration, 25 U.S.C. § 2719(b)(1)(B)(iii)) and the applicable regulations, the Rancheria cannot satisfy that exception. Thus, the BIA Defendants' decision to simply waive that requirement in order to approve the Rancheria's application was arbitrary, capricious, and in violation of IGRA's text and purpose.

**a.    The Project Does Not Satisfy the Statutory Requirement, for the Restored Lands Exception, that the Acquisition Be Made "As Part Of" the Tribe's Restoration**

It would be directly contrary to the text, purpose, and intent of IGRA, as well as the implementing regulations, to allow a restored tribe like the Rancheria to fully realize the benefits

35

of IGRA gaming on restored lands, later identify a more lucrative gaming site—continuing, in the meantime, to realize all of the restoration benefits from IGRA gaming—and then *decades after its date of restoration* (the Rancheria is now 38 years out from its restoration), have the Secretary take the new site into trust for gaming. The plain text of the statute requires that to be eligible for the restored-lands exception, the lands must be taken into trust for gaming "*as part of*" the tribe's restoration. 25 U.S.C. § 2719(b)(1)(B)(iii) (emphasis added). Thus, the trust acquisition for gaming plainly must be temporally connected to the restoration. The Secretary's implementing regulations in Part 292 recognize this Congressional intent by identifying only two ways in which a land acquisition, and related gaming, can be "part of" a tribe's restoration— either the trust land acquisition must establish the tribe's first trust lands or the trust land acquisition must be close-in-time (within 25 years of restoration) *and* the tribe must be "not gaming on other lands." *See* 73 Fed. Reg. 29354, 29364 (2008) ("[R]emoving the temporal requirement would so broaden the benefit to restored tribes that it would be detrimental to other recognized tribes, contrary to Congressional intent.").

Indeed, the "restored lands" exception is designed to give restored tribes a jump-start to quickly realize the benefits of IGRA gaming as part of their restoration process after suffering termination. Accordingly, a restored tribe faces no time constraint whatsoever for gaming on land that is part of its first request for newly acquired lands since restoration. A landless, previously "terminated tribe," should be given every opportunity to realize the economic benefits of IGRA for its restoration whenever it is able to first restore its land base. *See City of Roseville v. Norton*, 348 F.3d 1020, 1030 (D.C. Cir. 2003). After a restored tribe has lands taken into trust for gaming and commences gaming on those lands, however, it can no longer have lands taken into trust for gaming "as part of" its restoration; a subsequent acquisition would be an expansion of gaming activities, not a jump-start for restoration of the tribe as Congress intended.

Congress's clear intent was that a restored tribe seeking trust lands for another gaming operation must be subject to the more demanding—and, critically, the more politically accountable—two-part determination exception. Under that exception, a restored tribe cannot

proceed with additional gaming unless and until the Secretary, after consulting with state, local, and tribal governments, decides that a new gaming establishment will not be detrimental to the surrounding community, and obtains the Governor's concurrence in that determination. The Department has long recognized—through its regulations, in the 2010 opinion letter, and even in the Decision here—the importance of so constraining future gaming opportunities to proceed with gaming on a second, third, or any future trust land acquisition after restoration. Those situations require the invocation of the two-part determination exception because the tribe is already benefiting from gaming *as part of* its restoration *at the time of any such application*. *See* 25 C.F.R. § 292.12(c)(2).

> **b.** **The BIA Defendants Properly Found that the Evidence Could Not Support the Required Finding of a Temporal Connection, but Then Erred in Waiving That Requirement**

While the BIA Defendants properly found that the evidence could not support the required finding of a temporal connection, their novel employment of 25 C.F.R. § 1.2 to "waive" that requirement was arbitrary and capricious and is not permitted by law.

Under the temporal connection requirement, the Rancheria must show that either (1) Strawberry Fields is part of the tribe's first request for newly acquired lands after its restoration, or (2) the tribe "submitted an application to take [Strawberry Fields] into trust within 25 years after the tribe was restored to Federal recognition and the tribe is not gaming on other lands." *Id.* § 292.12(c). It is undisputed that the Rancheria cannot meet the first test. As such, it sought to meet the second; it cannot, however, meet the "is not gaming on other lands" requirement.

In the Decision, the BIA Defendants reiterated that the "is not gaming on other lands" requirement operates at the time of the Rancheria's trust *application,* not some undefined future time frame. Decision at 9. Nevertheless, to circumvent that requirement, they invoked an obscure regulation, providing that "the Secretary retains the power to waive or make exceptions to his regulations . . . in all cases *where permitted by law* and the Secretary finds that such waiver or exception is in the best interest of the Indians." 25 C.F.R. § 1.2 (emphasis added).

The BIA Defendants' novel employment of 25 C.F.R. § 1.2 here jettisons Congress's

clear intent to strictly limit the opportunity for restored tribes to engage in gaming on new lands "as part of" their restoration without the accountability to affected tribal, state, and local governments required by the two-part determination. The Rancheria has realized, and continues to realize, the benefits of IGRA gaming by operating a highly lucrative casino resort that it opened *as part of* its restoration over 20 years ago. By invoking the waiver, the BIA Defendants have directly allowed what IGRA prohibits: the Rancheria's development of a new, expanded, more lucrative gaming facility, without addressing, in consultation with affected local tribes, local governments, and the State of California, whether the contemplated casino resort could be "detrimental to the surrounding community." Moreover, the BIA Defendants' one-off waiver of the temporal connection requirement violates 25 U.S.C. § 5123(f), which prohibits federal agencies from making any decision "with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes." Under the Decision, the Rancheria may engage in Class III gaming on lands acquired 40 years after its restoration, without regard to the two-part determination; no other federally recognized tribe may do so.

Thus, the Decision to invoke the waiver violates IGRA and Section 476(f), and was arbitrary, capricious, and not "permitted by law."

### c.    The BIA Defendants Erred in Finding that the Rancheria Satisfied the "Significant Historical Connection" Requirement

The record is devoid of evidence to support the BIA Defendants' conclusion that the Rancheria has a "significant historical connection" to Strawberry Fields. Instead, as fully set forth above and in Theodoratus & McBride 2019, the significant historical connection to Strawberry Fields belongs to the Wintu and, to a lesser extent, the Nomlaki; in contrast, "the Rancheria's 'historical' connection to any land is a relatively modern one, and it is restricted to the original 30-acre parcel upon which a variety of individuals from diverse indigenous backgrounds took up residence with encouragement from federal officials in the mid-1930s." Theodoratus & McBride 2019 at 2. The Rancheria did not exist until federal agents created it in

1922 on its original 30-acre parcel, and there is no evidence whatsoever that the Rancheria ever used or occupied the Strawberry Fields parcel. Thus, the record is insufficient to establish a "significant historical connection" as required under the restored lands exception. *See Conf. Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 566 (D.C. Cir. 2016); *Butte Cty. v. Chaudhuri,* 887 F.3d 501, 508 (D.C. Cir. 2018). On this ground as well, the Decision was arbitrary, capricious, and not in violation of law.

### 2. The BIA Defendants Violated the IRA by Failing to Determine a "Need" for the Acquisition for Gaming

The IRA regulations required the Secretary to consider "[t]he need of . . . the tribe for additional land." Decision at 11. The BIA Defendants decided that acquiring Strawberry Fields for the Rancheria's casino gaming plans was needed to satisfy the Rancheria's "economic" need. *See id.* There is no support in the record for this conclusion.

In fact, the record establishes that as of 2017, the Rancheria generated at least $15 million in tribal government revenues and at least $22 million in per capita distributions for tribal members from its existing Win-River Casino (such revenues and distributions are consistent with GMA's updated analysis in October 2024). *See* FEIS Vol. I, Cmt. Ltr. T6 Ex. A, at 1-3, 26-29; Smith Dec. Ex. N at 3-4. Given these lucrative earnings and the Rancheria's publicly announced allocations of proportions of gaming revenues to its 182 adult and 156 minor members, the Rancheria likely provided each of its tribal members with approximately $67,000 per year. FEIS Vol. I, Cmt. Ltr. T6 Ex. A, at 3; Smith Dec. Ex. Nat 3. When income per household is considered, average annual household income solely from tribal gaming revenue distributions in a two-member household would have been approximately $114,267, "which is 15% greater than the Shasta County average." Smith Dec. Ex. N at 3. Thus, "households made up of Tribal Members of the Redding Rancheria achieve average household incomes that are above the average annual household incomes for the area." *Id.* at 3-4.

In short, there is simply no basis for the BIA Defendants' finding that the Rancheria needs this trust acquisition for gaming to support the Rancheria's "economic" needs. The Plaintiffs are likely to succeed on the merits of their IRA claims.

II.    **U**NDERLINE **P**LAINTIFFS **W**OULD **B**E **I**RREPARABLY **H**ARMED **A**BSENT AN **A**DMINISTRATIVE **S**TAY

The BIA's decision to take Strawberry Fields into trust would put an expansive casino and resort complex—over 1.1 million square feet of facilities and acres of paved parking lots that would alter 57 acres of grassland habitat—on top of and around multiple historic properties of incalculable value to the Tribes, and in the middle of what is currently a quiet rural residential area along the banks of the Sacramento River. Absent the stay that Plaintiffs seek, they would be irreparably harmed in multiple ways before final resolution.

A.    **Project Construction Would Irreparably Harm Wintu/Nomlaki Historic Properties**

As discussed above, despite substantial evidence in their possession indicating the existence, throughout Strawberry Fields and offsite areas where Project work will be conducted, of Wintu and Nomlaki historic properties related to the Six Wintu Villages and Fremont Massacre, the BIA Defendants conducted a woefully inadequate investigation of the historic properties in either area. This virtually guarantees that historic properties and related cultural resources will be harmed, if not destroyed, during the extensive grading, trenching, and other groundwork that will occur there. Daniels Dec. ¶¶ 27-30; Theodoratus & McBride Dec. ¶¶ 39-47. This squarely meets the definition of irreparable harm, *see Quechan,* 755 F. Supp. 2d at 1120 (damage to integrity of historic sites "easily" meets the irreparable harm requirement); *Hualapai*, 2024 WL 4678059, at *20.

Furthermore, with regards to the Wintu village CA-SHA-266, while a portion of this site has been investigated, large portions have not been, *see* Smith Dec. Ex. I at 16-20, Ex. K at 38 Fig. 16, and so face the same fate as other historic properties on Strawberry Fields and the relevant offsite areas. Moreover, while the Project calls for certain monitoring to be done so as to mitigate harms, *see* FEIS Vol. II at 5-8 to -10, not only must the properties have been properly investigated for such measures to be successful (and they have not), the Rancheria has demonstrated through its actions in July 2024 that it cannot be trusted to implement any such mitigation measures, *see* Giles Dec. ¶¶ 11-15 & Ex. A; Gross Dec. ¶¶ 2-5.

More broadly, Strawberry Fields is one of the last intact parcels of Wintu village

locations in northern California and features distant views of Mt. Lassen and Mt. Shasta, as well as views of the Sacramento River – key landscape features within the larger Wintu Cultural Landscape. Daniels Dec. ¶ 20; Rickard Dec. ¶¶ 32-35. When taken collectively, the material culture, landscape components, and documentary research demonstrate that Strawberry Fields, transected by the Six Wintu Villages, contains a significant concentration, linkage, and continuity of sites for the Wintu and Nomlaki, united historically and aesthetically by physical development—factors that make Strawberry Fields likely eligible for listing on the National Register as a Wintu/Nomlaki district, traditional cultural property, and/or cultural landscape. Daniels Dec. ¶¶ 16-26.

Construction of the Project will destroy the "integrity" of Strawberry Fields that is essential for this eligibility: its location, setting, feeling, and association with the Six Wintu Villages and the Fremont Massacre, *see* 36 C.F.R. § 800.5(a)(1); Daniels Dec. ¶ 28. It will similarly undermine the integrity of the Site within NAHC's Sacred Lands Files. The viewscape, alone, will be transformed, with a soaring hotel tower, casino, parking garages, and other facilities, from what is currently an undisturbed intact landscape, existing very much as it did when occupied by the ancestors of the Wintu and Nomlaki when they experienced the historic disruption of their lifeways by the Fremont Massacre and ensuing genocidal campaign. *See* Rickard Dec. ¶¶ 32-36; Daniels Dec. ¶¶ 27-30.

On these bases, absent the stay, the Tribes, therefore, face irreparable harm. *See Quechan,* 755 F. Supp. 2d at 1120; *Hualapai*, 2024 WL 4678059, at *20.

**B.    Project Construction Would Irreparably Harm Plaintiffs' Quality of Life**
　　　**1.    Project Construction Would Permanently Alter the Natural Character of Strawberry Fields, Harming SUS and Its Members**

Permanent alternation of natural settings, such as Strawberry Fields, and the inherent deprivation of interested parties' aesthetic, educational, spiritual, and recreational uses therein, constitute irreparable harm. *See Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, . . . is . . . irreparable."); *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011) (harm from a project to environmental group's

members' ability to "view, experience, and utilize" an area in undisturbed state is irreparable).

As development in and around the City of Redding has increased in recent decades, Strawberry Fields is an undeveloped sanctuary for wildlife and human observers, providing striking views of the Sacramento River, in the foreground, and the coastal mountains and Klamath Mountain Range to the west and northwest, for onlookers traveling along I-5. FEIS Vol. II at 3.5-11, 4.13-2 to -5. For local residents and boaters on the Sacramento River looking from the west, Strawberry Fields offers a uniquely undisturbed stretch of wooded shoreline. *Id.* at 4.13-9 to -11. The multi-year Project construction will dramatically alter the landscape of Strawberry Fields, and the construction process and resulting buildings, including the hotel that will be one of the tallest buildings in the region at 9 stories tall, will significantly diminish the aesthetic quality of Strawberry Fields from all angles. *Id.* at 2-11 to -16.

SUS members value Strawberry Fields for the wildlife habitat it offers—a sanctuary amidst vanishing open space in the area—and for the aesthetic beauty it provides as one of the last remaining examples of a large, intact natural habitat along the Sacramento River corridor within the Redding, California area. Giles Dec., ¶¶ 3-5. The bucolic property will be immediately and irreparably altered by Project construction, which will irreparably harm SUS and its members' ability to enjoy the area. *Id.* at ¶¶ 4-8.

### 2. Project Construction Would Irreparably Harm the Local Community Including SUS Members

According to the FEIS, during construction there will be approximately 605 trips each day, made by light and heavy trucks and heavy equipment, coming in and out of Strawberry Fields, FEIS Vol. II at 4.8-10, all of which will use narrow two-lane Bechelli Ln., *see id.*, 2-16 to -17; FEIS Vol. I at 4-103 to -104. Bechelli Ln. serves as the only ingress/egress for the residents on Sunnyhill Lane, including Stand Up Shasta members. Giles Dec., ¶¶ 5, 9-10. The constant noise, dust, and traffic that will be generated by this and other elements of the long-term construction of the Project will irreparably harm members of SUS and other neighboring residents and justify staying the BIA Defendants' decision. *Accord San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.,* 657 F. Supp. 2d 1233, 1242 (D. Colo. 2009); *Fallon*

*Paiute-Shoshone Tribe v. United States DOI,* No. 3:21-cv-00512-RCJ-WGC, 2022 U.S. Dist. LEXIS 7465, at *1 (D. Nev. Jan. 14, 2022).

Indeed, as discussed above*,* the FEIS acknowledges that construction noise, if left unmitigated, will have a significant adverse effect on sensitive receptors in the vicinity of the Project, but relies on the implementation of BMPs to conclude that the impact will be reduced to a less significant level. FEIS Vol. II at 2-27 to -28, 4.11-3. However, whether those BMPs are employed by the Rancheria is left to its discretion. *Id*. at 2-27-28. And the Rancheria's recent disregard of *mandatory* BMPs calls very much into doubt whether it will implement these nonmandatory BMPs. *See* Giles Dec., ¶¶ 11-15; Gross Dec., ¶¶ 2-5, 7. Furthermore, even if the Rancheria did implement these BMPs, nothing in the FEIS indicates that they will be effective. FEIS Vol. II at 4.11-3; 2-27-28. The construction-borne harm that SUS members and area residents fear is imminent and very real and has, in fact, already commenced in part.

### 3.    Plaintiffs Have Suffered Procedural Injuries that Will Be Rendered Irreparable If the Project Is Allowed to Proceed

In addition to the substantive harms Plaintiffs would experience if Project construction is permitted to proceed, Plaintiffs would also be irreparably injured by the BIA Defendants' violations of the NHPA, ESA, MSA, and NEPA, which further weighs in favor of the requested stay. *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009) (internal citations omitted) ("When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury"); *Quechan*, 755 F. Supp. 2d at 1120 (holding that "if the tribe hasn't been adequately consulted [as required under the NHPA] and the project goes ahead anyway, this legally-protected procedural interest would effectively be lost," constituting irreparable harm).

## III.    A STAY WOULD NOT INJURE INTERESTED PARTIES OR THE PUBLIC INTEREST

Defendants' interests, which are the same as the public's interest, would not be harmed by the stay. *See Pursuing America's Greatness,* 831 F.3d at 511. Concerning Plaintiffs' claims under NHPA, NEPA, and the ESA, the interest of Defendants and the public is ensuring informed decision-making on federal actions with the potential to affect historic properties, the

human environment, listed species, and their critical habitat. Those interests would be well served by the stay. Specific to the ESA claims at issue here, Congress made clear that when considering the balance of hardships, the "balance has been struck in favor of affording endangered species the highest of priorities." *Conservation Law Found. v. Ross,* 422 F. Supp. 3d 12, 34 (D.D.C. 2019). Moreover, if the stay were denied and Project construction progresses, there is a serious risk of these claims being mooted, denying Plaintiffs the opportunity to seek relief. *See Finca Santa Elena, Inc. v. U.S. Army Corps of Engineers,* 62 F. Supp. 3d 1, 5 (D.D.C. 2014) (collecting cases where environmental challenges were mooted upon completion of construction); *see also Weiss v. Sec'y of Dep't of Int.,* 459 Fed. App'x 497, 500-501 (6th Cir. 2012) (holding NEPA and NHPA claims moot because construction had been completed).

It may be contended that the Rancheria would be harmed by the delay in construction activities, but even if a delay constitutes harm, it is not of a magnitude sufficient to tip the scales away from granting the stay. *See Anglers of the AU Sable v. U.S. Forest Serv.,* 402 F. Supp. 2d 826, 839 (E.D. Mich. 2005) ("any increased costs from delay . . . is not sufficient to establish prejudice because NEPA contemplates just such delay"). More significantly, the BIA's interest in supporting tribal self-sufficiency and economic/social well-being, and the Rancheria's aligned self-interest, are not injured because the Rancheria currently operates an economically successful casino which provides its members with significant per capita distributions. *See* Smith Dec. Ex. N at 3. The interests of the Defendants and the public would not be harmed by the issuance of the stay, rather the goals of the relevant statutes would be promoted. This, and the lack of any harm to another interested party, further supports the issuance of a stay of the BIA's action.

### A.    No Bond Should Be Required

Finally, no bond or security should be required before imposing an administrative stay under 5 U.S.C. § 705, because the Defendants will not suffer any monetary costs or damages if the Court stays their action of taking Strawberry Fields into trust. *See, e.g.*, *Florida v. Mayorkas*, 672 F. Supp. 3d 1206, 1215 n.8 (N.D. Fla. 2023); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 478 (E.D. Wis. 2021) (non-beneficiaries of loan-forgiveness program were not required to post bond

44

in connection with injunction prohibiting USDA from implementing program that would benefit non-parties); *see also Fed. Prescr. Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (noting that the court has the power "to dispense with any security requirement whatsoever where the restraint will do the defendant no material damage [or] where there has been no proof of likelihood of harm" (cleaned up)).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for administrative stay.


Dated: February 4, 2025                    By: */s/ Kaighn Smith, Jr.*_____
                                           KAIGHN SMITH, JR., ESQ.
                                           D.D.C. Bar No. MI0027
                                           **DRUMMOND WOODSUM**
                                           84 Marginal Way, Suite 600
                                           Portland, Maine 04101-2480
                                           (207)772-1941
                                           ksmith@dwmlaw.com

                                           *Counsel for Plaintiffs, Wintu Tribe of*
                                           *Northern California, Paskenta Band of*
                                           *Nomlaki Indians, and Speak Up Shasta*
                                           *Association*




Dated: February 4, 2025                    By: */s/ Stuart G. Gross*_____
                                           STUART G. GROSS
                                           D.D.C. Bar No. CA00210
                                           **GROSS KLEIN PC**
                                           305 Broadway, Suite 777
                                           New York, NY 10007
                                           (212) 658-1219
                                           sgross@grosskleinlaw.com

                                           *Counsel for Plaintiffs, Wintu Tribe of*
                                           *Northern California, Paskenta Band of*
                                           *Nomlaki Indians, and Speak Up Shasta*
                                           *Association*